**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
NEWARK DIVISION**

| | |
|---|---|
| FLINT GROUP NORTH AMERICA CORP., <br><br>             Plaintiff, <br><br> v. <br><br> FOX INDUSTRIES INC., <br><br>             Defendant. | Civil Action No. _____ <br><br><br> **COMPLAINT AND** <br> <u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff, Flint Group North America Corporation, individually and as equitable subrogee of Sonoco Products Co., sues Defendant, Fox Industries Inc., and alleges as follows:

<u>**INTRODUCTION**</u>

Flint Group North America Corporation ("FGNA") is a manufacturer of commercial inks—including the Arrowbond™ ink system ("Arrowbond ink")—used in high-quality printing on flexible plastic packaging.  FGNA sells its inks to commercial printing companies, like Sonoco Products Co. ("Sonoco"), which uses Arrowbond ink to print the packaging for household and consumer goods, such as Oreo™ and Chips Ahoy™ cookies.

Central to the Arrowbond ink manufacturing process is a product commonly known as "shot."  The shot is grinding media similar in shape and size to ball bearings.  The shot is not an ingredient in the Arrowbond ink, but rather one piece of equipment used to manufacture it.  During the milling process, the ink's primary components (solvents, resins, and pigments) pass through a basket containing thousands of shot.  The shot acts as pestle and mortar, crushing and grinding these components as they make their way through the manufacturing process.

Since at least 2008, FGNA had purchased from Fox one type of shot made out of zirconium silicate (the "Zirconium Shot"). For more than four years, FGNA routinely ordered the Zirconium Shot from Fox to manufacture Arrowbond ink, and FGNA never changed that order. In June 2012, however, Fox unilaterally changed the shot it regularly had been supplying to FGNA, without asking or telling FGNA. Even the invoices and product labeling that Fox sent FGNA gave no indication that any change to the shot had occurred.

This replacement shot, which consisted primarily of alumina (or aluminum oxide) (the "Alumina Shot")—the abrasive component of sandpaper—was defective and performed disastrously during FGNA's manufacturing process: it wore into microscopic pieces, damaging the Arrowbond ink and turning it into an abrasive liquid sandpaper. The ink then wreaked havoc on Sonoco's printing equipment, destroying its printing-press cylinders, ruining its printing processes, and impairing Sonoco's ability to supply customers and jeopardizing its relationships with those customers. As a result, Sonoco suffered more than $10 million dollars in damages.

It was not until late July 2014—more than two years after Fox's unilateral change and FGNA had made numerous inquiries of Fox about the shot—that Fox disclosed to FGNA that it began supplying FGNA with the Alumina Shot in June 2012. With Sonoco's printing-press cylinders disintegrating because of FGNA's damaged inks, FGNA was forced to settle Sonoco's cylinder replacement costs and related damages with a $6.3 million payment in November 2014.

FGNA also incurred significant other losses. Because of the Alumina Shot, FGNA was unable to sell hundreds of thousands of pounds of its products. FGNA suffered significant lost revenue from Sonoco and investigative and other expenses because of the damage the Alumina Shot caused. All told, FGNA incurred more than $9 million in damages due to Fox's actions. Trebled, FGNA seeks to recover in excess of $27 million from Fox in this lawsuit.

## PARTIES, JURISDICTION, AND VENUE

1.     This is a civil action for negligent misrepresentation, violations of the New Jersey Products Liability and Consumer Fraud Acts, fraudulent misrepresentation, breach of contract, breaches of warranty, and indemnity.

2.     FGNA is a corporation organized and existing under the laws of Michigan, with its principal place of business at 14909 N. Beck Road, Plymouth, MI 48170.

3.     Fox is a corporation organized and existing under the laws of New Jersey, with its principal place of business located at 22 Commerce Road, Fairfield, NJ 07004.

4.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332, because the parties are domiciliaries of different states and the amount in controversy exceeds $75,000, exclusive of attorneys' fees, interest, and costs.

5.     This Court has personal jurisdiction over Fox because it is a New Jersey corporation, citizen, and resident; Fox breached the contracts at issue in New Jersey; Fox made the misrepresentations at issue in New Jersey; and Fox delivered and manufactured and/or distributed the defective product at issue in this case in New Jersey.

6.     Venue is proper under 28 U.S.C. § 1391(b) because Fox is a resident of this district and a substantial part of the events giving rise to FGNA's claims occurred in this district.

7.     All conditions precedent to this lawsuit have been performed, excused, or waived.

## GENERAL ALLEGATIONS

### The Use of Shot in the Manufacture of Gravure Printing Inks

8.     FGNA is a manufacturer of commercial ink and ink-related products.  Among other things, FGNA manufactures Arrowbond ink, which FGNA's customers use on a gravure press for high-quality printing on flexible plastic packaging.

9.      Gravure printing involves engraving the print image onto a massive cylinder, which usually is constructed of a steel core, a copper underlayment, and a chrome coating.  Inks, such as Arrowbond ink, are passed between the cylinder and a flexible plastic film to print the image engraved on the cylinder onto the film, with a large "doctor blade" tracking the cylinder during printing to remove excess ink.  Gravure printing is used to produce high-quality packaging for countless recognizable household and consumer goods.

10.     Gravure ink is manufactured through a three-step process.  First, in the pre-mix step, solvents and resins are mixed with dry pigments.  Second, in the milling step, the pigments are ground into homogenous particles smaller than five microns (a micron is one thousandth of a millimeter) in diameter.  Third, in the "let down" step, the ink is finished with additional solvents, which ensure that the ink carries the requisite coloristic and viscosity properties.

11.     Shot is a critical piece of equipment in the manufacture of pigmented gravure ink. Shot is not an ingredient, and it is not intended to be included in the finished ink product.  FGNA never has manufactured shot, and it never has purchased shot for resale or distribution.

12.     In the milling step, the mix of solvents, resins, and dry pigments passes through a basket containing thousands of pieces of shot.  Through countless collisions between the shot and the pigment, the shot acts as mortar and pestle to crush the pigments as they pass through the shot, until the pigment particles reach a generally homogenous shape and are approximately five microns or smaller in diameter; otherwise, the ink will not meet the desired coloristic properties.

13.     Shot is sold in various sizes and is made using different materials, including, for example, steel, glass, zirconium silicate, and yttrium-stabilized zirconium oxide.  The type of material used to make the shot dictates its properties, such as density and hardness.  In turn, these properties indicate how the shot will perform during the intended manufacturing process.

