NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| FLINT GROUP NORTH AMERICA CORP., <br><br> Plaintiff, <br><br> v. <br><br> FOX INDUSTRIES INC., <br><br> Defendant. | Civ. Action No. 16-03009 <br><br> **OPINION** |

**John Michael Vazquez, U.S.D.J.**

### I. INTRODUCTION

This matter comes before the Court on Defendant Fox Industries, Inc.'s ("Fox" or "Defendant") partial motion to dismiss. D.E. 11. The Court reviewed all submissions in support and opposition, and considered the motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1(b). For the reasons that follow, the Court grants Defendant's motion.

### II. BACKGROUND

Plaintiff Flint Group North America Corp. ("Flint" or "Plaintiff") is a manufacturer of commercial ink and ink-related products. Complaint ("Compl.") ¶ 8 (D.E. 1). One of Flint's products is Arrowbond ink, which its customers use on a gravure press for high-quality printing on flexible plastic packaging. *Id.* This matter concerns allegations that Defendant sold Plaintiff

a defective product, known as "shot," that is used in the ink manufacturing process and which ultimately damaged Plaintiff's customer's printing machines. This property damage, according to Plaintiff, led to greater financial losses, including Plaintiff's payment of millions of dollars to its customer.

Plaintiff's ink is manufactured in a three-step process. First, in the pre-mix step, solvents and resins are mixed with dry pigments. *Id.* ¶ 10. Next, in the "milling step," the pigments are ground into homogenous particles smaller than five microns[1] in diameter. *Id.* Third, in the "let down" step, the ink is finished with additional solvents, which ensure that the ink carries the requisite coloristic and viscosity properties. *Id.*

During the milling step, the mix of solvents, resins, and pigments passes through a basket containing thousands of pieces of shot. *Id.* ¶ 12. Shot is not an ingredient, but rather a material that is not intended to be included in the finished ink product. *Id.* ¶ 11. Plaintiff describes shot as a "grinding media" similar in size to ball bearings. *Id.* at 1. The shot collides countless times with the mixture and acts as a pestle and mortar to crush the pigments as they pass through the shot, until the pigments reach a generally homogenous shape and are approximately five microns or smaller. *Id.* ¶ 12. Shot is made using various materials, such as steel, glass, and zirconium silicate, and is sold in different sizes. *Id.* ¶ 13.

Over time, shot will begin to decay, potentially causing it to fracture into large, hard particles. *Id.* ¶¶ 14-15. Flint used a basket strainer, screens, and multiple filters to prevent any oversized pieces of shot from damaging the ink as it was manufactured. *Id.* ¶ 15. However, if shot is defective, it may decay into pieces that are small enough to pass through the filters, but

---

[1] A micron is one thousandth of a millimeter. *Id.*

hard enough to damage the ink by making it abrasive. *Id.* Abrasive ink may cause damage to the ink itself as well as gravure cylinders and printing presses. *Id.*

In 2008, Flint began using a shot manufactured by Fox, which Flint refers to as "Zirconium Shot" in the Complaint. *Id.* ¶ 20. Fox convinced Flint to purchase Zirconium Shot because Fox claimed it performed just as well as one of its competitor's shots, but Zirconium Shot was less expensive. *Id.* ¶ 18. From 2008 until 2012, Flint successfully used Fox's Zirconium Shot to manufacture its Arrowbond ink. *Id.* ¶ 20.

One of Flint's largest customers is Sonoco Products Co. ("Sonoco"), an international provider of diversified packaging, packaging supply chain services, composite cans, tubes, and cores. *Id.* ¶ 21. Sonoco purchased Arrowbond Ink from Flint since at least 2007, which Sonoco used to print on flexible plastic packaging using its gravure presses. *Id.* ¶ 22. From 2008 until 2012, Flint successfully used Fox's Zirconium Shot in producing Arrowbond ink, which was then sold and used by Sonoco without incident. *Id.* ¶ 23.

