**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| FLINT GROUP PACKAGING INKS NORTH AMERICA CORP., | Civil Action No. 16-cv-03009 |
| *Plaintiff*, |  |
| v. | **OPINION** |
| FOX INDUSTRIES INC., CENOTEC CO. LTD., and CHARLES RICHARDSON |  |
| *Defendants*, |  |

**John Michael Vazquez, U.S.D.J.**

     This case concerns a dispute over grinding media – a product used in the commercial ink manufacturing process – that Defendant Cenotec Co. Ltd. ("Cenotec") manufactured and which Defendants Fox Industries Inc. ("Fox") and Charles Richardson sold to Plaintiff Flint Group Packaging Inks North America Corp.'s ("Flint"), a commercial ink manufacturer. Pending before the Court are three separate motions to dismiss Plaintiff's Third Amended Complaint ("TAC") pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. D.E. 232 (Fox), D.E. 228 (Cenotec), D.E. 236 (Richardson). The Court reviewed the parties' submissions in support and in opposition[1] and decided the motion without oral argument pursuant to Fed. R. Civ.

---

[1] Fox's brief, D.E. 232-1, will be referred to as "Fox. Br."; Fox's reply brief in support of its motion to dismiss, D.E. 244, will be referred to as "Fox Reply"; Cenotec's brief, D.E. 228-1, will be referred to as "Cenotec Br."; Cenotec's reply brief in support of its motion to dismiss, D.E. 245, will be referred to as "Cenotec Reply"; Richardson's brief, D.E. 236-1, will be referred to as "Rich. Br."; Richardson's reply brief in support of his motion to dismiss, D.E. 246, will be referred to as "Rich. Reply"; Flint's opposition to Fox's motion to dismiss, D.E. 241, will be referred to as "Flint Opp. Fox"; Flint's opposition to Cenotec's motion to dismiss, D.E. 240, will be referred to as "Flint Opp. Cenotec"; and, Flint's opposition to Richardson's motion to dismiss, D.E. 242, will be referred to as "Flint Opp. Rich."

P. 78(b) and L. Civ. R. 78.1(b).  For the reasons stated below, Defendants' motions to dismiss are denied.

## I.    BACKGROUND

Flint has amended its Complaint three times, D.E. 82, D.E. 152, D.E. 220.  Much of the extensive factual background the Court included in its earlier opinion dismissing Plaintiffs' initial complaint, D.E. 39 ("Prior Opinion") at 1-6, is realleged in the TAC.  The Court incorporates that background by reference here and briefly reviews the new allegations in Flint's TAC that are relevant to the pending motions.

Flint manufactures commercial inks.  TAC ¶ 14.  Flint sells its finished ink to commercial printers, such as Sonoco Products Co. ("Sonoco").  *Id*.  To manufacture ink, Flint uses grinding media, referred to as "shot", to crush and grind ink ingredients as they move through Flint's manufacturing process.  *Id*. ¶ 15.  Cenotec manufactures shot, *id*. ¶ 16, and Fox sells it, *id*. ¶ 17.  Richardson is the founder, president, sole owner, and lone officer of Fox.  *Id*. ¶ 18.

The current matter arises out of Flint's purchase and subsequent use of shot from Fox that was manufactured by Cenotec.  In its TAC, Flint now clarifies the differences between the shot that it thought it was purchasing from Fox and the shot that it actually received from Fox.  Flint's TAC also details a conspiracy between Fox, Richardson, and Cenotec to secretly sell Flint non-conforming shot disguised as conforming shot.

Flint alleges that in 2008, based on the recommendation of Fox, it began purchasing "Zirconium Silicate Bead" shot, product code "CZS" ("CZS"), from Fox for use in Flint's ink manufacturing processes.  *Id*. ¶¶ 55-56.  Cenotec manufactures CZS.  *Id*. ¶ 55.  To purchase CZS, Flint placed orders for either "Zirconium Silicate" or "ZiSi."  *Id*. ¶ 56.  Fox's "acknowledgements, labels, and other related documents consistently identified the product that it sold and supplied

Flint as" CZS.  *Id*. ¶ 57.  Between 2008 and 2012, Flint used CZS to manufacture its ink without issue.  *Id*.

The TAC now adds that in or around 2012, Cenotec introduced Richardson and Fox to another of its shot products called "Zirconia Toughened Alumina Beads," product code "CZM," ("CZM").  *Id*. ¶ 79.  Cenotec allegedly directed Fox and Richardson to "sell CZM as CZS" and to not tell Fox's customers the two were different products.  *Id*.  Flint claims Cenotec, Fox, and Richardson entered this conspiracy to secretly pass-off CZM as CZS so that they could charge their customers CZS prices for CZM, which is comparably cheaper to make, thus increasing Defendants' profits.  *Id*. ¶ 133.  In 2012, Richardson assembled Fox employees and directed them to sell CZM to Fox's customers without identifying it as such or warning that CZM contained alumina.  *Id*. ¶ 86.  As a result, Fox's employees began misbranding and misidentifying CZM as CZS on product labels, order acknowledgements, packing slips, spec sheets, and other documents Fox provided to customers.  *Id*. ¶ 87.  Between 2013 and 2014, Fox secretly supplied "thousands of pounds" of CZM to Flint disguised as CZS.  *Id*. ¶¶ 91-92.  Flint then unknowingly used the CZM in its ink manufacturing process.

CZM is not suitable for Flint's ink manufacturing purposes.  *See id*. ¶ 130.  During Flint's ink-making process, the CZM "wore into pieces of alumina smaller than 25 thousandths of a millimeter," passed through Flint's industry-standard filters, and mixed with Flint's finished ink.  *Id*. ¶ 27.  Flint alleges that this effectively turned its ink into "liquid sandpaper."  *Id*.  As discussed in the Prior Opinion, Flint claims that the alumina-infused ink it then sold to Sonoco "wreaked havoc on Sonoco's equipment."  *Id*. ¶ 28.  The alumina-infused ink abraded Sonoco's printing cylinders such that the cylinders were unusable after handling only a fraction of the printing they

normally handled.  *Id*. ¶¶ 65-67.  As a result, Sonoco was unable to print the images it desired, which disrupted its ability to make timely deliveries to its customers.  *Id*. ¶ 69.

Flint claims Defendants' conspiracy to pass-off CZM as CZS caused Flint significant damages.  Specifically, Sonoco quantified its costs to resurface its thousands of cylinders and for the waste, labor downtime, outbound freight, cylinder freight, blocked and one-off jobs, and other overhead at approximately $700,000 per month.  *Id*.  Sonoco calculated that its total damages exceeded $10,000,000.  *Id*. ¶ 146.  Flint ultimately paid Sonoco more than $6,300,000 to compensate Sonoco for those damages, which it seeks to recover in this suit.  *Id*.  Flint also seeks to recover the difference between the price it paid for the CZS and the actual price of the CZM it was provided with.  *Id*. ¶ 156.  Flint adds that it suffered damages from "thousands of pounds of spoiled" products, lost profits from ink sales and other products ruined by the CZM, and the costs it sustained in investigating the cause of Sonoco's damages, totaling nearly $14,400,000.  *Id*. ¶ 154.

## II.  PROCEDURAL HISTORY

Flint filed its initial Complaint against Fox on May 25, 2016.  D.E. 1.  On July 13, 2016, Fox filed its first motion to partially dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6), D.E. 11.  The Court granted Fox's motion to dismiss and dismissed Counts One, Four, Five, Six, Eight, Nine, Ten, Eleven, and Twelve of the Complaint.  D.E. 40.  However, the Court permitted Flint to amend its initial Complaint to add a cause of action for breach of express warranty.  *Id*.