14.　　Over time and use in milling, shot will decay.

15.　　For example, shot can fracture into large, hard particles. To eliminate the damages that these particles might cause, the gravure ink manufacturing process involves multiple levels of filtration, including the use of a basket strainer and a filter. In manufacturing Arrowbond ink, FGNA used a basket strainer, screens, and multiple filters that were consistent with industry standard. Sonoco also filtered the Arrowbond ink with a "sock filter" before use.

16.　　If the shot is defective—and it decays into pieces that are small enough to pass through industry-standard filters but hard enough (because of their material composition) to make the ink abrasive, for example—filtration will not be effective. Abrasive ink can result in serious problems, including damage to the ink, gravure cylinders, and printing presses.

**FGNA Uses Fox's Zirconium Shot to Manufacture Arrowbond Ink**

17.　　In 2007, FGNA's Lebanon, Ohio facility (the "Lebanon Facility")—consulted the facilities of its affiliates in Clermont, France, and Cinisello, Italy, regarding their manufacture of gravure inks. At the time, these facilities used yttrium-stabilized zirconium oxide ("YTZ") shot and recommended that FGNA do the same at the Lebanon Facility.

18.　　FGNA's Lebanon Facility also consulted with Fox, which purported to be an international researcher, manufacturer, and supplier of shot. Fox recommended that FGNA instead use Fox's Zirconium Shot to manufacture Arrowbond ink, which Fox marketed and sold to many customers other than FGNA and which was not specially made for FGNA. According to Fox, the Zirconium Shot would perform as well as the YTZ shot but would be less expensive.

19.　　Over the next several months, FGNA conducted extensive testing, including trial and production manufacturing runs using the Zirconium Shot, other types of shot, and various

sizes of shot, at the Lebanon Facility.  The results of FGNA's testing appeared to confirm Fox's recommendation that it use the Zirconium Shot to manufacture the Arrowbond ink.

20.    In early 2008, FGNA began using Fox's Zirconium Shot to manufacture Arrowbond ink at its Lebanon Facility.  For more than four years, between 2008 and 2012, FGNA successfully used Fox's Zirconium Shot to manufacture Arrowbond ink.

<b>Fox Unilaterally Replaces the Zirconium Shot,<br>
Damaging the Arrowbond Ink and Destroying Sonoco's Printing-Press Cylinders</b>

21.    One of FGNA's largest customers is Sonoco, an international provider of diversified packaging, packaging supply chain services, and composite cans, tubes, and cores.

22.    Since at least 2007, Sonoco has purchased Arrowbond ink from FGNA, which Sonoco uses to print on flexible plastic packaging using its gravure presses, including the packaging for Oreo and Chips Ahoy cookies using the Snack 'N Seal™ innovation.

23.    For more than four years, from 2008 through 2012, FGNA successfully used Fox's Zirconium Shot to produce Arrowbond ink, which FGNA in turn sold to Sonoco.

24.    Then, in spring 2013, Sonoco reported to FGNA that it was experiencing unusual and atypical difficulties using the Arrowbond ink.

25.    These difficulties appeared at the time to be "drying in," a phenomenon that is caused by ink prematurely drying on the gravure cylinder, preventing or at least diminishing the transfer of ink to the plastic film.  Although drying in commonly occurs in gravure printing, what Sonoco believed in spring 2013 to be drying in was occurring with uncommon frequency, and as soon as anywhere between the first 15,000 to 1 million feet of print jobs.

26.    As a result, it became nearly impossible for Sonoco to complete satisfactory print jobs in a manner consistent with its ordinary printing processes.  Sonoco was unable to complete jobs in one printing run and was forced to redo large print jobs numerous times.  If Sonoco did

not do so, it observed that not only would the ink fail to create the desired print image, but sometimes a wavy line of "chatter" also would develop in the image. These difficulties seriously disrupted Sonoco's printing processes, which caused Sonoco's waste to increase and made it difficult for Sonoco to deliver orders to customers on time.

27.    Sonoco reported these issues to FGNA, and both Sonoco and FGNA attempted to develop a solution, to no avail. In November 2013, FGNA compensated Sonoco $201,000 because of these difficulties, in addition to $392,000 in other related claims FGNA paid.

28.    The next month, in December 2013, however, Sonoco's difficulties took a turn for the worse. What had begun as an apparent drying-in problem very clearly was an issue of damage to and excessive wear on Sonoco's printing-press cylinders. The drying in and chatter that Sonoco had observed were symptoms of this excessive cylinder damage and wear.

29.    Over the following eight months, FGNA and Sonoco undertook an extensive investigation to determine the cause of this excessive cylinder damage and wear.

30.    As part of this investigation, Sonoco, FGNA, and others reviewed magnified analyses of Sonoco's affected printing-press cylinders. This review revealed that as Sonoco printed with Arrowbond ink, its cylinders were worn excessively in a virtually uniform way, and appeared to be ground down, much like sandpaper is used to remove paint from wood. This wear precipitated an increase in the width of the cylinder cell walls (which are thinner on top and wider on the bottom, creating an inverted trapezoidal well between them). In turn, this caused what Sonoco previously perceived to be drying in and a wavy chatter pattern.

31.    This wear also explained Sonoco's observation that its cylinders were lasting only between 15,000 and 1 million feet of packaging before the copper underlayment became exposed, and the cylinder was rendered unusable and needed to be resurfaced. In the past,

Sonoco routinely had been able to print many millions of feet of packaging using Arrowbond ink before needing to resurface its cylinders.

32.    The following is a comparison prepared by Sonoco during the investigation.  It shows one of Sonoco's cylinders that was used to print approximately 500,000 feet of packaging with Arrowbond ink (left) and another cylinder that Sonoco used to print about 2.1 million feet of packaging with ink supplied by a competitor of FGNA (right):



33.    The left image reflects a badly damaged cylinder: after only about 500,000 feet of printing, the cell walls have been ground down to the extent that the copper underlayment is exposed.  By contrast, the right image shows a typical cylinder after 2.1 million feet of printing.

34.    The deterioration caused to Sonoco's printing-press cylinders by the damaged Arrowbond ink resulted in serious adverse financial and other consequences to Sonoco.