In 2013, Sonoco reported to Flint that it was experiencing problems with the Arrowbond ink. *Id.* ¶ 24. Sonoco explained that the ink was "drying in," a problem caused by ink prematurely drying on the gravure cylinder which inhibits the transfer of ink to the plastic film. *Id.* ¶ 25. Although drying in is a common occurrence in gravure printing, in spring 2013, Sonoco believed that the Arrowbond ink was drying in with uncommon frequency. *Id.* ¶ 25. The drying in resulted in a failure to create the desired print image and sometimes caused a wavy line of "chatter" in the image. *Id.* ¶ 26. Due to these problems, Sunoco was unable to complete jobs in a single printing run and was forced to "redo" large print jobs multiple times. *Id.* Sonoco and Flint attempted to solve the drying in problem but were unable to do so. *Id.* ¶ 27. In November 2013, Flint compensated Sonoco nearly $600,000 due to Sonoco's printing problems. *Id.*

One month later, Sonoco discovered excessive wear to its printing press cylinders. *Id.* ¶ 28. Sonoco began an eight-month investigation to determine the cause of the damage. *Id.* ¶ 29. The investigation revealed that what was first believed to be a drying in problem, was actually caused by the Arrowbond ink excessively wearing down the cylinders resulting in the cylinders being unusable and in need of resurfacing. *Id.* ¶ 30. The cylinders were uniformly ground down, similar to the manner in which sandpaper is used to remove paint from wood. *Id.* In the past, the cylinders were capable of printing "many millions" of feet before they needed to be resurfaced, but the excessive wear required resurfacing after printing between 15,000 and 1 million feet. *Id.* ¶ 31. Sonoco incurred significant costs due to the damaged cylinders, production delays, labor downtime, and damage to its goodwill with its customers. *Id.* ¶¶ 35-36.

In order to determine what caused Sonoco's unexpected printing problems, Flint examined every aspect of the process used to manufacture Arrowbond ink to see whether there had been any changes since 2011. *Id.* ¶ 38. Flint found no such changes. *Id.* Flint also contacted all of its suppliers to determine whether there were any changes in their products. *Id.* ¶ 39. According to Flint, Fox delayed providing Flint with the certificates of analysis (the "CoAs") that listed the materials used to make the shot. *Id.*

In July 2014, Flint alleges that Fox made a "shocking admission." *Id.* ¶ 41. In June 2012, Fox stopped selling Flint Zirconium Shot and began providing a different shot, which Plaintiff calls "Alumina Shot." *Id.* In August 2014, Fox provided Flint with the CoAs, which revealed that the Alumina Shot consisted primarily of alumina, and only a small portion of zirconium silicate. *Id.* ¶ 42. Alumina is the abrasive component of sandpaper and is less expensive than zirconium silicate. *Id.*

4

As will be discussed, it appears that Fox still called the reconfigured shot by its original name, "Zirconium Silicate Beads." *Id.* ¶ 43. Plaintiff, in its pleadings, has coined the term "Alumina Shot" to describe the differences between the original "Zirconium Shot" and the later "Alumina Shot." In other words, Fox did not actually sell products it called "Zirconium Shot" or "Alumina Shot." In addition, Fox's Zirconium Silicate Beads shot was not a product that was custom made for Flint. *Id.* ¶ 18 (alleging that Fox's Zirconium Silicate Beads were "marketed and sold to many customers other than [Flint] and which was not specially made for [Flint]."). This Opinion uses the terms Zirconium Shot and Alumina Shot solely because they are the labels used in the Complaint.

Prior to July 2014, Fox did not inform Flint that in June 2012, Fox began supplying the Alumina Shot in place of the Zirconium Shot. *Id.* ¶ 44. Flint alleges that it never agreed to receive the Alumina Shot in place of the Zirconium Shot. *Id.* ¶ 43. From 2008 to 2014, all of the invoices and containers of shot Fox provided to Flint indicated that Flint was receiving the Zirconium Shot. *Id.* Flint alleges that had it known that the Zirconium Shot was replaced with the Alumina Shot, it never would have purchased the Alumina Shot. *Id.* ¶ 45.