On November 11, 2017, Plaintiff filed a letter application seeking leave to file an amended complaint.  D.E. 68.   Plaintiff's proposed first amended complaint asserted "numerous counts that [the] Court had previously dismissed with prejudice."  D.E. 151 at 2.  On January 26, 2018, United States Magistrate Judge Mark Falk granted in part and denied in part Flint's motion to file

an amended complaint.  D.E. 79.  Specifically, Judge Falk denied Flint's application as to Counts

One, Two, Three, Four, Five, Six, Seven, Eight, Nine, Ten, and Fourteen and granted Flint's

application as to Counts Eleven, Twelve, and Thirteen.  *Id*.  Despite Judge Falk's ruling, Flint

included all counts in its First Amended Complaint ("FAC"), which if filed on February 09, 2018,

adding Richardson and Cenotec as Defendants.  D.E. 82.  On March 9, 2018, Fox filed a motion

to dismiss Flint's FAC, D.E. 90, which Richardson joined, D.E. 92.  Cenotec also moved to dismiss

the FAC.  D.E. 106.  After limited jurisdictional discovery, Cenotec filed an amended motion to

dismiss, D.E. 125, which Fox joined, D.E. 131.  The Court granted Fox and Cenotec's motions to

dismiss, dismissed the FAC without prejudice, and ordered Flint to file an amended complaint

consistent with the Court's and Judge Falk's previous orders, D.E. 40, 79.  D.E. 151.

On April 22, 2019, Flint filed its Second Amended Complaint ("SAC").  D.E. 152.  Cenotec

followed with another motion to dismiss, D.E. 157, as did Fox, D.E. 164.  On September 6, 2019,

Flint filed a motion for leave to file its TAC.  D.E. 189.  Fox and Cenotec opposed the motion,

D.E. 196, 197.  On December 18, 2019, Judge Falk granted Flint's motion for leave to file its TAC.

D.E. 213.

Flint then filed its TAC.  D.E. 220.  The TAC asserts seven Counts: (1) a claim under New

Jersey's Product Liability Act, N.J.S.A. §§ 2A:58c-1, *et seq.*, ("PLA"); (2) breach of contract; (3)

breach of the covenant of good faith and fair dealing; (4) violation of New Jersey's Consumer

Fraud Act, N.J.S.A. §§ 56:8-1, *et. seq.* ("CFA"); (5) fraud; (6) civil conspiracy; and (7) negligent

misrepresentation.  The current motions (with oppositions and replies) followed.  D.E. 228, 232,

236, 240, 241, 242, 244, 245, 246.

### III.   STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a count for "failure to state a claim upon which relief can be granted[.]"  To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint is plausible on its face when there is enough factual content "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully."  *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted).  As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims."  *Id*. at 789.

In evaluating the sufficiency of a complaint, a district court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  A court, however, is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations."  *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).  If, after viewing the allegations in the complaint most favorable to the plaintiff, it appears that no relief could be granted under any set of facts consistent with the allegations, a court may dismiss the complaint for failure to state a claim.  *DeFazio v. Leading Edge Recovery Sols.*, 2010 WL 5146765, at *1 (D.N.J. Dec. 13, 2010).

For allegations sounding in fraud, Rule 9(b) imposes a heightened pleading standard. Specifically, a party alleging fraud "must state with particularity the circumstances constituting

fraud or mistake," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). A plaintiff must plead fraud with sufficient particularity such that he puts the defendant on notice of the "precise misconduct with which [he is] charged." *Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d Cir. 2004), *abrogated in part on other grounds by Twombly*, 550 U.S. at 557. "To satisfy this standard, the plaintiff must plead or allege the date, time, and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).

## IV.   ANALYSIS[2]

Defendants have moved to dismiss Flint's CFA, PLA, fraud, negligent misrepresentation, breach of the implied covenant of good faith and fair dealing, and conspiracy claims on various grounds. The Court will address each of Defendants' arguments in turn.

### A.  CFA

#### 1.  The Economic Loss Doctrine

All Defendants move to dismiss Flint's CFA claim based on the economic loss doctrine. Fox Br. at 21-28; Rich. Br. at 15-21; Cenotec Br. at 14-36. Defendants contend that because a sales contract governed the parties' relationship, Flint's only recourse for Fox's alleged provision of CZM instead of CZS is a claim for breach of contract. *See e.g.*, Fox Br. at 26.

"The economic loss doctrine prohibits the recovery in a tort action of economic losses arising out of a breach of contract." *Sun Chem. Corp. v. Fike Corp.,* 235 A.3d 145, 150 n. 2

---

[2] The parties agree that New Jersey law governs. Accordingly, the Court will apply New Jersey law. *See Manley Toys, Ltd. v. Toys R Us, Inc.*, No. 12-3072, 2013 WL 244737, at *2 (D.N.J. Jan. 22, 2013) ("Because the parties have argued the viability of the remaining claims as though New Jersey substantive law applies, the Court will assume that to be the case." (citing *USA Mach. Corp. v. CSC, Ltd.*, 184 F.3d 257, 263 (3d Cir. 1999)).

(2020)).  In *Saltiel v. GSI Consultants, Inc.*, the New Jersey Supreme Court held that "[u]nder New Jersey law, a tort remedy does not arise from a contractual relationship *unless the breaching party owes an independent duty imposed by law*."  788 A.2d 268, 280 (N.J. 2002) (emphasis added) (citation omitted).  Courts in this district have held that the CFA imposes and independent duty by law.  *See G & F Graphic Servs., Inc. v. Graphic Innovators*, *Inc.*, 18 F. Supp. 3d 583, 589-90 (D.N.J. 2014) (collecting cases).

In *G & F Graphic*, the court observed the following:

> The state legislature intended persons who committed fraudulent commercial practices in connection with the sale of merchandise to be liable for treble damages. To hold that this statutory claim is subsumed by plaintiff's breach of contract cause of action would be contrary to legislative intent and would preclude consumer fraud claims in far too many circumstances.

*Id.* at 589 (citing *Florian Greenhouse, Inc. v. Cardinal IG Corp.*, 11 F. Supp. 2d 521, 528 (D.N.J. 1998)).  The *G & F Graphic* court also ruled that this conclusion was consistent with *Saltiel* because "[t]he CFA imposes . . . a duty to be fair and honest in consumer transactions which is 'independent of the duties that ar[i]se under [a] contract."  *Id.* at 590 (quoting *Saltiel*, 788 A.2d at 280).  The Court finds such reasoning persuasive.  Accordingly, the Court finds that the economic loss doctrine does not bar Flint's CFA claim.

### 2.  Scope of the CFA

Fox and Richardson next contend that the CFA does not apply to the transaction at issue here, Fox's sale of shot to Flint.  Defendants explain that the CFA is inapplicable because Fox and Flint are "sophisticated" parties and because shot is not "merchandise" within the meaning of the CFA.  Fox Br. at 26-28; Rich. Br. at 22-23.

The CFA provides that "[t]he term 'merchandise' shall include any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale[.]"  N.J.S.A.

§ 56.8-1(c).  "'[T]he public,' as used in this definition of 'merchandise,' refers to 'the public at large.'"  *Princeton Healthcare Sys. v. Netsmart New York, Inc.*, 29 A.3d 361, 365 (N.J. Sup. Ct. App. Div. 2011) (quoting *Finderne Mgmt. Co. v. Barrett*, 955 A.2d 940 (N.J. Sup. Ct. App. Div. 2008)).  However, "[t]o fall within the scope of the NJCFA, goods and services need not be only those that are purchased by 'average consumers'; the statute may also cover merchandise that is 'expensive, uncommon, or only suited to the needs of a limited clientele.'"  *CDK Glob., LLC v. Tulley Auto. Grp., Inc.*, No. 15-3103 (KM) (JBC), 2016 WL 1718100, at *6 (D.N.J. Apr. 29, 2016).