35.    In addition to Sonoco's increased costs of having to resurface thousands of its cylinders more often, the damage to Sonoco's cylinders caused Sonoco's costs for waste, labor downtime, outbound freight, cylinder freight, blocked and one-off jobs, and other incremental

overhead to increase dramatically (collectively, the "Sonoco Damages"). Sonoco initially quantified the Sonoco Damages at about $700,000 per month.

36.     Even more significant, Sonoco's excessive cylinder damage and wear was disrupting its ability to make timely deliveries to its customers, who in turn were under pressure to bring their products to market through distributors and resellers domestically and around the world, such as Wal-Mart. This put a significant strain on Sonoco's relationship with those customers, and they demanded that Sonoco take all possible measures to deliver timely.

37.     Over time, the operational impact of this excessive cylinder damage and wear became so acute that Sonoco began using alternative suppliers of Arrowbond inks. Otherwise, Sonoco simply would have been unable to supply its customers on time, particularly with respect to the packaging for critical, time-sensitive jobs, such as the Halloween-edition Oreo cookies.

38.     To determine the source of Sonoco's sudden and unprecedented problems, FGNA reviewed every aspect of the processes it used to manufacture Arrowbond ink to determine whether any changes had taken place since at least 2011. FGNA identified no such changes.

39.     FGNA also contacted every one of the suppliers of products FGNA used to manufacture Arrowbond ink to determine whether any changes in such products had taken place. As part of this effort, FGNA contacted Fox, informing it about the excessive damages incurred by Sonoco, the critical nature of the situation, and the possibility that the shot might be the cause. FGNA also requested the shot's certificates of analysis (the "CoAs"), which would identify the materials that make up the shot. Based on FGNA's inquiries, Fox knew or should have known of the importance of timely providing FGNA accurate information about the shot. For months, however, Fox delayed providing the CoAs to FGNA, and Fox did not disclose that the Lebanon

Facility no longer was using the Zirconium Shot.  As a result, FGNA identified no changes in the products that it used to make Arrowbond ink.

40.    Similarly, Sonoco's investigation included an analysis of every potential cause of the excessive damage and wear Sonoco observed, including an analysis of its doctor blades and the cylinders themselves.  This effort ruled out every potential cause other than the ink.  Between these and FGNA's findings, however, Sonoco and FGNA had hit a dead-end: despite their efforts, Sonoco and FGNA had failed to uncover the cause of the excess cylinder wear.

41.    In late July 2014 (and on at least three subsequent occasions in writing through August 2014), however, Fox made a shocking admission to FGNA: since June 2012, Fox had not provided FGNA with the Zirconium Shot that FGNA had contracted to purchase.  Instead, Fox surreptitiously supplied FGNA with the Alumina Shot (collectively, the "Admissions").  Fox made these Admissions years belatedly, months after FGNA first inquired whether the Zirconium Shot had been replaced with some other type of shot, and only after FGNA confronted Fox with evidence that the Arrowbond ink inexplicably contained aluminum (from the alumina in the Alumina Shot).

42.    Further, in August 2014, Fox finally provided FGNA the CoAs for the shot that Fox had been supplying FGNA since June 2012.  Although Fox describes the Alumina Shot as consisting of zirconium silicate "toughened" with aluminum, the CoAs reflect that it consists primarily of alumina, and only a small portion is zirconium silicate.  Alumina is the abrasive component of sandpaper, and it is less expensive than zirconium silicate.

43.    FGNA never agreed with Fox to receive the Alumina Shot in place of the Zirconium Shot.  Indeed, each of Fox's invoices for Zirconium Shot issued between 2008 and 2014 demonstrate that what FGNA ordered to purchase, and what Fox agreed to supply, was "1.4

– 1.6MM **Zirconium Silicate Beads**."  Further, the labels on the containers in which Fox was to deliver the Zirconium Shot to FGNA during that time period also reflect that what Fox purportedly supplied to FGNA were "Zirconium Silicate Beads." [1]

44.     Prior to late July 2014, Fox never disclosed to FGNA that, in June 2012, it had replaced the Zirconium Shot with the Alumina Shot and supplied the Alumina Shot in place of the Zirconium Shot consistently thereafter, until Fox's deception was caught in late July 2014.

45.     Had Fox disclosed this crucial fact, FGNA never would have purchased the Alumina Shot.  This is because alumina is a much harder substance than chrome, which covers Sonoco's cylinders, and thus could have (and ultimately did) make the Arrowbond ink abrasive. At a minimum, FGNA would have engaged in the same extensive testing—including trial and production manufacturing runs—that it undertook before using the Zirconium Shot.

46.     Because FGNA did not know that Fox had been supplying it the Alumina Shot instead of the Zirconium Shot since June 2012, FGNA had no opportunity to determine whether the Alumina Shot was defective or would cause any danger to FGNA's manufacturing process and the Arrowbond ink, or to take any measures that would have stopped or mitigated the massive damages caused by the Alumina Shot to Sonoco and FGNA.

**The Alumina Shot Also Destroys FGNA's Nitrocellulose Bases**

47.     FGNA also manufactures nitrocellulose bases for use in high-quality gravure printing (the "NC Bases") at the Lebanon Facility.  An NC Base essentially is an unfinished ink

---

[1] Copies of Fox's invoices for the period June 2012 through 2014 (the time material to this case) are attached at Composite Exhibit A and collectively referenced as the "Invoices."  Fox's Invoices corresponded to the purchase orders that FGNA transmitted to Fox to order additional Zirconium Shot (the "Purchase Orders"), and the description of the product Fox sold and shipped to FGNA in the Invoices mirrored the description of the product FGNA requested in its Purchase Orders.  After FGNA selected the Zirconium Shot, the purchase orders and the Invoices were not subject to any negotiations between the parties, apart from limited communications about price.

containing nitrocellulose, which FGNA's customers blend with various solvents after they have taken delivery of the NC Base to convert it into a finished ink.

48.    FGNA uses the same manufacturing equipment as the Arrowbond ink—and shot, in particular—to produce the NC Bases, which it sells to commercial-printing companies. FGNA's relationships with these customers represent millions of dollars in annual revenue. Since at least 2007, FGNA has sold NC Bases to Sonoco, which it used to print grocery bags and surface-printed confectionary packaging, such as wrappers for M&M™ chocolates.