Flint alleges that the Fox's misrepresentations about the Alumina Shot caused it to sustain more than $9 million in damages, including "lost business, reputational damage, wasted Arrowband ink and [nitrocellulose bases], and other costs."[2] Pl. Op. at 5; Compl. ¶ 64. Part of those damages include paying a $6.3 million settlement to Sonoco to settle Sonoco's legal claims against Flint, which were in excess of $10 million. Compl. ¶ 78.

---

[2] Flint manufactures nitrocellulose bases ("NC Bases") for use in high-quality gravure printing. *Id.* ¶ 47. NC Base is an unfinished ink containing nitrocellulose that Flint's customers blend with various solvents to convert it into a finished ink. *Id.* Flint alleges that Sonoco also experienced the same printing difficulties with the NC Bases. *Id.* ¶ 50.

5

Plaintiff filed a twelve-count complaint alleging causes of action for (1) negligent misrepresentation, (2) violation of New Jersey's Product Liability Act ("PLA"), (3) violation of the PLA (as equitable subrogee of Sonoco), (4) violation of the New Jersey Consumer Fraud Act, (5) violation of the New Jersey Consumer Fraud Act (as equitable subrogee of Sonoco), (6) fraudulent misrepresentation, (7) breach of contract, (8) breach of warranty of merchantability, (9) breach of warranty of fitness for a particular purpose, (10) negligent misrepresentation (as an alternative theory to Count One), (11) fraudulent misrepresentation (as an alternative theory to Count Six), and (12) common law indemnity. Defendant moved to dismiss Counts One, Four, Five, Six, Eight, Nine, Ten, Eleven, and Twelve. In its opposition brief, Plaintiff voluntarily withdrew its implied warranty claims in Counts Eight and Nine. Plaintiff's Opposition Brief ("Pl. Opp.") at 1 n.1. Plaintiff requests that if the Court grants any portion of the motion to dismiss that it be permitted to amend the Complaint to add a claim for breach of express warranty. Since the Court is granting Fox's motion, Plaintiff may file an amended complaint adding a claim for breach of express warranty. Counts Eight and Nine are dismissed.

### III.  LAW AND ANALYSIS

#### A. Standard of Review

According to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court should dismiss a complaint when it fails "to state a claim upon which relief can be granted." In analyzing a motion to dismiss under Rule 12(b)(6) the court will "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir.2002). In addition to the complaint, the Court may also consider any

exhibits attached thereto. *See Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (noting that when deciding a motion to dismiss, courts generally consider "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record").

To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Determining whether a complaint is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. While not a "probability requirement," plausibility means "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Even if plausibly pled, however, a complaint will not withstand a motion to dismiss if the facts alleged do not state "a legally cognizable cause of action." *Turner v. J.P. Morgan Chase & Co.*, No. 14-7148, 2015 WL 12826480, at *2 (D.N.J. Jan. 23, 2015). Additionally, a court is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).

### B. The Product Liability Act

Defendant argues that the PLA, N.J.S.A. 2A:58C-1, *et seq.*, subsumes Counts One, Four, Five, Six, Eight, Nine, Ten, Eleven, and Twelve and that, consequentially, those claims must be dismissed. The Court agrees.

The PLA controls any "product liability action" which is defined as "*any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the*

*claim*, except actions for harm caused by breach of an express warranty." N.J.S.A. 2A:58C-1b(3) (emphases added). The PLA defines "harm" as

> *physical damage to property, other than to the product itself;* (b) personal physical illness, injury or death; (c) pain and suffering, mental anguish or emotional harm; and (d) *any* loss of consortium or services or *other loss deriving from any type of harm described in subparagraphs (a)* through (c) of this paragraph.

N.J.S.A. 2A:58C-1b(2) (emphases added).