Here, Flint indicates that, at a minimum, the shot is an object, *see* TAC ¶ 15, and that Cenotec markets its shot to the public.  *Id*. ¶ 16, 17.  The TAC also alleges that Fox sold Cenotec's CZM shot to at least "three other customers" besides Flint.  *Id*. ¶ 25.  Flint has adequately alleged the shot is merchandise within the meaning of the CFA.

The Court also disagrees with Defendants' argument that Flint is not a "consumer" under the CFA.  "The entire thrust of the [CFA] is 'pointed to products and services sold to consumers in the popular sense.'"  *BOC Grp., Inc. v. Lummus Crest, Inc.*, 597 A.2d 1109, 1112 (N.J. Sup. Ct. Law. Div. 1990) (quoting *Neveroski v. Blair*, 358 A.2d 473 (N.J. Sup. Ct. App. Div. 1976)).  "[A]lthough the Consumer Fraud Act does not define the term 'consumer' or contain an explicit 'retail restriction,' it was intended to protect persons engaging in 'consumer' transactions, not those acquiring businesses."  *J & R Ice Cream Corp. v. California Smoothie Licensing Corp.*, 31 F.3d 1259, 1272 (3d Cir. 1994).  "A 'consumer' is generally defined as 'one who uses (economic) goods, and so diminishes or destroys their utilities.'"  *Stockroom, Inc. v. Dydacomp Dev. Corp.*, 941 F. Supp. 2d 537, 544 (D.N.J. 2013) (quoting *Hundred East Credit Corp. v. Eric Shuster Corp.*, 515 A.2d 246 (N.J. Sup. Ct. App. Div. 1986)).

Flint alleges that "it never purchased shot for resale or distribution." TAC ¶ 50. Instead, Flint claims that it was an end user of Cenotec's shot – Flint alleges that it passes "solvents, resins, and dry pigments . . . through a basket containing thousands of pieces of shot" at the milling step of the ink manufacturing process and that "shot wears out over time." TAC ¶¶ 49, 50. In other words Flint "did not obtain the [shot] . . . for . . . resale; [Flint] was the consumer and user of [the shot]." *CDK Glob., LLC*, 2016 WL 1718100, at *6. Courts in New Jersey "have squarely held that the NJCFA applies to the sale of merchandise for use in business operations" as here. *Stockroom, Inc.*, 941 F. Supp. 2d 537, 543-544 (finding the plaintiff business to be a "consumer" under the CFA in connection with the plaintiff's purchase of order-processing software from defendant business); *see also Coastal Grp., Inc. v. Dryvit Sys., Inc.*, 643 A.2d 649, 653 (N.J. Sup. Ct. App. Div. 1994) (reversing trial court's finding that the plaintiff, a condominium project owner and developer, was not a consumer within the meaning of the CFA in connection with plaintiff's purchase of prefabricated wall paneling from the defendant panel manufacturer). Flint has sufficiently pled that the CFA applies.

### 3.  Subsumption

Defendants next assert that because Flint's claims "sound in products liability," Flint is limited to its remedy under the PLA and may not seek damages under a tort theory of liability. Cenotec Br. at 22; Rich. Br. at 12; Fox. Br. at 33. Cenotec adds that Flint's CFA claim is subsumed because its damages stem from an injury caused by a defective product. Cenotec Br. at 21-22.

In the Prior Opinion, relying on *Gupta v. Asha Enterprises, L.L.C.* 27 A.3d 953, 959 (N.J. Sup. Ct. App. Div. 2011), the Court indicated that Flint's CFA claim could potentially be viable "if [Fox] offered two separate products entitled Zirconium Shot and Alumina Shot, and [Flint] bought the former but was supplied with the latter." Prior Opinion at 9. In *Gupta*, the plaintiffs

were Hindu vegetarians who placed an order from the defendant restaurant for vegetarian samosas. *Id.* at 956. The defendant mistakenly provided meat-filled samosas that the plaintiffs alleged caused them spiritual injury upon consumption. *Id.* at 957. Although the *Gupta* court ultimately granted summary judgment against the plaintiffs' CFA claim because the plaintiffs failed to present proof of an ascertainable loss, *id.* at 960, the *Gupta* court did find that the plaintiffs had adequately alleged a misrepresentation under the CFA. *Id.* Specifically, the *Gupta* court found that "plaintiffs' allegations that they were assured that [defendant] did not make meat samosas, that [plaintiffs] were repeatedly told that the samosas purchased by them were vegetarian, and that 'VEG Samosa' was written on the container in which [plaintiffs'] order was packaged" provided "prima facie evidence of misrepresentations by [defendant's] employees." *Id.* Here, the TAC now alleges that Fox offered two distinct products – CZS and CZM – and that Flint sought to purchase the former but was supplied with the latter. *See* TAC ¶ 79. Flint further alleges that – like the defendant in *Gupta* – Fox and Richardson misrepresented CZM as CZS on product labels, order acknowledgements, packing slips, spec sheets, and other documents provided to customers. *Id.* ¶ 87. The Court finds that the TAC now adequately alleges an actionable misrepresentation under *Gupta*.

This finding is buttressed by the New Jersey Supreme Court's recent decision in *Sun Chem. Corp. v. Fike* Corp. 235 A.3d 145, 148 (N.J. 2020).[3] In *Fike*, the New Jersey Supreme Court addressed the question of whether "a [CFA] claim [can] be based, in part or exclusively, on a claim that also might be actionable under the [PLA]." *Id.* The *Fike* court answered the question in the affirmative, reasoning that "[i]t is the nature of the claims brought, and not the nature of the

---

[3] Flint raised *Fike* to the Court's attention through a notice of supplemental authority. D.E. 252. Defendants have not sought leave to file a sur-reply brief to address the decision in *Fike* or its applicability here.

damages sought, that is dispositive of whether the PLA precludes separate causes of action.   In other words, the court in *Fike* stated the PLA will not bar a CFA claim alleging express or affirmative misrepresentations.  *Id*.  The *Fike* court further explained that "the CFA and PLA are intended to govern different conduct and to provide different remedies for such conduct.  There is thus no direct and unavoidable conflict between the CFA and PLA."  *Id*. at 154; *see also id*. at 155 ("[A] claim . . . premised upon a product's manufacturing, warning, or design defect . . . must be brought under the PLA . . .  But nothing about the PLA prohibits a claimant from seeking relief under the CFA for deceptive, fraudulent, misleading, and other unconscionable commercial practices in the sale of the product.").

The Court finds that the PLA does not subsume Flint's CFA claim.  First, as the *Fike* court made clear, the fact that Flint's CFA claim is brought in the same suit as a PLA claim does not, in and of itself, render Flint's CFA claim improper.  *Id*. at 154.  Second, applying *Fike*, the Court finds that Flint's CFA claim is not based on the CZM's "manufacturing, warning, or design defect."  *Id*. at 155.  Instead, Flint's CFA claim is based on alleged express misrepresentations: (1) Fox and Richardson's express misrepresentations that CZM was CZS, TAC ¶¶ 191-93; (2) Fox and Richardson's express misrepresentations concerning the date on which Fox first switched CZM with CZS without telling Flint, *id*. ¶¶ 194-197.