49.    For years, FGNA successfully manufactured NC Bases using the Zirconium Shot.

50.    In 2014, at the same time that Sonoco and FGNA were grappling with the problems the damaged Arrowbond ink were causing, Sonoco began experiencing the same printing difficulties with the NC Bases, including what Sonoco initially perceived to be drying in.  Sonoco's problems with the NC Bases contributed to the Sonoco Damages.

51.    Based upon its recent experience with and ongoing investigation into Arrowbond ink, Sonoco discontinued using the NC Bases.  Sonoco also instructed FGNA that it no longer would receive any NC Bases produced at the Lebanon Facility, dealing a further blow to FGNA, as the Arrowbond ink already had been replaced with a competitor's product.

**Fox's Alumina Shot Causes FGNA to Sustain Millions of Dollars in Damages**

52.    Alumina is not a component of or ingredient in Arrowbond ink or NC Bases, and it is not present in any of the equipment used to manufacture ink at the Lebanon Facility (other than the Alumina Shot, which FGNA unknowingly and unwillingly used).

53.    Based upon Fox's July 2014 bombshell Admissions that it unilaterally replaced the Zirconium Shot in clear violation of the contract between FGNA and Fox and without notice to FGNA, FGNA suspected that the Alumina Shot was the root cause of Sonoco's excessive cylinder damage and wear, and, in turn, its printing difficulties.

54.     FGNA conducted metallurgical analyses of Arrowbond ink it manufactured during the period of June 2012 through July 2014. These analyses revealed heavy concentrations of aluminum—from the alumina in the Alumina Shot—in the samples FGNA tested.

55.     To verify these test results, FGNA conducted lab and production manufacturing trials in which it produced Arrowbond ink using Alumina Shot from Fox, steel shot (which FGNA used before the Zirconium Shot), and YTZ shot.

56.     In every instance, Arrowbond ink manufactured with Fox's Alumina Shot failed industry-standard ink abrasion tests, even when FGNA filtered the ink using a 5-micron gauge filter, which is far more stringent than the industry standard for the manufacture of gravure inks. This finding also was supported by the fact that while all colors of Arrowbond ink and NC Bases made with Alumina Shot resulted in abrasiveness and cylinder wear, Sonoco did not experience the same issues in 2013 and 2014 with the white inks, which are not made with shot.

57.     Based on Fox's Admissions, FGNA immediately discontinued the use of Fox's Alumina Shot and switched to shot made with YTZ, which Fox, in 2007, had convinced FGNA to not use. Unlike the Alumina Shot, the YTZ shot did not cause (and since has never caused) the Arrowbond ink or the NC Bases to become abrasive. This change alleviated the excessive cylinder damage and wear and other printing difficulties that Sonoco experienced.

58.     FGNA ultimately restarted supplying the Arrowbond ink, manufactured using the YTZ shot, to Sonoco in limited quantities for purposes of requalifying the inks for Sonoco. This ink has not caused the excessive cylinder damage and wear Sonoco previously experienced with the damaged Arrowbond ink and NC Bases made with the Alumina Shot. Using this ink, Sonoco has been able to print up to 9.8 million feet of packaging using a single cylinder.

59.    Based upon the results of Sonoco and FGNA's investigation, testing, and observations, the Alumina Shot damaged FGNA's Arrowbond ink and NC Bases and, in turn, damaged Sonoco's printing cylinders, resulting in its printing difficulties.

60.    The Alumina Shot was defective because particles of the Alumina Shot were small enough to pass through FGNA and Sonoco's multiple layers of strainers, screens, and filters yet hard enough to grind down and destroy Sonoco's cylinders, resulting in more than $10 million in Sonoco Damages (and millions of dollars in damages to FGNA).

61.    This defect in the Alumina Shot was the result of a design defect, as the Alumina Shot's risks far outweighed its utility and despite the existence of a feasible and practical alternative design (e.g., shot made with YTZ, or without alumina); the failure of the Alumina Shot to contain adequate warnings or instructions, although Fox knew or should have known of the hazards of using the Alumina Shot; and Fox's deviation from its design specifications, formulae, or performance standards in manufacturing the Alumina Shot.  These deficiencies caused damage to the Arrowbond ink and the NC Bases and, in turn, to Sonoco's printing cylinders, resulting in tens of millions of dollars in damage.

62.    Further, Fox itself confirmed this defect when Fox's president in August 2014 disclosed, for the first time, the risks in using the Alumina Shot:

> . . .  However, the harder, longer lasting beads [i.e., the Alumina Shot] . . . do not break down into an unnoticeable portion of the ink.  These beads are designed tougher and remain intact . . . .

63.    It was this "harder, longer lasting" and "tougher" quality of the Alumina Shot—the result of its high alumina content—that, when the shot wore and pieces made their way into the Arrowbond ink and NC Bases, ground down Sonoco's chrome-plated cylinders and caused them to wear excessively.  Fox intentionally withheld this information from FGNA for more than

two years, despite the fact that it would have directly impacted whether (and if so, how) FGNA could safely use the Alumina Shot to manufacture Arrowbond ink and NC Bases.

64.    The Alumina Shot—which FGNA never agreed to purchase from Fox and which was defective—damaged FGNA's Arrowbond ink and NC Bases, causing FGNA to suffer more than $9 million in total damages (the "FGNA Damages") (and Sonoco's excessive cylinder damage and wear, resulting in more than $10 million in Sonoco Damages).

65.    First, hundreds of thousands of pounds of Arrowbond ink and NC Bases were damaged by the Alumina Shot and rendered waste because these products were contaminated and became abrasive due to the Alumina Shot.  As a result, these Arrowbond inks and these NC Bases are unsaleable.  This alone has caused FGNA to sustain losses in excess of $1.4 million.

66.    The Alumina Shot also caused FGNA's Lebanon Facility downtime during the investigation into Sonoco's excessive cylinder damage and wear and printing difficulties.

67.    The dangers of the downtime that FGNA was forced to suffer due to the Alumina Shot were foreseeable to Fox.  As a Fox employee told FGNA in mid-July 2014 in attempting to explain away the defective shot:

> We understand that if your mills are down for days, weeks or even months, you are out of business.  Mill parts are costly and the lead time to get the parts you need can take forever.  If your mills are down for days, weeks or even months, it can be devastating.

68.    Notably, this Fox employee did not inform FGNA that Fox was supplying FGNA Alumina Shot, not Zirconium Shot, that the Alumina Shot was defective, or that it was the Alumina Shot that was causing Sonoco and FGNA's damages.