Importantly, "[t]he language chosen by the Legislature in enacting the PLA is both expansive and inclusive, encompassing virtually all possible causes of action relating to harms caused by consumer and other products." *In re Lead Paint Litig.*, 191 N.J. 405, 436–37 (2007). In determining whether a cause of action is subsumed by the PLA, "the Court must evaluate the essential nature of the claims presented and decide whether, at their core, Plaintiffs' claims would traditionally be considered as products liability claims." *Indian Brand Farms v. Novartis Crop Prot., Inc.*, 890 F. Supp. 2d 534, 544 (D.N.J. 2012). "Where the 'essential nature of the claim' is 'that the product was not reasonably fit, suitable or safe for its intended purpose because it either contained a manufacturing defect, failed to contain adequate warnings or instructions, or was designed in a defective manner,' the PLA subsumes the claim." *Sun Chem. Corp. v. Fike Corp.*, No. 13-4069, 2015 WL 881961, at *3 (D.N.J. Mar. 2, 2015) (quoting *Koruba v. Am. Honda Motor Co.*, 396 N.J. Super. 517, 531 (App. Div. 2007)). In other words, "where the core issue is a 'defect inherent in the product,' then the PLA governs." *Id.* (quoting *Gupta v. Asha Enterprises, L.L.C.*, 422 N.J. Super. 136, 146 (App. Div. 2011)).

Defendant asserts that based on the plain language of the PLA, the statute's broad reach, and case law, Plaintiff's relevant claims are barred. Plaintiff responds that its claims for negligent misrepresentation, violation of the CFA, fraudulent misrepresentation, and common

law indemnity are not subsumed by the PLA for three primary reasons. First, Plaintiff argues that a cause of action under the CFA "exists where a defendant misrepresents or omits to a plaintiff that it is receiving one product, but in truth is receiving a different product." Pl. Opp. at 10 (citing *Gupta*, 422 N.J. Super. 136). In *Gupta*, the plaintiffs were Hindu vegetarians who placed an order from the defendant restaurant for vegetarian samosas. *Gupta*, 422 N.J. Super. at 142. The defendant mistakenly provided meat-filled samosas that the plaintiffs alleged caused them spiritual injury upon consumption. *Id.* at 143. The New Jersey Appellate Division granted summary judgment against the plaintiffs' PLA claim because their "claims focuse[d] on the conduct of [the defendant's] employees in supplying the wrong order, not on any 'defect' in the samosas." *Id.* at 146. The court also granted summary judgment on the plaintiffs' CFA claim because the plaintiffs failed to present proof of an ascertainable loss. *Id.* at 148.

*Gupta* is inapposite. *Gupta* focused on whether the plaintiffs presented sufficient facts to defeat summary judgment as to the PLA, CFA, and other tort claims. In granting summary judgment on the PLA claim, the Appellate Division concluded that the plaintiffs' claims did not focus on a defect in the samosas. Here, unlike *Gupta*, the heart of Plaintiff's complaint is that Defendant sold Plaintiff a defective product. Compl. at 2. (alleging that Alumina Shot "was defective and performed disastrously during [Flint's] manufacturing process"). Moreover, the issue here is whether the PLA subsumes Plaintiff's other claims -- a matter that was not addressed in *Gupta*. *Gupta* may have been applicable if Defendant offered two separate products entitled Zirconium Shot and Alumina Shot, and Plaintiff bought the former but was supplied with the latter. But this is not the case. Fox only sold one product, Zirconium Silicate Beads, to Flint. Zirconium Shot and Alumna Shot are fictitious labels set forth in a creatively pled complaint. The essence of Flint's Complaint is that Fox reconfigured its Zirconium Silicate

Beads, by adding alumina (or more alumina), thereby resulting in a defective product. Therefore, *Gupta* is not an apt comparison.

Second, Plaintiff maintains that the CFA and its other tort claims are not subsumed by the PLA because the "'essential nature' of the [Complaint] is not a products liability claim." Pl. Opp. at 10 (citing *New Hope Pipe Liners, LLC v. Composites One, LCC*, No. 09-3222, 2009 WL 4282644 (D.N.J. Nov. 30, 2009)). Plaintiff argues that its misrepresentation-based claims do not "sound in product defect" and are not subsumed by the PLA. *Id.* at 10-11. A careful reading of the Complaint and relevant case law, however, indicates that the essential allegations in Plaintiff's Complaint sound in products liability.