Defendants arguments do not warrant a contrary result.  First, Defendants rely heavily on the Court's Prior Opinion.  *See e.g.*, Rich. Br. at 13-15.  However, as set forth above, Flint's TAC adds new allegations – specifically, that CZM and CZS are different products – that bring its CFA claims outside the scope of the Prior Opinion.  Moreover, the Court has found that the New Jersey Supreme Court's decision in *Fike* commands this result.  This Court is bound to follow the *Fike* decision because this is a question of New Jersey law.  For the same reason, the Court must also

reject Defendants' arguments based on the kinds of damages Flint seeks. *See e.g.*, Fox Br. at 33; Cenotec Br. at 19-23. The *Fike* court instructed that this Court must look to "the nature of the claims brought, and *not the nature of the damages sought*" in evaluating whether the PLA subsumes Flint's CFA claim. *Fike*, 235 A.3d at 148 (emphasis added). Accordingly, the Court finds that Flint's PLA claim does not subsume its CFA claim.

### 4.  Plausibility

Defendants argue that, for a variety of reasons, Flint's CFA claim does not meet the applicable pleading standard. The Court addresses each argument in turn.

Cenotec asserts that Flint's CFA and fraud claims against it must be dismissed because Cenotec is not alleged to have made any of the alleged misrepresentations. Cenotec Br. at 23. Cenotec opines that it could only be liable for Fox and Richardson's alleged misrepresentations under either an agency or partnership theory, neither of which are alleged in Flint's TAC. *Id.* at 25-31. In response, Flint contends that it alleges a conspiracy rather than agency and/or partnership. Flint Opp. Cenotec at 8. Flint also argues that Cenotec may be liable for the alleged misrepresentations because it directed Richardson and Fox to make them. *Id.* at 9.

Under New Jersey law, acts and statements of a co-conspirator may be attributed to other co-conspirators for purposes of establishing a claim. *Morgan v. Union Cty. Bd. of Chosen Freeholders*, 633 A.2d 985, 999 (N.J. Sup. Ct. App. Div. 1993) (superseded by statute on other grounds as stated in *Michaels v. State of N.J.*, 955 F. Supp. 315, 327 fn. 12 (D.N.J. 1996)); *see also Prunkel v. Cty. of Bergen*, No. CV 17-5154 (JLL), 2018 WL 4043291, at *9 (D.N.J. Aug. 23, 2018) (relying on *Morgan* for purposes of evaluating conspiracy allegations). In *Morgan*, the plaintiff had sued several board members of the Union County Board of Chosen Freeholders under 42 U.S.C. § 1983, alleging that defendants subjected him to a constructive discharge because of his

political affiliation. *See Morgan*, 633 A.2d at 995.  After trial, the court dismissed the § 1983 claim. *Id*. at 997.  The trial court "found no causal connection between each defendant's acts and statements and the plaintiff's constructive discharge." *Id*. at 999.  The Appellate Division reversed, finding that "the trial court ignored the law of conspiracy." *Id*. at 998.  The *Morgan* court stated that the principle that "once a . . . conspiracy is formed, each conspirator while a member [of the unlawful combination] is liable for every act and declaration of each and all of the conspirators, done or made in the pursuance of . . . the conspiracy" applied "equally . . .  to civil conspiracies" as it did to criminal conspiracies. *Id*. at 999 (citations omitted).  The *Morgan* court continued that "it was not necessary that each of the conspirator's acts, standing alone, was such as to compel plaintiff to resign.  Instead, the question was whether the combination of defendant's acts" satisfied the elements of plaintiff's underlying § 1983 claim. *Id.*

Here, Cenotec makes similar arguments to those the defendants in *Morgan* made – that it cannot be liable because it did not make the misrepresentations complained of.  However, as in *Morgan*, the analysis turns on the civil conspiracy allegations – which, as discussed below, the Court finds to be sufficiently pled.  For purposes of stating a fraud claim against Cenotec, Flint may rely on the statements of Cenotec's alleged co-conspirators – Fox and Richardson.  *See Morgan*, 633 A.2d at 999.  Accordingly, the Court denies Cenotec's motion to dismiss on this ground.

Flint (in part) bases its CFA, common-law fraud, and negligence claims on Fox and Richardson's alleged misrepresentation as to when Fox began supplying Flint with CZM instead of CZS.  TAC ¶¶ 145-149.  Flint claims this misrepresentation caused it to overpay its settlement with Sonoco (the "Sonoco Overpayment Damages").  Cenotec argues that the Sonoco Overpayment Damages cannot form the basis for a CFA claim.  Cenotec Br. at 15.  Specifically,

Cenotec claims that "any alleged misrepresentation [concerning Flint's settlement with Sonoco] were not made 'in connection with' the sale of shot to Plaintiff." *Id.*

The Court finds that the CFA is not as limited as Cenotec argues.  In addition to capturing fraudulent practices "in connection with the sale of . . . merchandise" the CFA also explicitly covers deceptive practices made "in connection with . . . the subsequent performance of" a sale of merchandise.  N.J.S.A. § 56:8-2.  The decision in *Pollitt v. DRS Towing, LLC* is instructive.  No. CIV. 10-1285 AET, 2011 WL 1466378, at *1 (D.N.J. Apr. 18, 2011).  In *Pollitt*, a car dealership extended credit to the plaintiff to purchase a car and then assigned the credit agreement to another defendant.  *Id.* at *1.  When the plaintiff failed to make the required payments, her car was repossessed and stored in a facility.  *Id.*  The plaintiff subsequently made the requisite payment under the credit agreement, but was also subjected to additional and undisclosed charges from the storage facility.  *Id.* at *1-2.  The plaintiff claimed that these hidden fees violated the CFA.  *Id.* at *2.  The defendants argued that the CFA did not cover the storage facility's additional charges because the fees were not charged in connection with the car dealership's initial extension of credit. *Id.*  The *Pollitt* court disagreed.  The court reasoned that although the storage facility was not a debt collector, the hidden fees that it had charged were connected to the repossession of the plaintiff's vehicle which was, in turn, connected to the original loan.  *Id.* at *5.  Thus, in light of the "clear legislative intent that the CFA be applied broadly" the court in *Pollitt* ruled that "a CFA claim may be brought against a party who demands payment for services in connection with the subsequent performance of a loan, even if that party is not an assignee of the loan."  *Id.* (citing *Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 696 A.2d 546, 551 (1997)).

Here, the Court finds that Richardson's statements concerning the date Fox first switched CZM for CZS are sufficiently connected "with . . . [Fox's] subsequent performance" of its sales

agreements with Flint.  N.J.S.A. § 56:8-1(e).  Richardson's and Fox's alleged misrepresentations are directly related to the merchandise – the shot – that serves as the predicate for Flint's CFA claim.  Specifically, Flint alleges that these statements were made to cover up Fox's undisclosed switch from CZM to CZS.  TAC ¶¶ 139-150.  Because the CFA is "to be applied broadly in order to accomplish its remedial purpose," *Lemelledo*, 696 A.2d at 551, the Court finds that Richardson and Fox's statements allegedly made to cover up the nature of the shot fall under the CFA.

Cenotec also argues that Flint's damages "are facially implausible."  Cenotec Br. at 31-32.  Cenotec argues, for example, "if Cenotec told Fox to lie about when it started selling CZM, Cenotec would have enhanced any potential liability for itself (and Fox) . . . [T]here is no plausible reason for Cenotec to do that."  *Id*.  In short, Cenotec appears to be arguing that as a matter of law, a business would never take action that could subject it to liability.  Unfortunately, there are a myriad of cases demonstrating the opposite.  In any event, at this stage, the Court must accept Flint's well-pleaded allegations as true; Cenotec's arguments on this point would require the Court to do the opposite.  Moreover, "at the pleading stage, nothing prohibits [Flint] from pleading alternate, and even legally inconsistent, theories . . .  the Federal Rules of Civil Procedure expressly allow such pleadings."  *G & F Graphic Servs., Inc.*, 18 F. Supp. 3d at 587; *see also* Fed. R. Civ. P. 8(d)(2)(permitting pleading in the alternative).  Accordingly, the Court disagrees with Cenotec's argument.