69.    The damage the Alumina Shot caused to FGNA's Arrowbond ink and NC Bases also forced FGNA to divert significant personnel time to its investigation into the cause of Sonoco's excessive cylinder damage and wear and printing difficulties, and to make significant

capital expenditures and financial accommodations to Sonoco in connection with the investigation, all at tremendous expense to FGNA.

70.    Additionally, the excessive cylinder damage and wear and printing difficulties that Sonoco experienced ultimately as a result of the Alumina Shot caused Sonoco to lose confidence in FGNA's ability to deliver reliable, high-quality gravure inks.  This caused FGNA to lose revenue from Sonoco, which in turn resulted in at least additional hundreds of thousands of dollars in damage to FGNA.

71.    Finally, Sonoco's damages dwarfed those that FGNA realized from Sonoco.  The damage that Fox's Alumina Shot caused to the Arrowbond ink and the NC Bases resulted in Sonoco incurring more than $10 million in Sonoco Damages.

72.    Although Sonoco's own internal investigation quantified the Sonoco Damages at more than $10 million, Sonoco's total damages were much higher because of the injury to its significant customer relationships and the business opportunities it lost because of the excessive cylinder damage and wear and difficulties it experienced due to the defective Alumina Shot.

73.    During the course of FGNA and Sonoco's eight-month investigation into Sonoco's excessive cylinder damage and wear and printing difficulties, Sonoco made clear that it held legal claims against FGNA for the damages it sustained.

74.    Sonoco's problems with the damaged Arrowbond ink and NC Bases, the nature and extent of the related consequences Sonoco was suffering—including Sonoco's inability to meet customer deliveries on time, and the broader implications these delays would have on the ability of Sonoco's customers to bring their products to market—and FGNA's potential liability and exposure for all of Sonoco's damages, alarmed FGNA tremendously.

75.     FGNA initially resisted paying Sonoco's damages, disputed the amount of Sonoco's damages, and engaged in hard-fought negotiations with Sonoco.  These negotiations were at arms' length and were an attempt to resolve Sonoco's claims against FGNA and avoid litigation over what Sonoco claimed to be many millions of dollars in losses.

76.     However, Sonoco and FGNA's extensive investigations into Sonoco's excessive cylinder damage and wear and printing difficulties revealed that Sonoco's damages were well-founded and the result of the Alumina Shot.

77.     Moreover, in an incredibly competitive market, FGNA derives tremendous goodwill from the high quality of the products it manufactures and the customer service it provides.  FGNA dedicates significant resources to supplying its customers with the highest-quality products and providing the best customer service to ensure that its customers do not experience adverse consequences as a result of its products.  The gravity of Sonoco's complaints, the Sonoco Damages, and the broader implications of Sonoco's inability to deliver its products to customers on time crippled FGNA's ability to provide Sonoco this high quality and very well could have led Sonoco to seek permanent alternative suppliers for the Arrowbond ink.

78.     After months of negotiations, FGNA and Sonoco agreed to a settlement to resolve Sonoco's more than $10 million in Sonoco Damages, under which FGNA made a settlement payment to Sonoco of $6.3 million—which FGNA seeks to recover from Fox in this lawsuit—in exchange for a release of Sonoco's legal claims against FGNA based upon the Alumina Shot.

79.     Of course, liability for Sonoco's damages caused by the Alumina Shot lies exclusively with Fox.  Countless times from June 2012 through July 2014, Fox affirmatively misrepresented to FGNA that it was supplying it with Zirconium Shot, and Fox never disclosed to FGNA that in reality it was providing FGNA defective Alumina Shot, which was cheaper than

the Zirconium Shot.  The evidence—including the fact that only Arrowbond ink manufactured with the Alumina Shot was abrasive—is conclusive that the Alumina Shot damaged the Arrowbond ink and the NC Bases and, in turn, Sonoco's cylinders and its printing processes.  As such, Fox was the sole cause of the Sonoco Damages and the FGNA Damages.

## COUNT I - NEGLIGENT MISREPRESENTATION
### (FGNA, individually, versus Fox)

80.     The allegations in paragraphs 1 through 79 above are incorporated by reference as though fully set forth herein.

81.     Fox had a pecuniary interest in the sale of shot to FGNA.

82.     The Invoices contained misrepresentations that Fox supplied FGNA with Zirconium Shot, when in truth Fox supplied FGNA with Alumina Shot.

83.     The labeling on the packages of shot that Fox supplied FGNA beginning in June 2012 contained misrepresentations that such packages contained Zirconium Shot, when in truth the packages contained Alumina Shot.

84.     The misrepresentations on the Invoices and package labeling that the product provided to FGNA was Zirconium Shot were negligently made because Fox failed to exercise reasonable care to ensure that the Invoices and package labeling accurately informed FGNA that the shot delivered to it in truth was Alumina Shot, not Zirconium Shot.

85.     FGNA justifiably relied on the misrepresentations in the Invoices and the package labeling that the shot delivered was Zirconium Shot, and used the shot as if it were such.

86.     FGNA's justifiable reliance on Fox's misrepresentations directly and proximately caused and continues to cause FGNA damages.

WHEREFORE, FGNA demands judgment against Fox for damages, together with pre- and post-judgment interest, and such other and further relief the Court deems just and proper.

## COUNT II - PRODUCT LIABILITY ACT (N.J. STAT. ANN. §§ 2A:58C-1, *ET SEQ.*)
### (FGNA, individually, versus Fox)

87.     The allegations in paragraphs 1 through 79 above are incorporated by reference as though fully set forth herein.

88.     This is a product liability action by FGNA, individually, against Fox under New Jersey Statutes Annotated §§ 2A:58C-1 *et seq.*

89.     The Alumina Shot was defective, as it was not reasonably fit, suitable, or safe for its intended purpose because:

(a)     The Alumina Shot was designed in a defective manner because its risks far outweighed its utility, and at all times material a technically feasible and practical alternative design that would have reduced or prevented FGNA's harm was available (e.g., shot made with YTZ, or without alumina);

(b)     The Alumina Shot failed to contain adequate warnings or instructions, and Fox failed ever to warn or instruct FGNA, even though Fox knew or should have known of the hazards of using the Alumina Shot, including that the Alumina Shot was hard enough to make Arrowbond ink and NC Bases abrasive to Sonoco's printing-press cylinders, thereby damaging FGNA's Arrowbond ink and the NC Bases and Sonoco's cylinders, among other property; and

(c)     The Alumina Shot deviated from the design specifications, formulae, or performance standards of Fox, or from otherwise identical units manufactured to the same manufacturing standards or formulae.