In *Indian Brand Farms*, Judge Hillman addressed the issue of whether the plaintiffs' common law misrepresentation and CFA claims were subsumed by the PLA. 890 F. Supp. 2d 534. There, the plaintiffs were blueberry farms and individual farmers who for several years had purchased an insecticide from the defendant. *Id.* at 536. In 1997, the defendant began selling the plaintiffs a new type of insecticide claiming that the new product was safer and more effective than the previous insecticide. *Id.* The new insecticide contained an additional ingredient known as surfactant. *Id.* In order to protect the blueberry plants from both insects and fungi, the plaintiffs mixed the insecticide with a fungicide, a well-known process called "tank-mixing," and then apply the mixture to the blueberry plants. *Id.* The addition of the surfactant to the new insecticide, when mixed with the fungicide, caused "systematic injury" to the blueberry plants, including "blotches, depression, spots on the plants, and plant death." *Id.* at 537.

The court analyzed the "essential nature" of the plaintiffs' claims and determined that, at its core, the complaint "centered directly on the extent of the damage that resulted to the blueberry plants and fruit after [the] [p]laintiffs' use of" the new insecticide. *Id.* at 547. Judge

10

Hillman noted that although the plaintiffs "clearly allege[d]" that the defendant misrepresented the new insecticide's adverse effects on the blueberry plants, the crux of the plaintiffs' "dissatisfaction is that the product itself . . . caused harm to the blueberry plants." *Id.* The court explained that the "gravamen of their complaint . . . is that the application and use of [the defendant's new] insecticide product . . . to treat [the] [p]laintiffs' blueberry plants resulted in harm to the plants and the fruit yields," and that the defendant did not inform the plaintiffs of the potential for harm. *Id.* at 547-48. The court described these allegations as a "clear articulation of the classic tort law duty to warn of or make safe," and therefore dismissed the plaintiffs' fraud-based claims as being subsumed by the PLA. *Id.* at 548.

Here, the essential nature of Plaintiff's Complaint sounds in products liability. The Complaint is replete with allegations of harm caused by a defective product, the Alumina Shot. *See, e.g.*, Compl. at 2; ¶¶ 61-79 (alleging damage caused by Alumina shot and stating that the "defect in the Alumina Shot was the result of a design defect"; "Fox itself confirmed this defect"; "The Alumina Shot . . . was defective"; "Fox employee did not inform [Flint] . . . that the Alumina Shot was defective"). Indeed, Plaintiff brings a cause of action pursuant to the PLA alleging that the Alumina Shot was defective. In this regard, this matter is factually similar to *Indian Brand Farms*. In that case, plaintiffs alleged that the addition of one ingredient, surfactant, made the product defective. Here, Plaintiff argues that the addition of the alumina made the Zirconium Silicate Beads defective. As explained by the New Jersey Supreme Court, the PLA maintains "one unified, statutorily defined theory of recovery for harm caused by a product." *In re Lead Paint Litig.*, 191 N.J. at 436. Plaintiff may not circumvent this legislative policy by "recast[ing] a products liability claim as a fraudulent or negligent misrepresentation claim." *Indian Brand Farms*, 890 F. Supp. 2d at 543; *see also New Hope Pipe Liners*, 2009 WL

4282644, at *2 ("[I]f the facts of a case suggest that the claim is about defective manufacture, flawed product design, or failure to give an adequate warning, then the PLA governs and the other claims are subsumed."). As noted, Flint attempts to do so by coining new names for the Zirconium Silicate Beads (Zirconium Shot and Alumina Shot).

Moreover, Plaintiff's reliance on *New Hope Pipe Liners* is misplaced. There, Judge Thompson explained that "[m]ost of [the plaintiff's] claims could be characterized as 'representation-based' claims -- i.e., they are based on allegations that [the] [d]efendants made assertions about the quality of their goods and that these assertions induced [the] [p]laintiff to purchase [the product]." *New Hope Pipe Liners*, 2009 WL 4282644, at *3. In this matter, as noted above, the heart of Plaintiff's Complaint sounds in products liability. Plaintiff cannot contend that that the "essential nature" of its claims is not premised on products liability when the plain language of the Complaint indicates otherwise.[3] Moreover, in *New Hope Pipe Liners*, the alleged misrepresentations were affirmative verbal misrepresentations as to the efficacy of a product. To this end, *Indian Brand Farms* is factually much closer to *New Hope Pipe Liners* than the current case in that the defendant affirmatively misrepresented that the new ingredient in the insecticide made it safer and more effective. Here, by comparison, Defendant's alleged misrepresentations are that it did not change its package and labeling for its Zirconium Silicate Beads when Fox added more alumina to its shot. Compl. ¶ 43.