Defendants further contend that the TAC does not meet the heightened pleading standard applicable to CFA claims.  The New Jersey Consumer Fraud Act provides that

> the act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the

> subsequent performance of such person as aforesaid, whether or not
> any person has in fact been misled, deceived or damaged thereby, is
> declared to be an unlawful practice[.]

N.J.S.A. § 56:8-2.  To state a claim under the CFA, Flint must allege "(1) unlawful conduct; (2) ascertainable loss; and (3) a causal relationship between the unlawful conduct and the ascertainable loss."  *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 929 A.2d 1076, 1086 (2007).  In addition, "[c]laims under the CFA are required to meet the particularity requirement of Fed. R. Civ. P. 9(b)," which requires more than the *Twombly-Iqbal* standard, including "notice of the precise misconduct with which [defendant is] charged." *Daloisio v. Liberty Mut. Fire Ins. Co.*, 754 F.Supp.2d 707, 709 (D.N.J. 2010) (internal citations omitted).  A plaintiff must "allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation."  *See Urbino v. Ambit Energy Holdings, LLC*, 2015 WL 4510201, at *3 (D.N.J. July 24, 2015) (internal citations omitted).

Flint alleges that in 2012, Defendants entered a conspiracy to falsely pass-off CZM as CZS. TAC ¶¶ 79-86.  As part of that conspiracy, between 2013 and 2014, in response to purchase orders for CZS, Fox and Richardson instead supplied Flint with CZM disguised as CZS.  *Id*. ¶ 90. Richardson "directed [Fox employees] to sell CZM to Fox's customers without identifying it as such or telling customers that the product Fox shipped now contained alumina."  *Id*. ¶ 86. Richardson further ordered Fox's employees to disguise CZM as CZS by placing misrepresentations "on the labels, order acknowledgments, packing slips, spec sheets, and other documents" Fox provided to customers.  *Id*. ¶ 87.  Richardson allegedly knew that the CZM was not suitable for Flint's purposes.  *Id*. ¶ 83.  Flint further indicates that, when it confronted Richardson about the plan to pass off CZM as CZS, Richardson made a series of misrepresentations to cover up the scheme.  Specifically, Flint's TAC alleges that "[o]n July 31

and August 14, 2014, Fox and Richardson told Flint in writing that it was in June 2012 that Defendants began supplying Flint with CZM in place of CZS." *Id*. ¶ 145.  Flint alleges, however, that Defendants now admit this statement was false. *Id*. ¶ 149.  Flint has sufficiently identified the who, what, when, where, and how of the alleged improper conduct, which can be attributed to Cenotec through Flint's conspiracy claim.  The Court finds Flint has adequately alleged unlawful conduct under the CFA.

Defendants next contend that Flint has not alleged an ascertainable loss under the CFA. Cenotec argues that Flint's "overpayment damages" are insufficiently pled because Flint fails to allege (1) the amount that Fox charged for CZS per unit, (2) the amount that Fox charged for CZM per unit, (3) the number units that Flint bought from Fox since 2013, (4) the amount that Flint paid to Fox since 2013, and (5) the amount that Flint would have paid but for the alleged misrepresentations."  Cenotec Br. at 18-19.

The Court finds that Flint has adequately pled an ascertainable loss under the CFA.  "The precise amount of loss need not be known; it need only be measurable."  *Dzielak v. Whirlpool Corp.*, 26 F. Supp. 3d 304, 336 (D.N.J. 2014).  Flint makes numerous allegations as to ascertainable loss, *see, e.g.*,  TAC ¶ 133, 156, 192, 205.  Flint indicates a dollar valuation on these damages: "[a]t a minimum, these damages total approximately \$3.78 million."  *Id*. ¶ 156.

The Court also finds that Flint has sufficiently alleged a causal connection between Defendants misrepresentations and Flint's ascertainable loss.  Flint indicates that Fox and Richardson's disguise of the CZM as CZS caused it to overpay.  TAC ¶ 156.  Flint adds that it relied on Fox and Richardson's false representation that Fox began supplying CZM in 2012 when it settled Sonoco's property damage claim.  *Id*. ¶ 148. Thus, Flint's allegations adequately meet the third element of a CFA claim.

Defendants' motions to dismiss Flint's CFA claim are denied.

**B.  Fraud and Negligent Misrepresentation Claims**

**1.  The Economic Loss Doctrine**

All Defendants move to dismiss Flint's common law fraud and negligent misrepresentation claims based on the economic loss doctrine.  Fox Br. at 21-28; Rich. Br. at 15-21; Cenotec Br. at 14-36.  Defendants contend that because a sales contract governed the parties' relationship, Flint's only recourse is a claim for breach of contract.  *See e.g.*, Fox Br. at 26.  Defendants argue that because the TAC alleges "no inducement of Flint by Fox," Flint's TAC cannot survive the economic loss doctrine.  *Id.*  Flint counters that the economic loss doctrine does not bar CFA claims and that its fraud claims are based on Fox and Richardson's statements outside the parties' agreements.  *See* Flint Opp. Fox at 4.  Flint alleges two separate bases for its fraud and negligent misrepresentation claims: (1) Fox and Richardson's alleged misrepresentation that Fox began providing Flint with CZM in June 2012 when, in fact, Fox had not started supplying CZM in lieu of CZS until 2013; (2)  Fox's alleged misbranding of CZM as CZS on product labels, order acknowledgements, packing slips, spec sheets, and other documents Fox provided.  *Id.* ¶¶ 38-41.

Defendants appear to contend that in the absence of a claim for fraudulent inducement, the very existence of a contract between the parties bars any misrepresentation-based claims.  *Id.*  Flint does not claim to be asserting a fraudulent inducement claim.  *See* Flint Opp. Fox at 15.  However, the analysis of whether a tort claim is barred by the economic loss doctrine is more specific.  "The 'critical issue' with regard to economic loss 'is whether the allegedly tortious conduct is *extraneous* to the contract.'"  *Bracco Diagnostics, Inc.*, 226 F. Supp. 2d at 564 (emphasis added) (quoting *Emerson Radio Corp. v. Orion Sales, Inc.*, No. CIV. A. 95-6455, 2000 WL 49361, at *7 (D.N.J. Jan. 10, 2000)).  "An alleged misrepresentation is extraneous to an agreement when it

breaches a duty 'separate and distinct from the performance' of the agreement's terms." *Id.* (citing *Chen v. HD Dimension, Corp.,* No. CIV.A. 10-863 FLW, 2010 WL 4721514, at *6 (D.N.J. Nov. 15, 2010)). In analyzing whether a misrepresentation is extraneous, this Court must compare the misrepresentations with the specific contractual language at issue. *Montclair State Univ. v. Oracle USA, Inc.*, No. CIV.A. 11-2867 FLW, 2012 WL 3647427, at *6 (D.N.J. Aug. 23, 2012) (comparing alleged misrepresentations with express terms of parties' agreement); *see also G & F Graphic Servs., Inc.*, 18 F. Supp. 3d at 591 ("An examination of the parties' contract reveals that no warranty applies to [plaintiff's] claim that it was sold the wrong model press, and that the parties did not limit their remedies for the type of claim asserted here—an intentional tort.")).