90.     These defects were present in the Alumina Shot when it was under Fox's control and distributed by Fox.

91.     These defects in the Alumina Shot directly and proximately caused and continue to cause FGNA damages.

WHEREFORE, FGNA demands judgment against Fox for damages, together with pre- and post-judgment interest, punitive damages for Fox's intentional and deliberate conduct, and such other and further relief the Court deems just and proper.

## COUNT III - PRODUCT LIABILITY ACT (N.J. STAT. ANN. §§ 2A:58C-1, *ET SEQ.*)
### (FGNA, as equitable subrogee of Sonoco, versus Fox)

92.     The allegations in paragraphs 1 through 79 above are incorporated by reference as though fully set forth herein.

93.     This is a product liability action by FGNA, as equitable subrogee of Sonoco, against Fox under New Jersey Statutes Annotated §§ 2A:58C-1 *et seq*.

94.     FGNA is the equitable subrogee of Sonoco because of its $6.3 million payment to settle Sonoco's claims for the excessive cylinder damage and wear and other damages caused to it by the Alumina Shot, which also damaged FGNA's Arrowbond ink and NC Bases.  Holding FGNA to be the equitable subrogee of Sonoco would compel the ultimate discharge of Sonoco's damages by the one who in good conscience should pay it, Fox, and is just, and enforcement of such subrogation is consonant with right and justice.

95.     The Alumina Shot was defective, as it was not reasonably fit, suitable, or safe for its intended purpose because:

(a)     The Alumina Shot was designed in a defective manner, because its risks far outweighed its utility, and at all times material a technically feasible and practical alternative design that would have reduced or prevented Sonoco's harm was available (e.g., shot made with YTZ, or without alumina);

(b)     The Alumina Shot failed to contain adequate warnings or instructions, and Fox failed ever to warn or instruct Sonoco or FGNA, even though Fox knew or should have known of the hazards of using the Alumina Shot, including the fact that the Alumina Shot was hard enough to make Arrowbond ink and NC Bases abrasive to Sonoco's printing-press cylinders, thereby damaging FGNA's Arrowbond ink and the NC Bases and Sonoco's cylinders, among other property; and

(c)     The Alumina Shot deviated from the design specifications, formulae, or performance standards of Fox, or from otherwise identical units manufactured to the same manufacturing standards or formulae.

96.     These defects were present in the Alumina Shot when it was under Fox's control and distributed by Fox.

97.     These defects in the Alumina Shot directly and proximately caused and continue to cause FGNA damages.

WHEREFORE, FGNA demands judgment against Fox for damages, together with pre- and post-judgment interest, punitive damages for Fox's intentional and deliberate conduct, and such other and further relief the Court deems just and proper.

### COUNT IV - CONSUMER FRAUD (N.J. STAT. ANN. §§ 56:8-1, *ET SEQ.*)
### (FGNA, individually, versus Fox)

98.     The allegations in paragraphs 1 through 79 above are incorporated by reference as though fully set forth herein.

99.     This is a consumer fraud action by FGNA, individually, against Fox under New Jersey Statutes Annotated §§ 56:8-1 *et seq*.

100.     Fox committed unlawful conduct and employed an unconscionable and deceptive commercial practice in the sale of shot to FGNA by, among other things, affirmatively

misrepresenting (a) in the Invoices, that Fox supplied FGNA with Zirconium Shot, when in truth Fox supplied FGNA with Alumina Shot and (b) in the labeling on the packages of shot that Fox supplied FGNA beginning in June 2012, that such packages contained Zirconium Shot, when in truth the packages contained Alumina Shot.

101.    Fox also committed unlawful conduct and employed an unconscionable and deceptive commercial practice in the sale of shot to FGNA by, among other things, knowingly omitting and failing, until late July 2014 to advise FGNA that beginning in June 2012, Fox supplied FGNA with Alumina Shot and not Zirconium Shot.

102.    FGNA has sustained an ascertainable loss as a result of Fox's unlawful conduct and unconscionable and deceptive commercial practices.

103.    A causal nexus exists between Fox's unlawful conduct and unconscionable and deceptive commercial practices and the ascertainable loss FGNA has sustained.

WHEREFORE, FGNA demands judgment against Fox for damages, together with pre- and post-judgment interest, treble damages, punitive damages, attorney's fees and costs, and such other and further relief the Court deems just and proper.

### COUNT V - CONSUMER FRAUD (N.J. STAT. ANN. §§ 56:8-1, *ET SEQ.*)
### (FGNA, as equitable subrogee of Sonoco, versus Fox)

104.    The allegations in paragraphs 1 through 79 above are incorporated by reference as though fully set forth herein.

105.    This is a consumer fraud action by FGNA, as equitable subrogee of Sonoco, against Fox under New Jersey Statutes Annotated §§ 56:8-1 *et seq*.

106.    FGNA is the equitable subrogee of Sonoco because of its $6.3 million payment to settle Sonoco's claims for the excessive cylinder damage and wear and other damages caused to it by the Alumina Shot, which also damaged FGNA's Arrowbond ink and NC Bases.  Holding

FGNA to be the equitable subrogee of Sonoco would compel the ultimate discharge of Sonoco's damages by the one who in good conscience should pay it, Fox, and is just, and enforcement of such subrogation is consonant with right and justice.

107.    Fox committed unlawful conduct and employed an unconscionable and deceptive commercial practice in the sale of shot to FGNA by, among other things, affirmatively misrepresenting (a) in the Invoices, that Fox supplied FGNA with Zirconium Shot, when in truth Fox supplied FGNA with Alumina Shot and (b) in the labeling on the packages of shot that Fox supplied FGNA beginning in June 2012, that such packages contained Zirconium Shot, when in truth the packages contained Alumina Shot.

108.    Fox also committed unlawful conduct and employed an unconscionable and deceptive commercial practice in the sale of shot to FGNA by, among other things, knowingly omitting and failing, until late July 2014 to advise FGNA that beginning in June 2012, Fox supplied FGNA with Alumina Shot and not Zirconium Shot.

109.    Sonoco has sustained an ascertainable loss as a result of Fox's unlawful conduct and unconscionable and deceptive commercial practices.