Finally, Plaintiff argues that the PLA does not subsume claims where the damages are "consequential, anticipated economic losses resulting from . . . a product defect." Pl. Opp. at 10.

---

[3] Plaintiff also contends that "if the Court cannot determine at the pleadings stage whether an NJPLA or some other claim is appropriate, the Court should not dismiss [the Complaint]." Pl. Opp. at 11. As discussed, the essential nature of Plaintiff's Complaint is based on products liability. Thus, there is no question as to whether "an NJPLA or some other claim is appropriate." *Id.*

Plaintiff maintains that "the Alumina shot damaged itself, with [Flint] and Sonoco sustaining consequential anticipated economic losses as a result." *Id.* at 13.[4] In support of its position, Plaintiff relies on three cases: *Francis E. Parker Mem'l Home, Inc. v. Georgia-Pac. LLC*, 945 F. Supp. 2d 543, 552-56 (D.N.J. 2013); *Kuzian v. Electrolux Home Prod., Inc.*, 937 F. Supp. 2d 599, 608 (D.N.J. 2013); and *Nafar v. Hollywood Tanning Sys., Inc.*, No. 06-3826, 2007 WL 1101440, at *5 (D.N.J. Apr. 10, 2007).[5] For the reasons that follow, the Court finds Plaintiff's arguments unavailing.

"Economic loss" has been defined in a variety of ways. *Pub. Serv. Enter. Grp., Inc. v. Philadelphia Elec. Co.*, 722 F. Supp. 184, 193 n.4 (D.N.J. 1989). In the warranty context, the New Jersey Supreme Court has stated that:

> [e]conomic loss can take the form of either direct or consequential damages. A direct economic loss includes the loss of the benefit of the bargain, i.e., the difference between the value of the product as represented and the value in its defective condition. Consequential economic loss includes such indirect losses as lost profits.

*Id.* Put another way, "economic losses are all pecuniary damages not resulting from physical harm or property damage." *Id.*; *see also Alloway v. Gen. Marine Indus., L.P.*, 149 N.J. 620, 627 (1997) ("[E]conomic loss encompasses actions for the recovery of damages for costs of repair, replacement of defective goods, inadequate value, and consequential loss of profits." (citations omitted)).

---

[4] Plaintiff also seeks economic damages for loss of goodwill in the marketplace, labor downtime at its facility, and making "significant capital expenditures and financial accommodations to Sonoco in connection with the investigation" of the defect, and paying $6.3 million to settle Sonoco's potential claims against Plaintiff. Compl. ¶¶ 64-78. Additionally, Plaintiff maintains that Sonoco's customer relationships were damaged and Sonoco lost business opportunities. *Id.*

[5] Plaintiff also cites to *New Hope Pipe Liners*, 2009 WL 4282644 at *2-3, but *New Hope Pipe Liners* does not discuss consequential economic loss.

13

Harm is defined by the PLA, in part, as "(a) physical damage to property, other than to the product itself . . . or other loss deriving from any type of harm described in subparagraphs (a) through (c) of this paragraph." N.J.S.A. 2A:58C-1b(2). Thus, if Flint were seeking compensation for damage to the shot itself, it would not constitute harm as defined under the PLA. Yet, Flint looks to recover for physical damage to property other than the shot (but nevertheless caused by the defective shot). As such, its allegations fall squarely within the PLA's definition of harm.