The language of the parties' agreements is unclear. The TAC generally alleges "valid and binding contracts existed between Flint and Fox" that required Fox to deliver CZS to Flint without explaining any other terms of the parties' agreement. *See e.g.*, TAC ¶ 176. Without any support from its TAC, Flint claims that "that the contract between Fox and Flint was [not] any type of sophisticated commercial instrument with . . . representations, warranties, remedy and indemnification provisions," Flint Opp. Fox at 16. The Court cannot consider this assertion. *Swift v. Pandey*, No. CIV.A. 13-649 JLL, 2013 WL 6022093, at *2 (D.N.J. Nov. 13, 2013) (citing *Pennsylvania ex rel. v. Zimmerman v. Pepsico*, 836 F.2d 173 (3d Cir.1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.")). On the other hand, Defendants have failed to identify the specific contractual language that they claim Flint's fraud claims fall under – the parties' agreements are not attached to Defendants' motions to dismiss nor do Defendants attempt to cite any specific language from the agreements. The Court cannot evaluate the application of the economic loss doctrine to Flint's fraud claims without

additional information.  Accordingly, Defendants' motions to dismiss Flint's fraud and negligent misrepresentation claims based on the economic loss doctrine are denied without prejudice.

### 2.  Subsumption

Defendants argue that Flint's fraud and negligent misrepresentation claims must be dismissed as subsumed by Flint's PLA claim.  Fox Br. at 33; Cenotec Br. at 19-21; Rich. Br. at 12-15.  As with Flint's CFA claim, the Court finds that the common-law fraud and negligent misrepresentation claims in Flint's TAC are not subsumed by Flint's PLA claim.

Although *Fike* only dealt with the interaction between the PLA and the CFA, the *Fike* court also set the standard for assessing whether a claim is subsumed by the PLA.  When deciding whether the PLA subsumes a claim, the *Fike* court instructed courts to evaluate: "whether the claim is based upon a product's manufacturing, warning, or design defect and therefore covered by the PLA."  *Fike*, 235 A.3d at 156; *see also id*. at 155.

Here, Flint's fraud and negligent misrepresentation claims are not based on CZM's manufacturing, warning, or a design defect in CZM.  Instead, Flint's fraud and negligent misrepresentation claims are based on two categories of express misrepresentations: (1) Fox and Richardson's express misrepresentations that CZM was CZS, TAC ¶¶ 203-05; *id*. ¶ 223; (2) Fox and Richardson's express misrepresentations concerning the date on which Fox first switched CZM with CZS, *id*. ¶¶ 206-08; *id*. ¶ 223-24.  These express misrepresentations are not related to the manufacturing of CZM, the warnings accompanying CZM, or a design defect with CZM; instead, Flint's fraud and negligent misrepresentation claims are based on Fox and Richardson's alleged efforts to falsely pass-off CZM for CZS and to obfuscate the time during which they did so.  Applying the standard in *Fike*, the Court finds that the PLA does not subsume the fraud and negligent misrepresentation claims in Plaintiff's TAC.

### 3. Plausibility

Defendants argue that Flint's common-law fraud and negligent misrepresentation claims are not adequately pled. "To establish common-law fraud, a plaintiff must prove: '(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.'" *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 260 (N.J. 2005) (quoting *Gennari v. Weichert Co. Realtors*, 691 A.2d 350 (N.J. 1997)). Fraud must be pled with particularity pursuant to Rule 9(b). *See Frederico*, 507 F.3d at 200.

Here, the Court incorporates its analysis concerning Flint's CFA claim and finds that Flint's TAC adequately pleads the first, second, fourth, and fifth elements of a fraud claim. *See* Op. at 19-22. The only question is whether Flint has adequately alleged that Defendants intended Flint rely on their alleged misrepresentations. The Court finds that it has. Flint generally alleges that Richardson and Fox maintained fraudulent intent when making the alleged misrepresentations. *Id.* ¶ 213. General allegations as to intent are permitted. *See* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge and other conditions of a person's mind may be alleged generally."). The Court also finds the fact that Fox and Richardson allegedly disguised CZM as CZS by misidentifying CZM as CZS on "the labels, order acknowledgments, packing slips, spec sheets, and other documents" Fox provided to customers, TAC ¶ 87, supports a plausible inference that Defendants intended Flint to rely on the misrepresentations. *See G & F Graphic Servs., Inc.*, 18 F. Supp. 3d at 594 ("[T]he alleged fact that 'many of the component parts [of the press] had their serial numbers removed prior to the delivery of the GI Press to [plaintiff]' . . . supports a plausible inference of fraudulent intent."). Similarly, the Court finds that Flint's allegations concerning Richardson's efforts to cover up Fox's undisclosed switch from CZS to CZM, TAC ¶ 135, also supports a

plausible inference of fraudulent intent and reliance.   And, as described above, Fox and Richardson's statements and conduct are attributable to Cenotec in light of Flint's plausible conspiracy allegations.  Defendants' motions to dismiss Flint's fraud claim are denied.

The Court also finds that Flint has adequately pled its negligent misrepresentation claim against Fox and Richardson.  To establish a claim for negligent misrepresentation, a plaintiff must establish that (1) a false statement, (2) was negligently made, (3) plaintiff justifiably relied on that statement, and (4) suffered economic loss or injury because of the reliance.  *Wiatt v. Winston & Strawn LLP*, 838 F. Supp. 2d 296, 312 (D.N.J. 2012).  Flint's negligent misrepresentation claim is based on the same express misrepresentations supporting the fraud claim.  Contrary to Defendants' arguments, because Flint's negligent misrepresentation claim is premised on express misrepresentations, Flint was not required to allege that Defendants owed flint an independent duty to disclose.  *Eberhart v. LG Elecs. USA, Inc.*, 188 F. Supp. 3d 401, 409 (D.N.J. 2016).  Accordingly, for the same reasons as the Court found that Flint adequately pled its common-law fraud claim, the Court finds that Flint has adequately pled a claim for negligent misrepresentation.

### C.  Plaintiff's PLA Claim

#### 1.  The Component Parts Doctrine

Cenotec argues that Flint's PLA claim against it must be dismissed under the component parts doctrine.   Cenotec Br. at 10.  Cenotec asserts that it is a component part manufacturer and that, as such, it cannot be liable where the component part it manufactured – here the shot – only became dangerous after it was integrated into a larger system.  *Id*.  Flint contends that the component parts doctrine is inapposite here.   Flint Opp. Cenotec at 31.

The component parts doctrine provides for the imposition of liability on a manufacturer "for the harm caused by a defective finished product."  *Tawil v. Illinois Tool Works, Inc.*, No.

CV158747, 2016 WL 4260791, at \*5 (D.N.J. Aug. 11, 2016) (citing *Boyle v. Ford Motor Co.*, 942 A.2d 850, 853 (N.J. Sup. Ct. App. Div. 2008).   Under the doctrine, to impose liability on a component part manufacturer, a plaintiff must allege the following:

> (1) such defect was caused by the integration of a defective component product into the finished product; or (2) the manufacturer or distributor of the component product substantially participates in the integration of the component product into the ultimate design of the finished product; and (i) the integration of the component causes the product to be defective; and (ii) the resulting defective product is a proximate cause of the harm.

*Id*. (citing *Boyle*, 942 A.2d at 853).   "[T]he component parts doctrine applies only when the plaintiff is seeking to impose liability on a manufacturer for harm caused *by* a defective finished product." *Id.* (emphasis in original) (citing *Zaza v. Marquess & Nell, Inc.*, 675 A.2d 620 (N.J. 1996)).

In support of its motion, Cenotec relies on *Zaza*.  Cenotec Br. at 10-12.   In *Zaza*, the New Jersey Supreme Court addressed the following question:

> whether under the Products Liability Act, *N.J.S.A.* 2A:58C–1 to –7, a component part fabricator that builds a system component in accordance with the specifications of the owner, which component is not dangerous until it is integrated into the larger system, can be held strictly liable to an injured employee for the failure of the owner, installer-assembler, and training consultant to install safety devices and provide warnings.