110.    A causal nexus exists between Fox's unlawful conduct and unconscionable and deceptive commercial practices and the ascertainable loss Sonoco has sustained.

WHEREFORE, FGNA demands judgment against Fox for damages, together with pre- and post-judgment interest, treble damages, punitive damages, attorney's fees and costs, and such other and further relief the Court deems just and proper.

## COUNT VI – FRAUDULENT MISREPRESENTATION
### (FGNA, individually, versus Fox)

111.    The allegations in paragraphs 1 through 79 above are incorporated by reference as though fully set forth herein.

112.    Fox misrepresented, in the Invoices, that Fox supplied FGNA with Zirconium Shot, when in truth Fox supplied FGNA with Alumina Shot.

113.    Fox misrepresented, in the labeling on the packages of shot that Fox supplied FGNA beginning in June 2012, that such packages contained Zirconium Shot, when in truth the packages contained Alumina Shot.

114.    Fox knowingly omitted and failed, until July 2014, to advise FGNA that beginning in June 2012, Fox supplied FGNA with Alumina Shot and not Zirconium Shot, despite FGNA's numerous requests for such information during its investigation into Sonoco's excessive cylinder damage and wear in 2014 and the numerous Purchase Orders FGNA transmitted to Fox, which requested that Fox supply Zirconium Shot.

115.    The fact that the shot Fox supplied to FGNA was Alumina Shot instead of Zirconium Shot was material to FGNA's purchase of shot, its use of shot to manufacture Arrowbond ink and NC Bases, and its resale of such products to customers, including Sonoco.

116.    Fox knew that its misrepresentations and omissions were false and that the shot Fox supplied FGNA was in truth Alumina Shot, not Zirconium Shot.

117.    Fox intended FGNA to rely upon Fox's misrepresentations and omissions.

118.    FGNA justifiably relied on Fox's misrepresentations and omissions, and such reliance was reasonable.

119.    FGNA's justifiable reliance on Fox's misrepresentations and omissions directly and proximately caused and continues to cause FGNA damages.

WHEREFORE, FGNA demands judgment against Fox for damages, together with pre- and post-judgment interest, and such other and further relief the Court deems just and proper.

## COUNT VII - BREACH OF CONTRACT
### (FGNA, individually, versus Fox)

120.     The allegations in paragraphs 1 through 79 above are incorporated by reference as though fully set forth herein.

121.     Each of the Invoices constitutes a valid and binding contract between FGNA and Fox, whereby Fox was obligated to deliver to FGNA a specified quantity of Zirconium Shot.

122.     FGNA performed its obligations under each such contract.

123.     Fox breached each such contract by: (a) failing to deliver Zirconium Shot and instead delivering Alumina Shot; and (b) delivering defective Alumina Shot.

124.     Fox's breaches of each such contract have directly and proximately caused and continue to cause FGNA damages.

WHEREFORE, FGNA demands judgment against Fox for damages, together with pre- and post-judgment interest, and such other and further relief the Court deems just and proper.

## COUNT VIII – BREACH OF WARRANTY OF MERCHANTABILITY
### (FGNA, individually, versus Fox)

125.     The allegations in paragraphs 1 through 79 above are incorporated by reference as though fully set forth herein.

126.     FGNA purchased the Alumina Shot—which Fox represented repeatedly to be Zirconium Shot—from Fox.

127.     At the time of purchase, Fox was in the business of selling shot, including the Alumina Shot and the Zirconium Shot, and, by its occupation, held itself out as having special knowledge regarding shot, including the Alumina Shot and the Zirconium Shot.

128.     The Alumina Shot would not pass without objection in the trade under the description contained in the Invoices; was not of fair average quality within such description;

was not fit for the ordinary purposes for which such goods are used; did not run of even kind, quality, and quantity within each unit and among all units involved; was not adequately contained, packaged, and labeled; and did not conform to the promises or affirmations of fact made on the labels on the packaging containing the Alumina Shot.

129.    FGNA took reasonable steps to notify Fox within a reasonable period of time that the Alumina Shot did not have the expected quality.

130.    FGNA was harmed, and the failure of the Alumina Shot to have the expected quality was a substantial factor in causing FGNA's harm.

WHEREFORE, FGNA demands judgment against Fox for damages, together with pre- and post-judgment interest, and such other and further relief the Court deems just and proper.

**COUNT IX – BREACH OF WARRANTY OF FITNESS
FOR A PARTICULAR PURPOSE**
**(FGNA, individually, versus Fox)**

131.    The allegations in paragraphs 1 through 79 above are incorporated by reference as though fully set forth herein.

132.    FGNA purchased the Alumina Shot—which Fox represented repeatedly to be Zirconium Shot—from Fox.

133.    Fox was in the business of selling shot, including the Alumina Shot and the Zirconium Shot, and, by its occupation, held itself out as having special knowledge regarding shot, including the Alumina Shot and the Zirconium Shot.

134.    FGNA in fact relied upon Fox's skill and judgment as distinguished from its own skill and judgment in buying the Alumina Shot.

135.    At the time of purchase, Fox had reason to know that FGNA required the Alumina Shot for a particular purpose and that FGNA relied on Fox's skill and judgment to select or furnish suitable goods.

136.    The Alumina Shot was not fit for the particular purpose for which FGNA required it.

137.    FGNA took reasonable steps to notify Fox within a reasonable period of time that the Alumina Shot was not fit for the particular purpose for which FGNA required it.

138.    FGNA was harmed, and the failure of the Alumina Shot to have the expected quality was a substantial factor in causing FGNA's harm.

WHEREFORE, FGNA demands judgment against Fox for damages, together with pre- and post-judgment interest, and such other and further relief the Court deems just and proper.

## COUNT X - NEGLIGENT MISREPRESENTATION
### (FGNA, individually, versus Fox)

139.    The allegations in paragraphs 1 through 79 above are incorporated by reference as though fully set forth herein.

140.    Fox had a pecuniary interest in the sale of shot to FGNA and in communicating the Admissions to FGNA in and after late July 2014.

141.    Alternatively, to the extent that the Admissions are incorrect regarding the date on which Fox began supplying FGNA with the Alumina Shot (which, in the Admissions, Fox claimed to be June 2012), the Admissions constitute misrepresentations.

142.    Fox made the Admissions negligently because Fox failed to exercise reasonable care to ensure that the Admissions accurately informed FGNA of the date on which Fox began supplying FGNA the Alumina Shot.  Based on FGNA's inquiries, Fox knew or should have known of the importance of timely providing FGNA accurate information about the shot.