In *Francis E. Parker*, the plaintiff constructed a large assisted living facility using an exterior trim created and sold by the defendant. *Id.* at 547. The plaintiff alleged that the exterior trim prematurely deteriorated damaging the trim itself as well as causing the structure to be damaged by water, mold, mildew, fungi, and insect infestation. *Id.* at 548. The plaintiff alleged multiple theories of liability, including violations of the PLA and the CFA. *Id.* at 550. Judge Debevoise concluded that the PLA and CFA claims were not irreconcilable and that both claims could be maintained, depending on the harm alleged. *Id.* 551. The court explained that the CFA claim was not subsumed as it pertained to allegations of harm to the product itself (the exterior trim), but that the PLA subsumed claims relating to damage caused by the product to the surrounding structure. *Id.* at 554-56.

Here, as noted, Plaintiff does not allege damage to the product itself, the shot. Instead, Plaintiff claims damages *caused by* the allegedly defective shot. These damages are the type of "harm" that *Francis E. Parker* found to be subsumed by the PLA. Plaintiff acknowledges that use of the shot causes it to decay over time. Compl. ¶ 14. Thus, the issue is not the shot's decay, but rather that when it fractured, its particles were small enough to pass through the filters, yet hard enough to damage the ink, ultimately harming Sunoco's printing cylinders. Thus, damage

to the Arrowbond ink, NC Bases, and printing cylinders is "physical damage to property" caused by the allegedly defective shot. These damages fall within the PLA's definition of "harm."

Plaintiff's reliance on *Nafar*, 2007 WL 1101440 is also misplaced. In that case, the Plaintiff bought monthly memberships to a tanning studio and alleged that the defendant fraudulently omitted to tell her that any exposure to ultraviolet rays increased the risk of cancer. *Id.* at *1. The plaintiff asserted various causes of action, including a claim under the CFA, seeking economic damages in the form of membership fees that the plaintiff allegedly would not have paid but for the defendant's fraudulent omissions. *Id.* at *1, *4. The defendant argued that the CFA claim was subsumed by the PLA. *Id.* at *3. Judge Cavanaugh concluded that the CFA claim was not subsumed by the PLA, reasoning that the plaintiff's claims concerned the sale of services, as opposed to the purchase of a defective product. *See Crouch v. Johnson & Johnson Consumer Co.*, No. 09-2905, 2010 WL 1530152, at *7 n.1 (D.N.J. Apr. 15, 2010) (Judge Cavanaugh subsequently interpreting *Nafar* and stating that there, the plaintiff's "claims and basis for distinction of the CFA from the PLA was the purchase of services, rather than the purchase of a defective product"). Here, the present action does not concern the purchase of services. Therefore, *Nafar* is distinguishable.

Plaintiff's also relies on *Kuzian*, 937 F. Supp. 2d at 608. *Kuzian* based its reasoning, in part, on *Dean v. Barrett Homes, Inc.*, 204 N.J. 286, 288 (2010). In *Dean*, the New Jersey Supreme Court explained that the PLA's definition of harm is "a codification of the economic loss rule . . . which bars tort remedies in strict liability or negligence *when the only claim is for damage to the product itself.*" *Id.* at 295 (emphasis added). As explained above, Plaintiff does not seek recovery for damage to the defective product itself. Moreover, since *Dean* was

authored by the highest court of New Jersey, its interpretation of the PLA is binding on this Court.

Thus, because the cases relied on by Flint are distinguishable and because Flint is not seeking to recover for damage to the shot itself, only one inquiry remains. Specifically, the Court must determine whether Flint's claims can survive because it seeks to recover for economic losses in addition to property damage caused by the allegedly defective shot.

A straightforward reading of the statute's definition of harm indicates that such claims for economic losses are subsumed within the PLA because Flint is also seeking to recover for the property damage to its ink and Sunoco's presses. Such economic losses constitute "other loss deriving from" the damage to the ink and the cylinders. *See* N.J.S.A. 2A:58C-1b(2). When interpreting a statute, the Court begins with the plain language. *See In re Phila. Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010) ("It is the cardinal canon of statutory interpretation that a court must begin with the statutory language. 'Courts must presume that a legislature says in a statute what it means and means in a statute what it says there.'" (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992))). If the statutory language is unambiguous, the court ends its inquiry and applies the statute according to its plain language. *In re Price*, 370 F.3d 362, 368 (3d Cir. 2004) ("We are to begin with the text of a provision and, if its meaning is clear, end there."). As in the current matter, when physical property is damaged by a defective product, which in turn causes economic loss, the economic loss damages fall under the purview of the PLA pursuant to the unambiguous language of the PLA.