*Zaza*, 675 A.2d at 623.  In *Zaza*, the component part at issue was a "quench tank" – a stainless steel tank with holes – manufactured by the defendant.  *Id*. at 624.  The quench tank was, in turn, incorporated into a coffeemaker's "regeneration system" – a complex manufacturing process used to produce decaffeinated coffee beans.  *Id*.  Generally, the quench tank was to be used in the regeneration system to hold and cool the molten-carbon byproducts of decaf-coffee production. *Id*.  After the quench tank was incorporated into the regeneration system, the system's

manufacturer had also planned to install three safety devices to protect those attempting to use or repair the quench tank from having the tank's molten contents spill on them. *Id*. at 624-25. However, the safety devices were not installed, and the plaintiff sustained burns when the molten contents of the tank poured on him as he was attempting to fix a clog in the tank. *Id*. at 623.

The New Jersey Supreme Court found that the quench-tank manufacturer was not liable under the component parts doctrine because there was no defect in the quench tank and because the system manufacturer's failure to install the proper safety equipment was not foreseeable to the quench-tank manufacturer. *Id*. at 632, 635. The *Zaza* court emphasized that "the quench tank was not defectively designed." *Id*. at 635. The court noted that the plaintiff did not "allege any manufacturing defect in the quench tank itself. The quench tank was not in and of itself dangerous or defective." *Id*. at 631. The *Zaza* court specifically instructed that "[a] compenent part fabricator may be held strictly liable for injury caused by a defective component *where the defect is in the component part* and the part did not undergo substantial change after leaving the manufacturer's hands." *Id*. Here, Flint has repeatedly alleged that the CZM that Cenotec manufactured was defective in and of itself. *See* TAC ¶ 170. Flint claims that the alleged defects "were present in the CZM when they were under Cenotec's and Fox's control and distributed by Cenotec and Fox." *Id*. ¶ 171. The Court therefore denies Cenotec's motion on this ground.

### 2. The Economic Loss Doctrine

Defendants do not otherwise challenge the adequacy of Flint's PLA claim except to contend that, because the Uniform Commercial Code ("UCC") governed Fox's sale of shot to Flint, Flint is limited to seeking damages under the UCC and may not assert a claim under the PLA. Fox Br. at 14; Rich. Br. at 24-26. Flint counters that it "is not seeking to recover for any damage to the shot supplied by Fox itself"; instead Flint seeks damages for "physical damage to

property" and "consequential loss deriving therefrom" which, Flint claims, are recoverable under the PLA.  Flint Opp. Fox at 13.

The PLA defines "harm" as

> *physical damage to property, other than to the product itself*; (b) personal physical illness, injury or death; (c) pain and suffering, mental anguish or emotional harm; and (d) *any* loss of consortium or services or *other loss deriving from any type of harm described in subparagraphs (a)* through (c) of this paragraph.

N.J.S.A. 2A:58C-1b(2) (emphases added).  As the Court previously explained, "if Flint were seeking compensation for damage to the shot itself, it would not constitute harm as defined under the PLA."  Prior Opinion at 14.  However, no allegation in the Complaint indicates that Flint is seeking to recover damages to the shot Fox shipped it and this Court observed several times in its Prior Opinion that Flint was not seeking such damages.  *See id*. at 14, 16, 17.  Instead, through its PLA claim, Flint seeks to recover (1) the amount it paid to repair the Sonoco property allegedly damaged by Defendants' defective shot; (2) "thousands of pounds of . . . Flint products" that Defendants' shot damaged and rendered useless; and, (3) losses deriving from those harms.  *See* TAC ¶ 172.  As this Court has previously observed "[t]hese damages clearly fall within the PLA's definition of 'harm.'  The economic harm caused by this property damage . . . constitute[es] 'harm' as defined by subparagraph (d) of the PLA."  Prior Opinion at 18 (citing N.J.S.A. 2A:58C-lb(2)).  Consistent with the Prior Opinion, the Court finds that Flint's PLA claim is not barred by the economic loss doctrine.

### 3.  Equitable Subrogation

For the first time in its Reply, Fox takes the position that Flint is ineligible to proceed as Sonoco's equitable subrogee.  Fox Reply at 11.  Fox gives no reason for its failure to raise the issue in its opening brief.  Fox had more than adequate notice of Flint's intent to proceed as

Sonoco's equitable subrogee – the opening paragraph of Flint's TAC discloses that it is in part proceeding as "equitable subrogee of Sonoco," TAC at 1, as does the first sentence of Flint's initial Complaint filed in *2016*. D.E. 1 at 1. There is no excuse for Fox's failure to raise the issue in its opening brief. Because it would not be fair to Flint, the Court does not consider Fox's arguments on this point. *See e.g., Cobra Enterprises, LLC v. All Phase Servs., Inc.*, No. CV 20-4750 (SRC), 2020 WL 2849892, at *1 (D.N.J. June 1, 2020) ("[T]his is a new argument raised in a reply brief and will not be considered. As a matter of procedure, this Court will not accept arguments offered for the first time in the reply brief, as they were not properly asserted in the opening brief and Plaintiffs have not had the opportunity to respond to them.") Fox's motion on this point is denied.

### D.  Breach of the Covenant of Good Faith and Fair Dealing Claim

#### 1.  Statute of Limitations

Fox moves to dismiss Flint's claim for breach of the implied covenant of good faith and fair dealing based on the statute of limitations. Fox Br. at 31 (citing N.J.S.A. § 2A:14-1). Fox argues that the applicable statute of limitations for Flint's implied-covenant claim is six years and that "any alleged conduct by Fox, including purported violations of the implied covenant, before December 27, 2013, cannot form the basis of or otherwise support Flint's claim." *Id.* at 32. Flint counters that its implied-covenant claim relates back to the allegations in its initial Complaint – filed on May 25, 2016 – such that the statute of limitations has only run as to potential claims that accrued before May 25, 2010. Flint Opp. Fox at 33.

The statute of limitations is an affirmative defense not normally decided on a motion to dismiss. *See Crump v. Passaic County*, 147 F. Supp. 3d 249, 259 (D.N.J. 2015). However, "where

the complaint facially shows noncompliance with the limitations period," dismissal on statute of limitations grounds may be appropriate. *Id*.

Federal Rule of Civil Procedure 15(c) allows a party to amend a pleading to add new claims and parties that "relate back" to the date of the original filing for statute of limitations purposes. *Mullin v. Balicki*, 875 F.3d 140, 158 (3d Cir. 2017). Rule 15(c)(1)(A) provides that an amended pleading relates back to the original filing date if "the law that provides the applicable statute of limitations allows relation back." Fed. R. Civ. P. 15(c)(1)(A); *see also DeRienzo v. Harvard Indus., Inc.*, 357 F.3d 348, 353 (3d Cir. 2004) ("The court may apply the state law that establishes the limitations period to determine whether relation back is permissible."). Pursuant to New Jersey Court Rule 4:9-3, new claims in an amended pleading relate back if they "arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading[.]" N.J. Ct. R. 4:9-3.

Here, Flint's implied-covenant claim relates back to the "conduct" alleged in the initial Complaint. Generally, in its TAC, Flint alleges that Fox breached the implied covenant by misrepresenting the product it was supplying Flint with. TAC ¶ 184. This claim arises out of the same conduct set forth in the initial Complaint. *See e.g.,* D.E. 1 ¶ 41 ("[S]ince June 2012, Fox had surreptitiously supplied [Flint] with Zirconim Shot that [Flint] had contracted purchase. Instead, Fox surreptitiously supplied [Flint] with the Alumina Shot."). Accordingly, the Court finds that Flint's implied-covenant claim relates back to the "conduct" alleged in the initial Complaint, which was filed on May 25, 2016. Thus, the applicable statute of limitations would only bar Flint's implied covenant claim if it accrued before May 25, 2010. Because Flint's implied-covenant claim is based on conduct that occurred years after 2010, the Court finds that the statute of limitations

does not bar Flint's implied-covenant claim.  Fox's motion to dismiss based on the statute of limitations is denied.