143.    FGNA justifiably relied on the Admissions by, among other things, (1) basing its investigation into the excess wear of Sonoco's printing-press cylinders on June 2012 as the date Fox first began supplying FGNA with Alumina Shot, (2) communicating the Admissions to Sonoco, which, among other things, calculated its damages arising from the excess cylinder wear using June 2012 as the start date, and (3) accepting the accuracy of such calculations for FGNA and Sonoco's settlement negotiations, which resulted in FGNA paying Sonoco $6.3 million.

144.    FGNA's justifiable reliance on Fox's misrepresentations directly and proximately caused and continues to cause FGNA damages.

WHEREFORE, FGNA demands judgment against Fox for damages, together with pre- and post-judgment interest, and such other and further relief the Court deems just and proper.

## COUNT XI – FRAUDULENT MISREPRESENTATION
### (FGNA, individually, versus Fox)

145.    The allegations in paragraphs 1 through 79 above are incorporated by reference as though fully set forth herein.

146.    Alternatively, to the extent that the Admissions, which Fox communicated to FGNA in and after late July 2014, are incorrect regarding to the date on which Fox began supplying FGNA with the Alumina Shot (which, in the Admissions, Fox claimed to be June 2012), the Admissions constitute misrepresentations.

147.    The fact that Fox supplied the Alumina Shot to FGNA beginning in June 2012 was material to FGNA because, among other things, FGNA was unaware of its use of Alumina Shot, having never requested or agreed to purchase it from Fox; FGNA was investigating the cause of Sonoco's excess cylinder wear, which massively disrupted Sonoco's printing processes and was causing Sonoco at least $700,000 in damages per month, in addition to FGNA's own damages; and the date on which FGNA unwittingly began using Alumina Shot was critical to

identifying the root cause of Sonoco's excess cylinder wear as a result of the damaged Arrowbond ink and NC Bases and to calculating the corresponding damages. Based on FGNA's inquiries in 2014, Fox knew or should have known of the importance of timely providing FGNA accurate information about the shot.

148.    Fox knew that the Admissions were false and that Fox began supplying FGNA with Alumina Shot on some date other than June 2012.

149.    Fox intended FGNA to rely upon Fox's misrepresentations and omissions.

150.    FGNA justifiably relied on Fox's Admissions, and such reliance was reasonable. Among other things, FGNA (1) based its investigation into the excess wear of Sonoco's printing-press cylinders on June 2012 as the date Fox first began supplying FGNA with Alumina Shot, (2) communicated the Admissions to Sonoco, which, among other things, calculated its damages arising from the excess cylinder wear using June 2012 as the start date, and (3) accepted the accuracy of such calculations for FGNA and Sonoco's settlement negotiations, which resulted in FGNA paying Sonoco $6.3 million.

151.    FGNA's justifiable reliance on Fox's misrepresentations and omissions directly and proximately caused and continues to cause FGNA damages.

WHEREFORE, FGNA demands judgment against Fox for damages, together with pre- and post-judgment interest, and such other and further relief the Court deems just and proper.

## COUNT XII – COMMON LAW INDEMNITY
### (FGNA, individually, versus Fox)

152.    The allegations in paragraphs 1 through 79 above are incorporated by reference as though fully set forth herein.

153.    FGNA, without fault on its own part, has been compelled by legal obligation to pay $6.3 million to Sonoco as a reasonable settlement to resolve Sonoco's claims against FGNA

based upon the Alumina Shot and as a result of the substantial damage it caused to the Arrowbond ink and the NC Bases and, in turn, to Sonoco's printing cylinders.  These claims formed the basis for the settlement, and FGNA faced potential liability for such claims.

154.    A valid pre-existing indemnitor/indemnitee relationship exists between Fox, as indemnitor, and FGNA, as indemnitee.

155.    FGNA paid $6.3 million to Sonoco as a result of Fox's wrongful acts in delivering Alumina Shot instead of Zirconium Shot and in delivering Alumina Shot that was defective, with the knowledge that the Alumina Shot would be used to produce the Arrowbond ink and the NC Bases.

156.    Sonoco's damages were caused by Fox's negligence both in delivering Alumina Shot instead of Zirconium Shot and in delivering Alumina Shot that was defective.

157.    FGNA was only secondarily liable to Sonoco, whereas Fox was primarily liable for the damage Sonoco incurred as a result of the Alumina Shot and the damage it caused to the Arrowbond ink and the NC Bases and, in turn, to Sonoco's printing cylinders.

158.    FGNA's liability to Sonoco was only derivative of Fox's liability resulting from causing the damage Sonoco incurred as a result of the Alumina Shot and the damage it caused to the Arrowbond ink and the NC Bases and, in turn, to Sonoco's printing cylinders.

159.    As such, Fox is required to indemnify FGNA for the $6.3 million it paid Sonoco as a reasonable settlement to resolve Sonoco's claims against FGNA based upon the Alumina Shot as a result of the substantial damage it caused to the Arrowbond ink and the NC Bases and, in turn, to Sonoco's printing cylinders.

WHEREFORE, FGNA demands judgment against Fox for damages, together with pre- and post-judgment interest, and such other and further relief the Court deems just and proper.

## <u>JURY TRIAL DEMANDED</u>

FGNA requests a trial by jury for all issues so triable.

Dated: May 25, 2016.

Respectfully submitted,

**HOLLAND & KNIGHT LLP**
*Attorneys for Flint Group North America Corp.*

By:    *  /s/ Lee Vartan*
         **LEE VARTAN**
         New Jersey Bar No. 041252006
         lee.vartan@hklaw.com
         31 West 52nd Street
         New York, New York 10019
         Telephone:  (212) 513-3200
         Facsimile:  (212) 385-9010

and

By:    *  /s/ Joseph Mamounas*
         **JOSEPH MAMOUNAS**
         *Pro Hac Vice Application Forthcoming*
         Florida Bar No. 41517
         joseph.mamounas@hklaw.com
         **JANE MARIE RUSSELL**
         *Pro Hac Vice Application Forthcoming*
         Florida Bar No. 113098
         janemarie.russell@hklaw.com
         701 Brickell Avenue, Suite 3300
         Miami, Florida 33131
         Telephone: (305) 374-8500
         Facsimile:  (305) 789-7799