Yet, certain New Jersey courts have used language that arguably supports Plaintiff's interpretation. For example, in *Ford Motor Credit Co., LLC v. Mendola*, 427 N.J. Super. 226, 240 (App. Div. 2012), the Appellate Division observed that the "Product Liability Act and

common law tort actions do not apply to damage caused to the product itself, *or* to consequential but *purely* economic losses caused to the consumer because of a defective product." (emphasis added) (citing *Dean,* 204 N.J. at 294–98); *see also Alloway v. Gen. Marine Indus., L.P.,* 149 N.J. 620, 627–28 (1997); *Spring Motors Distribs., Inc. v. Ford Motor Co.,* 98 N.J. 555, 579–80 (1985)). The issue then becomes what the *Mendola* court meant by the word "purely." It appears that the Appellate Division interpreted "purely" to be synonymous with "only" or "solely." First, one of the cases relied on by the court in *Mendola* used the word "only." *See Spring Motors Distribs., Inc.* 98 N.J. at 578–79 ("[W]e hold that a commercial buyer seeking damages for *economic loss only* should proceed under the U.C.C. against parties in the chain of distribution. (emphasis added)). Similarly, in *Alloway*, another case cited to by the *Mendola* court, the New Jersey Supreme Court pointed out that the underlying claim concerned damage to the product itself and "did not allege that other property was damaged[.]" 149 N.J. at 626–27. The Court in *Alloway* went on to observe that contract, as opposed to tort, principles "more readily respond to claims for *economic loss caused by damage to the product itself.*" *Id.* at 627 (emphasis added) (citations omitted).[6] In light of these cases, the Court concludes that the PLA does not apply when a party is seeking "purely" or "only" economic damages. Because Plaintiff here is also seeking property damage caused by the defective shot, the pure economic loss doctrine does not save its claims.

---

[6] Indeed, although it did not decide the issue, the *Alloway* Court noted that "[a]n unresolved issue is whether the U.C.C. or tort law should apply when a defective product poses a serious risk to other property or persons, but has caused only economic loss to the product itself." *Id.* at 638. Thus, the Supreme Court of New Jersey did not even conclusively decide that a tort remedy would be unavailable in all cases in which only economic loss flows from the defective product itself.

Here, Plaintiff alleges that the defective shot damaged its Arrowbond ink and NC Bases, which in turn damaged Sonoco's printing cylinders. Plaintiff alleges that this property damage (to the ink and cylinders) caused it to sustain economic damages. The damage to the Arrowbond ink, NC Bases, and printing cylinders is "physical damage to property" caused by the allegedly defective shot. These damages clearly fall within the PLA's definition of "harm." The economic harm caused by this property damage is "other loss deriving from" "physical damage to property," thus constituting "harm" as defined by subparagraph (d) of the PLA. *See* N.J.S.A. 2A:58C-1b(2). Therefore, Plaintiff's claim for consequential economic loss deriving from "physical damage to property" is governed by the PLA.

In sum, the Court finds that Counts One, Four, Five, Six, Eight, Nine, Ten, Eleven, and Twelve are subsumed by the PLA. The essential nature of these claims and the other allegations in the Complaint sound in products liability. Accordingly, these Counts are dismissed with prejudice. *See Indian Brand Farms*, 890 F. Supp. 2d at 552 (dismissing with prejudice claims subsumed by the PLA).

## IV.   CONCLUSION

For those reasons, Counts One, Four, Five, Six, Eight, Nine, Ten, Eleven, and Twelve are dismissed with prejudice. Counts Eight and Nine are also dismissed because Plaintiff agreed to the dismissal. Within thirty days of this Opinion, Plaintiff may file an amended complaint adding a cause of action for breach of express warranty. An appropriate Order accompanies this Opinion.

Dated: May 5, 2017

John Michael Vazquez, U.S.D.J.