### 2. Economic Loss Doctrine

Fox opines that Flint' claim for breach of the implied covenant of good faith and fair dealing should be dismissed under the economic loss doctrine.  Fox Br. at 29-31.  Yet Fox's own brief acknowledges that the doctrine applies "when a party breaches a duty set forth *explicitly* in a contract."  *Id*. at 29.  Thus, as with the Defendants' arguments concerning the applicability of the economic loss doctrine to Flint's fraud and negligent misrepresentation claims, Fox's arguments on this point require the Court to consider the terms of the relevant agreements.  As also discussed above, the Court does not have such information before it.   Accordingly, Fox's motion to dismiss on this ground is denied.

### E.  Claims Against Richardson

Richardson opines that Flint's claims against him individually must be dismissed because the allegations in Flint's TAC are insufficient to pierce Fox's corporate veil.  Rich. Br. at 10-11. Flint counters that it has adequately alleged Richardson's individual participation in the alleged wrongdoing such that it need not pierce Fox's corporate veil.  *See* Flint Opp. Rich at 3.  Richardson replies that Flint's TAC cannot meet the elements necessary to plead a participation theory of liability against Richardson.  Rich. Reply at 2-4.

"There is ample legal authority demonstrating that 'a corporate officer can be held personally liable for a tort committed by the corporation when he or she is sufficiently involved in the commission of the tort.'"  *LM Ins. Corp. v. All-Ply Roofing Co., Inc.*, No. 14-4723, 2019 WL 366554, at *5 (D.N.J. Jan. 30, 2019) (quoting *Saltiel v. GSI Consultants, Inc.*, 788 A.2d 268, 272 (N.J. 2002)).  The New Jersey Supreme Court in *Saltiel* "reaffirmed the legal 'basis for holding

corporate officers personally liable' for their intentional tortious conduct, such as 'fraud and conversion.'" *G&F Graphic Servs.*, 18 F. Supp. 3d at 588 (quoting *Saltiel*, 788 N.J. at 272). Indeed, as *Saltiel* makes clear, "[t]he underlying reason for this rule is that an officer should not be permitted to escape the consequences of his individual wrongdoing by saying that he acted on behalf of a corporation in which he was interested." *Id.* (citation omitted).

Here, Flint asserts that Richardson personally made material misrepresentations to Flint. Specifically, Plaintiff alleges that "Richardson told Flint in writing that it was in June 2012 that Defendants began supplying Flint with CZM in place of CZS." TAC ¶ 145. Flint further alleges that Richardson, at the behest of Cenotec, represented to Flint between 2013 and 2014 that Fox was selling Flint CZS when, in fact, it was selling it CZM. *Id.* ¶ 203. Flint adds that Richardson "directed [Fox employees] to sell CZM to Fox's customers without identifying it as such or telling customers that the product Fox shipped now contained alumina." *Id.* ¶ 86. Richardson further ordered, according to Flint, Fox's employees to disguise CZM as CZS by placing misrepresentations "on the labels, order acknowledgments, packing slips, spec sheets, and other documents" Fox provided to customers. *Id.* ¶ 87. Plaintiff sufficiently alleges Richardson's individual participation in the fraud; Richardson may be held personally liable for his own intentional misrepresentations.[4] *See G&F Graphic Servs.*, 18 F. Supp. 3d at 588 (explaining that because the corporate-officer defendant, himself, made material misrepresentations, he sufficiently participated in his company's alleged fraud).

---

[4] Richardson's motion to dismiss Flint's negligent misrepresentation claim for failure to properly allege the participation theory is denied without prejudice because the parties' arguments on this point are tied to the arguments concerning the economic loss doctrine, which the Court has also dismissed without prejudice for the reasons stated above.

### F.  Civil Conspiracy Claims

All Defendants move to dismiss Flint's conspiracy claim.  Cenotec argues that Flint's conspiracy claim fails for failure to allege an underlying tort.  Cenotec Br. at 37.  Cenotec further argues that, in New Jersey, a civil conspiracy claim cannot be based on a PLA claim alone.  *Id*.  Fox makes the same argument.  Fox Br. at 28.  Richardson argues that "[w]hen officers of a corporation are acting in their corporate capacity, they cannot conspire with the corporation alone."  Rich Br. at 27 (citing *Robison v. Canterbury Village, Inc.,* 848 F.2d 424, 431 (3d Cir.1988)).

Under New Jersey law, a civil conspiracy requires two or more persons "'acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.'"  *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2003) (quoting *Morgan v. Union Cty. Bd. of Chosen Freeholders*, 633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993).  "[T]he 'gist' of the claim is not the unlawful agreement, 'but the underlying wrong which, absent the conspiracy, would give a right of action.'"  *Id.* (quoting *Morgan*, 633 A.2d at 998).  "Under New Jersey law, a claim for civil conspiracy cannot survive without a viable underlying tort."  *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 533 (D.N.J. 2011).

Flint's civil conspiracy claim is explicitly based on its CFA and common-law fraud claims, not the PLA.  TAC ¶ 216 ("Defendants entered into an agreement with one another to commit an unlawful act, namely violations of the CFA as in Count IV and fraud as in Count V.").  Thus the argument as to the PLA is misplaced, and the Court has already determined that the CFA and fraud claims are sufficiently pled. Flint has adequately alleged an underlying unlawful act.

The Court turns to the issue of whether Flint has adequately alleged "a combination" or "agreement" between "two or more persons" to commit the unlawful act and overt acts in furtherance of the conspiracy. *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263 (N.J. 2003). Here, Flint alleges that, in 2012, Cenotec introduced Fox and Richardson to CZM and "directed them to secretly 'sell' CZM as CZS . . . without 'tell[ing] any Fox customers about the difference' between the two products." TAC ¶ 79. Flint further alleges that Fox and Richardson agreed to take this course of action, *id*.; Cenotec supplied Fox with CZM instead of CZS, *id*. ¶ 217; Richardson directed Fox employees "to misbrand and misidentify the new CZM product as CZS on the labels, order acknowledgements, packing slips, spec sheets, and other documents Fox provided to customers," *id*. ¶ 87; and, that Fox shipped CZM disguised as CZS to its customers, *id*. ¶ 92. These allegations support a plausible inference that Defendants conspired to falsely pass-off CZM as CZS to Fox's customers.

Richardson's remaining argument also falls short. Richardson claims that the conspiracy claim fails because "officers of a corporation . . . acting in their corporate capacity . . . cannot conspire with the corporation alone." Rich. Br. at 27. But Richardson's own case contradicts his position. In *Robison*, the principle case Richardson relies on, the Third Circuit stated that "a . . . conspiracy between a corporation and one of its officers may be maintained if the officer is acting in a personal, as opposed to official, capacity, *or if independent third parties are alleged to have joined the conspiracy*." *Robison,* 848 F.2d at 431 (citation omitted). Here, Flint alleges an independent third party, Cenotec, joined the conspiracy. Thus, Richardson's argument that he could not have conspired with Fox alone, while accurate, misses the mark because Flint has not made such an allegation. The Court denies Defendants' motions to dismiss Flint's conspiracy claim.

## V.     CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss, D.E. 228, D.E. 232, D.E. 236, are denied.  An appropriate Order accompanies this Opinion.

Dated: October 20, 2020

_____
John Michael Vazquez, U.S.D.J.