**NOT FOR PUBLICATION**                    **FILED UNDER SEAL**[1]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| **FLINT GROUP PACKAGING INKS NORTH AMERICA CORP.,** | : : : : | **Civil Action No. 16-3009 (CCC) (MAH)** |
| **Plaintiff** | : : | |
| **v.** | : : | **OPINION** |
| **FOX INDUSTRIES INC.; CENOTEC CO. LTD.; CHARLES RICHARDSON,** | : : : : | |
| **Defendants.** | : : | |

**MICHAEL A. HAMMER, U.S.M.J.**

This matter comes before the Court by way of the joint motion filed by Defendants Cenotec Co. Ltd. ("Cenotec"), Fox Industries Inc. ("Fox"), and Charles Richardson ("Richardson") (collectively, "Defendants") for sanctions due to Plaintiff Flint Group Packaging Inks North America Corp.'s ("Flint" or "Plaintiff") purported spoliation of evidence. Joint Mot., Dec. 9, 2022, D.E. 373. Plaintiff opposes the motion. Pl.'s Opp'n, Jan. 12, 2023, D.E. 384. Defendants filed a reply in further support of their motion. Reply Br., Feb. 2, 2023, D.E. 388. The Court held oral argument on May 17, 2023. Oral Argument Tr., D.E. 407.

The Undersigned has considered the parties' submissions and arguments, the record, and the applicable law. For the reasons set forth below, Defendants' motion is **denied**.

---

[1] The Court has temporarily sealed this Opinion, in an abundance of caution, due to the parties' submissions of sealed exhibits, and the Court's analysis of them. To the extent any party wishes to seal any portion of this Opinion, that party shall make an appropriate motion in accordance with Local Civil Rule 5.3(c)(3), within **14 days** of the date of this Opinion. If no party timely files such a motion, or otherwise moves to extend the deadline by which to file the same, the temporary seal will be lifted.

## I.    BACKGROUND

Flint manufactures commercial inks used on plastic packaging and sells the ink to commercial printers, such as Sonoco Products Company ("Sonoco"). Sonoco is Flint's former customer and an equitable subrogor in this action. Third Amended Complaint ["TAC"], D.E. 220, ¶¶ 14, 162-174. The printing involved in this case, "gravure printing," involves "engraving a print image onto a massive cylinder." *Id.* ¶ 47. After purchasing the ink from Flint, Sonoco applied it to Sonoco's chrome-plated gravure cylinders. The cylinders were engraved with the images to be printed on consumer packaging. Ex. 4 to Nuñez Decl., Oct. 11, 2017 Dep. Tr. of Hugo Giorgio (Technical Manager, Sonoco), D.E. 384-5, at 25:20-26:19 ("Rotogravure [printing] uses cylinders that are made out of . . . steel, and on top of the steel you have copper. Copper is etched, and then it's chromed. So they're chromed cylinders -- then it's etched, of course, with an image, that imparts an image ultimately on a substrate."). The finished product results in packaging for consumer goods, such as Oreo cookies. TAC, D.E. 220, ¶ 14.

Flint uses a grinding media known as "shot" to manufacture ink. *Id.* ¶ 15. Shot is not itself an ingredient. *Id.* Instead, the ink's ingredients (i.e., solvents, resins, and pigments) "pass through a basket containing thousands of shot."[2] *Id.* The shot crushes and grinds the ingredients through this milling process. *Id.*; *see also* ¶ 51. Shot, however, is not intended to make it into Flint's finished ink products. *Id.* ¶ 50. When used properly, shot generally wears out over time before it is replaced by new shot. *Id.* ¶ 49.

The gravamen of Plaintiff's allegations in this matter is that Defendants switched the shot

---

[2] Flint used basket mills as part of the process to manufacture ink for Sonoco. *See* Ex. 17 to Kravitz Decl., Aug. 16, 2021 Dep. Tr. of Michael Hackett (Plant Manager, Flint), D.E. 373-19, at 197:21-24. A "basket mill is a vertical mill that has shot in it, [which is then placed] into a basket that's contained by the screens." Ex. 24 to Nuñez Decl., July 29, 2019 Dep. Tr. of Timothy Wagner (Product Manager, Flexible Film NA, Flint), D.E. 384-25, at 17:2-20.

that was sold to Flint, without telling Flint of the change.  From approximately 2008 to 2012, Cenotec manufactured, and Fox sold to Flint, a type of shot known as Zirconium Silicate Beads, product code "CZS" (hereinafter "CZS").  *Id.* ¶¶ 16-21.  CZS is made of zirconium silicate.  *Id.* ¶¶ 19-20.  In or around 2012 through 2014, however, Cenotec manufactured, and Fox sold to Flint, a different shot product—Zirconia Toughened Alumina Beads—bearing product code "CZM" (hereinafter "CZM").  *Id.* ¶¶ 22-23, 79.  Flint alleges that Fox supplied CZM without informing Flint.[3]  *Id.* ¶ 22.  Unlike CZS, CZM is made mostly out of alumina, which is a harder compound and significantly more abrasive than silicate.  *Id.* ¶¶ 23-24, 80.

Flint alleges that the switch to CZM had disastrous consequences for its ink-manufacturing process, and caused significant damage to its customer, Sonoco.  *Id.* ¶¶ 27-28, 83. Flint asserts that in or around the spring of 2013, Sonoco reported a number of problems with Flint's ink, including that the ink was damaging Sonoco's printing-press cylinders.  *Id.* ¶ 60.

---

[3] Defendants equivocate as to the date Flint received CZM.  First, Defendants' moving brief states that "it cannot be definitively determined . . . when the first delivery of CZM was made by Fox to Flint."  Joint Mot., D.E. 373-1, at 9.  The statements of Fox's President, Defendant Charles Richardson, have been inconsistent.  By letter dated August 14, 2014, Richardson told Timothy Wagner, Flint's Product Manager, that "the first shipment of the material in question was made on 11 June 2012."  Ex. 41 to Nuñez Decl., D.E. 385-42, at FGNA-002710.  However, interrogatory answers that Richardson certified on behalf of Fox provided a date of September 2013.  But at his deposition, Richardson could not recall how he determined that date.  Instead, he testified that Fox shipped CZM to Flint in 2013 but could not recall the specific date. Corrected Ex. 20 to Nuñez Decl., Dec. 8, 2020 Dep. Tr. of Charles Richardson, D.E. 400-4, at 270:16-20; *see id.* at 283:6-285:14 ("Q:  What documents does Fox have that would allow it to deduce that September 2013 was the first shipment of CZM to Flint – Lebanon?  A:  I would have to think about it.  I don't know.").  Defendants' experts opined that Flint likely first received CZM during various months in 2013.  Fox's Experts, Doctors Mikhail Laksin and Edgar A. Leone, opined that Fox supplied Flint with CZM from September 2013 to July 2014. *See* Ex. 4 to Kravitz Decl., Report of Dr. Mikhail Laksin & Dr. Edgar A. Leone, June 3, 2022, D.E. 376-4, at PAGEID: 5165.  Cenotec's Expert, Don Duncan, provided different dates.  After reviewing Cenotec's invoices and corresponding bills of lading regarding the shipment of shot to Flint, Mr. Duncan opined that the earliest Flint could have used CZM would have been June 2013.  Ex. 14 to Kravitz Decl., Report of Don Duncan, D.E. 376-14, at 6, ¶ 19.  Mr. Duncan also opined that if Mr. Richardson's testimony is credible—that Fox shipped CZM to Flint in September 2013—then the earliest Flint used CZM would have been November 2013.  *Id.*

This period in May of 2013 became known as the "weekend from hell," because Sonoco was having trouble running print jobs for its customers. Ex. 4 to Nuñez Decl., Oct. 11, 2017 Dep. Tr. of Hugo Giorgio (Technical Manager, Sonoco), D.E. 384-5, at 78:5-23. At the time, Sonoco believed the problem to be a process called "drying-in," whereby "dried ink partially fill[s] the microscopic [cells] of the gravure cylinder, which prevents the transfer of sufficient ink from the gravure cylinder to plastic film." TAC, D.E. 220, ¶ 60. Sonoco had to continuously redo print jobs; otherwise, it could not create the designed print and a "wavy line" of "chatter," or distorted print images, would develop. *Id.* ¶ 61. These problems impeded Sonoco's ability to deliver orders to its customers on time, and spurred Sonoco to demand that Flint reimburse it towards the end of 2013 through a claims process. *Id.* ¶¶ 61-62. Sonoco requested, and Flint paid, approximately $201,000 because of the difficulties experienced with Sonoco's printing processes and delay in delivering finished goods to its customers. *Id.* Flint also compensated Sonoco $392,000 "in other related claims." *Id.*

The problems persisted. In December 2013, Sonoco experienced substantial abrasion to its printing-press cylinders. *Id.* ¶ 63. The cylinders, which would normally print for roughly 7.5 million to 10 million linear feet of packaging material before requiring replacement, were now only printing between 50,000 to 500,000 linear feet of material. Ex. 9 to Kravitz Decl., Oct. 20, 2020 Dep. Tr. of Hugo Giorgio (Technical Manager, Sonoco), D.E. 373-11, at 16:9-21. Thus, beginning in December of 2013 and continuing through the summer of 2014, Sonoco put together a cross-functional team of Flint and Sonoco employees, led by Sonoco's Technical Manager, Hugo Giorgio, to determine the cause of Sonoco's premature cylinder wear. TAC, D.E. 220, ¶ 64; *see also* Ex. 9 to Kravitz Decl., Oct. 20, 2020 Dep. Tr. of Hugo Giorgio (Technical Manager, Sonoco), D.E. 373-11, at 16:9-17:11, 19:10-20:5; Ex. 56 to Nuñez Decl., D.E. 385-57, at SONOCO_000302.

During the joint investigation, Sonoco and Flint each created an iterative checklist to help analyze and identify the cause of the cylinder wear.  In or around June of 2014, Sonoco drafted a written record of the joint investigation in the form of a presentation, referred to as a "fishbone analysis."  Ex. 56 to Nuñez Decl., Fishbone Analysis, D.E. 385-57; Oral Argument Tr., D.E. 407, at 79:13-18.  The term "fishbone analysis," according to Hugo Giorgio, refers to the team's effort to evaluate groups of causes that may have contributed to Sonoco's cylinder wear.  Ex. 4 to Nuñez Decl., Oct. 11, 2017 Dep. Tr. of Hugo Giorgio (Technical Manager, Sonoco), D.E. 384-5, at 121:17-122:2.  Those "fishbones," or potential causes, included Sonoco's equipment, the printing process itself, the environment, and the materials used, among other things.  *Id.* at 121:17-124:25.

A total of ten members from Flint and Sonoco assisted in the investigation.  Ex. 56 to Nuñez Decl., Fishbone Analysis, D.E. 385-57, at SONOCO_000302.  Some members were tasked with running performance tests for the cylinders and ink, while others would coordinate a chemical analysis of the ink, audits of the printing process, and other analysis.  *Id.* at SONOCO_000302.  The team identified three main defects relating to Sonoco's printing issues: (1) drying-in; (2) cylinder wear; and (3) chatter on background cylinders.  *Id.* at SONOCO_000303.  The fishbone analysis reflects that Sonoco and Flint tested twenty-four potential theories of the three main defects.  *Id.* at SONOCO_000307.[4]

To study cylinder wear, Sonoco and Flint purchased a tool called an AniCam in March of 2014.  An AniCam is a high-resolution camera that serves as a magnifier and allows for close observation, imaging, and measurement.  Ex. 4 to Nuñez Decl., Oct. 11, 2017 Dep. Tr. of Hugo Giorgio (Technical Manager, Sonoco), D.E. 384-5, at 40:12-41:25; Oral Argument Tr., D.E. 407,

---

[4] The precise timeline of the parties' joint investigation into the potential causes of the three main defects is not clear from the fishbone analysis or the record before the Court.

at 30:13-19.  Hugo Giorgio used the AniCam to compare the cells of problematic cylinders to new cylinders.  Ex. 4 to Nuñez Decl., Oct. 11, 2017 Dep. Tr. of Hugo Giorgio (Technical Manager, Sonoco), D.E. 384-5, at 40:8-24.  Mr. Giorgio observed that "the wall thicknesses [in the problematic cylinders were] wider and the depth of the cell [was] shallower."  *Id.* at 40:21-25.  He also observed that the chrome on the problematic cylinders was wearing to a point where one could see the cylinder's copper.  *Id.* at 41:1-7.  The shallower cells on the cylinders led him to conclude that the cylinders were experiencing wear, rather than drying-in.  *Id.* at 63:2-64:10.

Through process of elimination, the team ruled out all but two possible causes of cylinder wear: (i) the ink Sonoco used was too abrasive, and (ii) the "ink formula lack[ed] lubricity characteristics."  Ex. 56 to Nuñez Decl., Fishbone Analysis, D.E. 385-57, at SONOCO_000307. The joint investigation team ran tests to determine why the ink was abrasive and why it lacked lubricity.  Flint also ran tests on its ink to determine if there were components in the ink that acted as abrasives.  *Id.* at SONOCO_000308.  Sonoco, on the other hand, ran its printing processes with a different ink to determine if that ink could extend cylinder life.  *Id.*; *see also id.* at SONOCO_000309-315 (test results).

Sonoco's tests confirmed that alternative inks extended cylinder life.  *Id.* at SONOCO_000316.  Flint's analysis confirmed that "an abrasive component was found in [Flint's] ink."  *Id.*; *see also* Corrected Ex. 27 to Nuñez Decl., Aug. 12, 2021 Dep. Tr. of Timothy Wagner (Product Manager, Flexible Film NA, Flint), D.E. 400-5, at 45:25-46:21 (concluding that ink manufactured by Flint in March 2013 was not abrasive, while ink made in August of 2013 was); Ex. 35 to Nuñez Decl., Abrasion Study, D.E. 385-36.  To confirm its findings, Flint manufactured ink using a different shot.  Ex. 56 to Nuñez Decl., Fishbone Analysis, D.E. 385-57, at SONOCO_000316.  The different shot did not cause any abnormal cylinder wear or damage. *Id.*  Thus, the team concluded that Sonoco's printing issues and cylinder wear were attributable

to the shot Flint used during that time, later determined to be CZM.  *Id.*[5]

In or around July and August 2014, Flint presented the results of the joint investigation to Fox and Richardson.  TAC, D.E. 220, ¶ 32.  Mr. Wagner, Flint's Product Manager, questioned whether Fox or Richardson knew why Flint was seeing higher levels of aluminum in its ink samples.  Corrected Ex. 27 to Nuñez Decl., Aug. 12, 2021 Dep. Tr. of Timothy Wagner (Product Manager, Flexible Film NA, Flint), D.E. 400-5, at 40:13-41:9.  Mr. Richardson then admitted that he had supplied Flint with CZM and not CZS.  *Id.* at 40:13-41:5, 279:9-20.  That was followed up by a correspondence dated August 14, 2014, in which Mr. Richardson represented to Flint that Fox began shipping CZM to Flint beginning on June 11, 2012.  Correspondence from Richardson to Flint, Aug. 14, 2014, D.E. 385-42, at FGNA-002710.  Using that timeframe, Sonoco calculated that it had suffered more than $10 million in damages.  TAC, D.E. 220, ¶¶ 39, 146.  Flint and Sonoco ultimately settled the matter of Sonoco's damages.  Flint paid Sonoco $6.3 million in or around November of 2014, in addition to the approximately $592,687.57 that Flint had paid Sonoco in 2013.

Flint filed this action on May 25, 2016.  Compl., D.E. 1.  The original complaint named

---

[5] As stated above, Flint also drafted several iterations of an iterative checklist to determine the cause of the cylinder wear, referred to by the parties as a "root cause memo."  Flint employees allegedly used the memo to test what could have been creating a variation in its ink.  Corrected Ex. 11 to Nuñez Decl., Jan. 28, 2020 Dep. Tr. of Nicki Kerrigan (Vice President, Sales: Flexible Packaging, Flint), D.E. 401, at 71:21-72:5.  But the record before the Court establishes, and both parties concede, that the first root cause memo was sent from Flint's Production Manager, Ken Gregor, to Flint employees Frank Mastria, former Global VP, and Mike Weber, Division Engineering Manager, on November 4, 2014.  Ex. 29 to Kravitz Decl., Root Cause and Corrective Action Report ["root cause memo"], D.E. 376-29; Oral Argument Tr., D.E. 407, at 78:19-24; Joint Mot., D.E. 373-1, at 38.  This root cause memo was exchanged between Flint employees four more times.  *See* Exs. 30-33, Root Cause Memos, D.E.s 376-30 through 33.  Because the root cause memo was drafted after Defendants Fox and Richardson admitted to the change in shot, and after Flint and Sonoco's joint investigation into the cylinder wear/printing issues concluded, the Court need not analyze it extensively.  Instead, the Court notes that the root cause memo appears to reflect both parties' contention that Flint considered and tested various theories concerning the printing and cylinder issues experienced by Sonoco.

only Fox as a Defendant.  Flint added Cenotec and Mr. Richardson in an Amended Complaint

filed on February 9, 2018.  D.E. 82.  Flint seeks to recover its payments to Sonoco, as well as its

own damages.  TAC, D.E. 220, ¶¶ 40, 43-46, 154, 156, 163-164.

## II.     DEFENDANTS' SPOLIATION ALLEGATIONS

Defendants allege that discovery has revealed that Flint and/or Sonoco destroyed or failed

to maintain Sonoco's cylinders and various documents concerning the cylinders.  Joint Mot.,

D.E. 373-1, at 13-20.[6]  Defendants also assert that Flint contaminated evidence relating to its

process of mixing steel balls with ceramic media in its basket mills.[7]  *Id.* at 21-23.  On the latter

point, they argue that Flint mixed the contents of basket mills containing ceramic media with a

basket mill containing solely steel media into a single vat.  *Id.*  Plaintiff opposes each of these

contentions.  The Court addresses the relevant background of each disputed item, and then

analyzes Defendants' spoliation contentions specific to that item.

### A.     *Reworking of Cylinders*

Printing-press cylinders were essential to Sonoco's gravure printing process.  TAC, D.E.

220, ¶ 47.  At the time, Sonoco had "thousands of cylinders."  *Id.* ¶ 68.  During discovery, and to

test Flint's theory that the change in shot damaged Sonoco's cylinders, on May 6, 2019, Cenotec

served a request for inspection on Flint.  *See* Ex. 46 to Kravitz Decl., Cenotec's First Request for

Inspection, D.E. 373-48.  Cenotec sought to inspect: (i) the equipment used to manufacture the

---

[6] For ease of reference, the Court shall cite to the PACER/ECF system's page numbers, located at the upper right-hand corner, when referring to any filed documents' page numbers.

[7] Flint would put shot (CZS or CZM) into a mill, and the ink's ingredients would then be crushed and ground as they moved through the manufacturing process into the final product.  *See* TAC, D.E. 220, ¶¶ 15, 51-52.  Flint's manager of flexible packaging, Timothy Wagner, testified that Flint began using CZM in its basket mills in April of 2013. *See* Corrected Ex. 27 to Nuñez Decl., Aug. 12, 2021 Dep. Tr. of Timothy Wagner (Product Manager, Flexible Film NA, Flint), D.E. 400-5, at 34:21-25.

ink; (ii) the ink that Flint either could not sell or that Flint's customers had returned due to the allegedly unsuitable shot; and (iii) the facilities where Flint manufactured the allegedly defective ink. *See id.* Defendant Fox issued a similar notice for inspection on September 27, 2019. Ex. 51 to Kravitz Decl., Fox's Re-Notice of Inspection, D.E. 373-53.

Defendants contend that Flint did not produce any of the damaged cylinders from the relevant period. More specifically, Defendants allege that "Sonoco reworked and/or destroyed every single printing cylinder that were supposedly worn or the subject of drying in[.]" Joint Mot., D.E. 373-1, at 13. A cylinder is "reworked" when its protective chrome layer is resurfaced with new chrome. *See, e.g.*, Corrected Ex. 10 to Nuñez Decl., June 8, 2021 Dep. Tr. of Jeff Johnson (Senior Manager, App Specialist, Packaging & Narrow Web, Flint), D.E. 400-2, at 26:24-27:17; Ex. 1 to Nuñez Decl., Sept. 29, 2021 Dep. Tr. of Edward Broadhurst (Operations Director, Trident Graphics), at 21:15-22:2. Sonoco's practice of reworking the cylinders, however, rendered an inspection impossible. Joint Mot., D.E. 373-1, at 13. Additionally, Defendants aver that neither Sonoco nor Flint preserved or photographed the cylinders, despite their opportunity to do so. *Id.*

### B.  The Cylinder Documents

On March 22, 2019, Cenotec served its first set of interrogatories and document demands on Flint. Ex. 48 to Kravitz Decl., Cenotec's First Set of Interrogatories, D.E. 373-50; Ex. 49 to Kravitz Decl., Cenotec's First Request for Production, D.E. 373-51. In response, Flint produced a set of documents entitled Sonoco Flexible Packaging – Cylinder Location & History.[8] Pl.'s Opp'n, D.E. 384, ¶ 52; *see also* Ex. 37 to Nuñez Decl., Cylinder Documents, D.E. 385-38. The

---

[8] The parties disagree over the names of these forms. *Compare* Joint Mot., D.E. 373-1, at 14 (referring to them as Cylinder History Reports), *with* Pl.'s Opp'n, D.E. 384, at 17 (referring to them as Cylinder Location & History forms). For the sake of clarity, the Court will refer to them as the Cylinder Documents.

relevance and utility of these documents is disputed among the parties, and is addressed more fully below.  Defendants contend that the Cylinder Documents would identify and link a particular cylinder to a particular job, and help determine how long that cylinder ran.  Joint Mot., D.E. 373-1, at 14, 20.  Flint claims to have produced all of the Cylinder Documents in both its and Sonoco's possession, for a total of thirty-three forms covering 145 different cylinders.  Pl.'s Opp'n, D.E. 384, ¶ 52.

Defendants argue that Flint must have destroyed "thousands" of Cylinder Documents. Defendants argue that Cylinder Documents were tied to each of Sonoco's cylinders, of which Sonoco purportedly had 3,100 in use at the time of the underlying events forming the basis of this litigation.  Joint Mot., D.E. 373-1, at 14.  Therefore, Defendants reason, Flint engaged in spoliation because it failed to produce all of the Cylinder Documents tied to each particular cylinder.  Defendants further assert that Flint never provided litigation hold letters to preserve the Cylinder Documents, either to its own employees or to Sonoco.  *Id.* at 15-19.

### C.  Contamination of Basket Mills

Lastly, Defendants aver that Flint contaminated the contents of its basket mills used to manufacture ink by dumping the shot from its basket mills into a single vat.  Joint Mot., D.E. 373-1, at 21-23.  Some background is necessary to understand this alleged spoliation.  During the relevant period, Flint had nine basket mills in its facility: eight mills stored ceramic shot and one mill contained steel shot.  *Id.* at 38; Pl.'s Opp'n, D.E. 384, ¶ 38; Corrected Ex. 27 to Nuñez Decl., Aug. 12, 2021 Dep. Tr. of Timothy Wagner (Product Manager, Flexible Film NA, Flint), D.E. 400-5, at 18:1-3.  In or around May of 2013, steel shot from the steel mill migrated to a neighboring mill containing ceramic shot.  *See* Joint Mot., D.E. 373-1, at 21-22; Ex. 25 to Nuñez Decl., Jan. 22, 2020 Dep. Tr. of Timothy Wagner (Product Manager, Flexible Film NA, Flint), D.E. 384-26, at 132:4-23; Ex. 6 to Nuñez Decl., Nov. 18, 2020 Dep. Tr. of Ken Gregor

(Production Manager, Flint), D.E. 384-7, at 279:14-280:4. The steel shot then purportedly mixed into other mills containing ceramic shot. Ex. 4 to Kravitz Decl., Report of Dr. Mikhail Laksin & Dr. Edgar A. Leone, June 3, 2022, D.E. 376-4, at PAGEID: 5191.

In or around July of 2014, Flint, seeking to remove CZM from its facility, replaced all of the shot in its nine basket mills. *See* Ex. 26 to Nuñez Decl., Jan. 23, 2020 Dep. Tr. of Timothy Wagner (Technical Service Manager, Flint), D.E. 384-27, at 105:9-19; Ex. 25 to Nuñez Decl., Jan. 22, 2020 Dep. Tr. of Timothy Wagner (Product Manager, Flexible Film NA, Flint), D.E. 384-26, at 51:9-15. In doing so, Flint emptied the contents of each mill into a single basin, or vat. Ex. 24 to Nuñez Decl., July 29, 2019 Dep. Tr. of Timothy Wagner (Product Manager, Flexible Film, NA Flint), D.E. 384-25, at 15:8-17:24. The vat was then preserved. *Id.* at 17:22-24.

Defendants argue that Flint intentionally mixed the contents of the nine mills into a single vat to destroy exculpatory evidence. Joint Mot., D.E. 373-1, at 22-23. More specifically, Defendants aver that the mixing of steel shot into the basket mill containing ceramic shot could have resulted in, or contributed to, Flint's ink becoming abrasive. *Id.* at 21-22. Because Flint mixed the mills into one vat, Defendants reason that they could not inspect the individual basket mills to determine exactly how much steel shot mixed into the ceramic mill(s), a question about which the parties vigorously disagree. *Id.* at 22-23.[9] Therefore, Defendants argue that Plaintiff spoliated the basket mills by mixing the contents of them into a single vat.

## III.    LEGAL STANDARD AND ANALYSIS

Spoliation refers to the alteration, destruction, or failure to produce evidence relevant to an issue in a case. *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012); *Castellani v.*

---

[9] The parties did, however, examine the vat. *See id.* at 22.

*City of Atlantic City*, Civ. No. 13-5848, 2016 WL 7155826, at *3 (D.N.J. Sept. 15, 2016). To determine whether a party engaged in spoliation, courts consider four factors: (1) whether the spoliated evidence was in the accused party's possession or control; (2) the relevance of the evidence to the litigation; (3) whether the accused party actually suppressed or destroyed the evidence; and (4) whether the accused party had a duty to preserve the evidence. *Bull*, 665 F.3d at 73; *Kuhar v. Petzl Co.*, Civ. No. 16-0395, 2018 WL 6363747, at *5 (D.N.J. Nov. 16, 2018). The party seeking spoliation sanctions, here Defendants, bears the burden of proving each factor. *See Kuhar*, 2018 WL 6363747, at *5; *Frazier v. Bed Bath & Beyond, Inc.*, Civ. No. 10-5398, 2013 WL 1845499, at *7 (D.N.J. Apr. 30, 2013). "[T]his is not a balancing test – ergo, every element must be met." *Kuhar*, 2018 WL 6363747, at *5.

The first factor requires that the moving party prove the purported spoliated evidence was in the spoliating party's "possession, custody, or control." *Eisenband v. Pine Belt Auto., Inc.*, Civ. No. 17-8549, 2020 WL 1486045, at *8 (D.N.J. Mar. 27, 2020) (quoting *Camden Iron & Metal, Inc. v. Marubeni Am. Corp.*, 138 F.R.D. 438, 442 (3d Cir. 1991)). However, it is not necessary for a party to have physical control of the evidence in question. *Id.* (quoting *Swindell Dressler Int'l Co. v. Travelers Cas. & Sur. Co.*, 827 F. Supp. 2d 498, 505 (W.D. Pa. 2011)). Instead, it is enough that the alleged spoliating party had "the legal right or ability to obtain the documents from another source upon demand." *Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 160 (3d Cir. 2004).

Second, evidence is considered relevant if the evidence would tend to support, or help defend against, a claim. *See Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004) ("A party seeking [sanctions] based on the spoliation of evidence must establish . . . that the destroyed evidence was 'relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."); *see also Frazier*, 2013 WL

1845499, at *7 (analyzing whether the evidence contains information relevant to the allegations in the complaint).  Whether evidence is relevant is generally considered under the discovery standard set forth in Federal Rule of Civil Procedure 26.  *See Fairview Ritz Corp. v. Borough of Fairview*, Civ. No. 09-0875, 2013 WL 163286, at *4 (D.N.J. Jan. 15, 2013).

Third, the Court must analyze whether there was a duty to preserve the purportedly spoliated evidence, and if so, when that duty arose.  *Bull*, 665 F.3d at 77-78.  A litigant is "under a duty to preserve what it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation."  *Scott v. IBM Corp.*, 196 F.R.D. 233, 249 (D.N.J. 2000).  Whether litigation is reasonably foreseeable is a "flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry."  *Bull*, 665 F.3d at 77 (quoting *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011)).  Additionally, the inquiry into whether litigation was reasonably foreseeable is a question of law to be determined by the Court.  *Van De Wiele v. Acme Supermarkets*, Civ. No. 13-5924, 2015 WL 4508376, at *3 (D.N.J. July 24, 2015).  Courts consider the following factors to determine whether the duty to preserve arose: "(1) pending or probable litigation involving the defendants; (2) knowledge by the plaintiff of the existence or likelihood of litigation; (3) foreseeability of harm to the defendants, . . .; and (4) evidence relevant to the litigation."  *Id.* (quoting *Aetna Life & Cas. Co. v. Imet Mason Contractors*, 309 N.J. Super. 358, 366 (N.J. App. Div. 1998)); *Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 518 (D.N.J. 2008).  Absent a duty to preserve, there can be no spoliation.  *Van De Wiele*, 2015 WL 4508376, at *3 (collecting cases).

Finally, the Court must determine whether the moving party has proved actual suppression – *i.e.*, that the spoliating party acted in "bad faith" in destroying, altering, or failing to produce evidence.  *Bull*, 665 F.3d at 79; *Van De Wiele*, 2015 WL 4508376, at *2.  The actual

suppression standard requires "a showing of intent apart from establishing the alleged conduct as a matter of fact." *Masterank Wax, Inc. v. RFC Container, LLC*, Civ. No. 19-12245, 2022 WL 19927891, at *5 (D.N.J. Aug. 30, 2022) (citing *Bull*, 554 F.3d at 79). "To be clear, therefore, the mere destruction or loss of evidence in and of itself does not make out a claim for actionable spoliation; more must be shown." *Kuhar*, 2018 WL 6363747, at *5. Accordingly, it is not enough that a party prove that evidence was destroyed or withheld because of ordinary negligence. *Id.* (quoting *Lucia v. McClain & Co., Inc.* Civ. No. 11-930, 2013 WL 4517976, at *16 (D.N.J. Aug. 23, 2013)). Nor is it enough to show that the evidence was destroyed in the usual course of business, or as a matter of routine. *Van De Wiele*, 2015 WL 4508376, at *4 (collecting cases); *McCann v. Kennedy Univ. Hosp., Inc.*, Civ. No. 12-1535, 2014 WL 282693, at *7 (D.N.J. Jan. 24, 2014) (finding no bad faith where the defendant's video system automatically overwrote its recordings after three weeks, and litigation was not foreseeable). Thus, Defendants must prove that Flint intentionally withheld or deprived the evidence to suppress it. *See Bull*, 665 F.3d at 79; *Rodriguez v. Auto Zone*, Civ. No. 12-3916, 2014 WL 197894, at *12 (D.N.J. Jan. 14, 2014).

If the Court finds that a party engaged in spoliation, it must then determine what sanctions, if any, are warranted. *See Bull*, 665 F.3d at 73 n.5. In determining whether and what sanctions are appropriate, the Court must consider:

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party, and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

*Id.* (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994)). The range of potential spoliation sanctions includes dismissal of the action, exclusion of evidence, an

14

instruction to the finder of fact allowing for an adverse inference, and attorneys' fees and costs. *Mosaid Techs. Inc. v. Samsung Elecs. Co., Ltd.*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004).

In this case, Defendants argue that Flint's own spoliation, and that of Sonoco, for which Flint is responsible as the subrogee, warrant the most severe sanction of dismissal of the TAC. Joint Mot., D.E. 373-1, at 41-44. In the alternative, Defendants seek that the Court issue an adverse inference. *Id*. at 44-45. The Court now analyzes whether Defendants have satisfied their burden of proving Plaintiff engaged in spoliation of evidence.

### A. Whether Flint Spoliated Sonoco's Cylinders

Defendants argue that Flint spoliated Sonoco's cylinders by failing to preserve or take protective measures against Sonoco reworking and/or discarding the damaged cylinders. Flint does not dispute that the cylinders are relevant to this matter. *See* Pl.'s Opp'n, D.E. 384, at 32-41. They plainly are. The Court thus considers whether Defendants have satisfied their burden of proving that Flint had a duty to preserve the cylinders and, relatedly, whether Flint controlled or possessed the cylinders. If Flint had such a duty, and possessed the cylinders, the Court must then consider whether Flint suppressed or destroyed the cylinders.

### i. Duty to Preserve

The parties strongly disagree concerning when Flint's duty to preserve arose. More particularly as to the cylinders, the issue is when Flint's duty to ensure that Sonoco took reasonable measures to preserve the cylinders arose. Defendants urge the Court to conclude that the duty first arose as early as May 2013—*i.e.*, when Sonoco began to experience serious issues with its printing processes. Defendants reason that the "weekend from hell" should have made the prospect of litigation reasonably foreseeable to Flint. Flint urges the Court to find that its duty to preserve arose in or around July or August of 2014, because only then did Flint know from its and Sonoco's investigation that its ink contained an abrasive component, and

Richardson admitted that Defendants had changed the shot from CZS to CZM.

Examination of Flint's and Sonoco's reactions to the problems experienced during the "weekend from hell" establishes that Flint could not, in May 2013, have reasonably foreseen litigation against the Defendants. In fact, little if anything in the record suggests Flint or Sonoco even realized that the shot's abrasiveness was the problem. During the "weekend from hell," Sonoco diagnosed the printing issues as drying-in. Ex. 4 to Nuñez Decl., Oct. 11, 2017 Dep. Tr. of Hugo Giorgio (Technical Manager, Sonoco), D.E. 384-5, at 78:5-23.

Seven more months would pass before Sonoco even complained to Flint about additional printing issues. Joint Mot., D.E. 373-1, at 10 (citing Ex. 15 to Kravitz Decl., December 6, 2013 Email Concerning Ink Issues, D.E. 376-15). By December 2013, Sonoco and Flint believed the printing issues could be attributed to any of three defects: drying-in, chatter, or cylinder wear. Ex. 56 to Nuñez Decl., Fishbone Analysis, D.E. 385-57, at SONOCO_000303. Sonoco and Flint then jointly investigated the issues and tested each possible theory, narrowing a list of twenty-four possible causes to two. *Id.* at SONOCO_000307. Sonoco and Flint then conducted further testing to conclude that Flint's ink was abrasive and causing damage to Sonoco's printing-press cylinders. *Id.* at SONOCO_000308-000316. By mid-2014, Flint and Sonoco were able to conclude from the AniCam analysis and ink comparison that the problematic inks contained an abrasive component and lacked lubricity. Flint then experimented with a different shot to test if it would cause abnormal cylinder wear. That alternative shot did not prove problematic. That allowed Flint to narrow the issue down to the shot it had been using for Sonoco. But that realization itself did not occur until 2014. And even then, Flint could not reasonably be expected to know why the shot had become problematic in May 2013, after years of using it without issue. That knowledge followed soon after completion of the testing, when Flint presented the investigative results to Fox and Richardson, and Richardson admitted to supplying Flint with

CZM rather than CZS. Corrected Ex. 27 to Nuñez Decl., Aug. 12, 2021 Dep. Tr. of Timothy Wagner (Product Manager, Flexible Film NA, Flint), D.E. 400-5, at 40:13-41:9. To that end, Flint's Product Manager, Timothy Wagner, testified that he was not aware of the change to CZM until Richardson told him on July 30, 2014. Ex. 25 to Nuñez Decl., Jan. 22, 2020 Dep. Tr. of Timothy Wagner (Product Manager, Flexible Film NA, Flint), D.E. 384-26, at 69:5-23. Accordingly, the Court finds that the earliest Flint could have reasonably foreseen litigation against some or all of the Defendants was in July 2014.

Defendants' contention that Sonoco's demand for approximately $201,000, which Flint paid in or around August 2013, should have placed Flint on notice of probable litigation similarly falls flat for two reasons. Joint Mot., D.E. 373-1, at 36; Ex. 43 to Kravitz Decl., August 2013 Claims Summary, D.E. 376-43. First, the considerable size of the claim notwithstanding, Sonoco's process of submitting claims to vendors appears to have been standard protocol. Ex. 59 to Supp. Kravitz Decl., June 27, 2019 Dep. Tr. of Gregory D. Munoz (Vice President, Supply Management, Sonoco), D.E. 388-7, at 50:23-62:12. Mr. Munoz testified that Sonoco issued "numerous" claims during this time. *Id.* at 50:1-12. Additionally, Flint was trying to preserve its business relationship with Sonoco. *See* Ex. 67 to Nuñez Decl., June 3, 2022 Expert Report of Joe Cichon, D.E. 384-68, at 7. The fact that Flint paid out a claim to continue that relationship is not indicative of a duty to preserve.

Second, and more importantly, as of August 2013, the most Flint and Sonoco could assume was that the production problems Sonoco experienced stemmed from Flint's ink-manufacturing processes. Nothing in the record establishes that Flint knew or should have known that some third party, much less the Defendants, was responsible for the printing issues that Sonoco experienced. As explained above, that knowledge necessarily followed an iterative process by Flint and Sonoco of identifying all potential causes and gradually narrowing them

down.  That process did not put Flint on notice of a duty to preserve until July 2014.

Lastly, Flint alleges that it did not know of Defendant Cenotec's involvement in supplying the CZM until after this case was filed in May 2016.  Pl.'s Opp'n, D.E. 384, at 39. Flint does not provide any support for that contention.  However, the record reflects that Flint's original Complaint named Fox as the sole defendant.  Compl., May 25, 2016, D.E. 1.  On May 5, 2017, District Court Judge Vazquez granted in part Fox's motion to dismiss.  Opinion and Order, D.E.s 39 and 40.  Flint then requested to amend the Complaint because discovery purportedly revealed that Cenotec had provided Fox with two products: the CZS and CZM.  Letter Requesting Leave to Amend, Nov. 8, 2017, D.E. 68.  Magistrate Judge Falk granted Flint's request, and Flint filed its First Amended Complaint as against Fox, Richardson, and Cenotec on February 9, 2018.  First Amended Complaint, Feb. 9, 2018, D.E. 82.

In sum, Defendants have failed to prove that Flint's duty to preserve arose at any point in 2013, let alone in May of 2013.  Instead, litigation was reasonably foreseeable as against Fox and Richardson in July 2014, when Sonoco and Flint concluded the investigation and found that the change in shot made Flint's ink abrasive.  Those allegations are the basis of this litigation.  It follows that Flint could not have reasonably anticipated the prospect of litigation against Cenotec until at least July 2014, and likely later.  Because Defendants have not proved that Flint had a reasonably foreseeable duty to preserve the cylinders before Sonoco reworked them, their motion as to the cylinders fails.  *Van De Wiele*, 2015 WL 4508376, at *3 ("If the duty to preserve evidence has not been triggered at the time the evidence was destroyed, then there can be no spoliation.") (quoting *Antoine v. KPMG Corp.*, Civ. No. 08-6415, 2010 WL 147928, at *10 (D.N.J. Jan. 6, 2010) (internal quotation marks omitted))).

18

### ii. Control

In the interests of completeness, the Undersigned also considers whether Flint had control over Sonoco's cylinders. Defendants urge the Court to conclude that Flint had control of Sonoco's cylinders for three principal reasons. First, Defendants posit that Flint's employees had access to the cylinders throughout the joint investigation into the printing issues, and that access equates to control. Joint Mot., D.E. 373-1, at 28, 35. Second, Defendants argue that Flint had control of the cylinders because Sonoco and Flint purportedly entered into a "Litigation Agreement." *Id*. at 28. That agreement was a deal by Sonoco and Flint to share in the proceeds of any litigation based on the claims in this case. *Id.*; *see also id.* at 24-26. Lastly, Defendants argue that as Sonoco's subrogee, Flint had control over the cylinders and must be held liable for the actions of its subrogor. *Id.* at 33-35. Defendants maintain that liability attaches even if the subrogor's actions predated the date on which the parties formally entered into a subrogation relationship. *See id.*

Flint disputes each of these contentions. Flint emphasizes that Sonoco owned the cylinders and that Flint's occasional ability to access them did not diminish Sonoco's control over them. Pl.'s Opp'n, D.E. 384, at 33-34. Additionally, Flint posits that the subrogation relationship between Sonoco and Flint, entered on November of 2014, has no bearing on whether Flint had control over the cylinders. *Id*. at 34-35. Lastly, Flint argues that any Litigation Agreement is mere conjecture and cannot serve as a basis for spoliation sanctions. *Id*. at 36-37.

Defendants have not established that Flint had control over Sonoco's cylinders. At the outset, there can be no dispute that the cylinders belonged to Sonoco. The cylinders were manufactured and supplied to Sonoco by Trident. Ex. 4 to Nuñez Decl., Oct. 11, 2017 Dep. Tr. of Hugo Giorgio (Technical Manager, Sonoco), D.E. 384-5, at 102:24-103:2; Ex. 10 to Nuñez Decl., June 8, 2021 Dep. Tr. of Jeff Johnson, D.E. 384-11, at 27:12-17. Of course, it is possible

that Flint's access to the cylinders was so complete that Flint could be said to control them. *See Mercy Catholic Med. Ctr.*, 380 F.3d at 160. On this point, Defendants point to Flint's access to the cylinders during Sonoco and Flint's joint investigation. Joint Mot., D.E. 373-1, at 35. But mere access to an item does not necessarily establish control over it. Consider *Mercy Catholic Medical Center*, for example. In that case, the Third Circuit held a hospital's submission of data to a Medicare Intermediary's subcontractor was the functional equivalent of submitting it to the Intermediary itself, such that it was an abuse of discretion for Medicare to deny the hospital a requested rate adjustment on the basis that the hospital erroneously submitted the relevant data to the subcontractor rather than the Intermediary itself. *Mercy Catholic Med. Ctr.*, 380 F.3d at 160. But in that case, the subcontractor had unfettered access to the same data available to the Intermediary in order to evaluate the rate-adjustment request.

Defendants have not established that Flint had comparable access to the cylinders such as to rise to the level of control over them. To the contrary, even as Sonoco experienced the printing issues and worked with Flint to investigate them, it continued to use the cylinders in its normal course of operations. Further, it was Hugo Giorgio—Sonoco's employee—who studied the cylinders through the AniCam. Ex. 4 to Nuñez Decl., Oct. 11, 2017 Dep. Tr. of Hugo Giorgio (Technical Manager, Sonoco), D.E. 384-5, at 40:8-24. Moreover, based on the fishbone analysis, it appears that Flint's role in the joint investigation was tied to Flint's ink. Flint employees Tim Wagner and Phil Ernst (Flint Chemist) were respectively tasked with coordinating process audits and chemical analysis of the ink. *See, e.g.,* Ex. 56 to Nuñez Decl., Fishbone Analysis, D.E. 385-57, at SONOCO_000302. To test whether the ink was abrasive, the joint investigation team requested that Flint "conduct particle size analysis" and "conduct particle type analysis to determine if there are components that act as abrasives." *Id.* at SONOCO_0000308, SONOCO_000316.

Even assuming Sonoco allowed Flint employees access to the cylinders as part of the joint investigation, that access was not so unfettered as to constitute control over the cylinders. Instead, the record reflects that Sonoco drove the decision to rework the cylinders when they were damaged. *See, e.g.*, Ex. 4 to Nuñez Decl., Oct. 11, 2017 Dep. Tr. of Hugo Giorgio (Technical Manager, Sonoco), D.E. 384-5, at 35:8-24, 102:25-103:2; Ex. 8 to Nuñez Decl., Oct. 4, 2019 Dep. Tr. of Scott Huffer (Principal Engineer, Sonoco), D.E. 384-9, at 114:2-10. And although Flint and Sonoco worked together during the investigation, evidence reflects that, as late as February 2015, Sonoco was unsure whether it would assist Flint in any litigation. Following a conference call with Flint on February 9, 2015, Sonoco employees created an internal memorandum stating: "Follow up conversation internally[:]  1. We cooperate and provide affidavits[;]  2. Don't cooperate and wait for them to potentially call us into court[.]" Ex. 65 to Nuñez Decl., Internal Notes from Feb. 9, 2015 Conference Call with Flint, D.E. 385-66, at SONOCO_013880. That does not reflect any intent to assist Flint, let alone control.

Defendants' argument that Flint and Sonoco's subrogation relationship conferred on Flint control over the cylinders is unavailing for two reasons. Flint and Sonoco negotiated a settlement of the claims as against each other in November 2014. Ex. 57 to Nuñez Decl., Ink Contract, D.E. 385-58; TAC, D.E. 220, ¶ 146. That period is well after Sonoco had already reworked and re-chromed the cylinders relevant to this litigation. Additionally, the Court is hard-pressed to find that Flint can be held liable for the actions of its subrogor, particularly when the actions complained of occurred before the subrogation relationship began. Defendants rely on various caselaw for the proposition that a subrogee stands in the shoes of its subrogor. *See, e.g.*, Joint Mot., D.E. 373-1, at 30 (citing *Auto-Owners Ins. Co. v. Puckett Co., Inc.*, Civ. Nos. 260658 & 261637, 2006 WL 2685086, at *6 (Mich. Ct. App. Sept. 19, 2006); *Great Northern Ins. Co. v. Altmans Prods. LLC*, Civ. No. 08-10395, 2009 WL 10680841, at *2 (E.D. Mich. Mar.

16, 2009); and *Holloway v. State*, 125 N.J. 386, 396 (1991)); Reply Br., D.E. 388, at 14 (citing *U.S. Fire Ins. Co. v. Royal Ins. Co.*, 759 F.2d 306, 309 (3d Cir. 1986)). Defendants' reliance on *Holloway* and *U.S. Fire Ins. Co.* is unpersuasive. Those cases do not concern spoliation, or even a dispute over discovery. Instead, these cases discuss subrogation principles generally, and even then, in the context of specific subrogation provisions in insurance policies.

Defendants' reliance on *Auto-Owners Ins. Co.* also is unavailing. That case was a subrogation action brought by an insurer on behalf of its insured homeowner. The insurer alleged that the defendant furnace-repair company's negligence caused fuel oil to leak from the homeowner's furnace and damage his house and property. 2006 WL 2685086, at *1, *6. During discovery, the insurer could not produce the furnace for inspection because the homeowner had discarded it. *Id.* at *6. The trial court issued an adverse-inference instruction to the jury, which found in favor of the defense. On appeal by the insurer, the Michigan Court of Appeals concluded that the trial court did not abuse its discretion in issuing the adverse-inference instruction. *Id.* at *7.

*Auto-Owners Ins. Co.* is distinguishable in several respects. First, the cause of damage to the insured's property and home was immediately ascertainable. In fact, only a week after the leak, the insurer notified the furnace-repair company that the insurer held the company responsible for the damage. *Id.* at *5. Here, more than a year passed between the "weekend from hell" and Flint's realization that the switch from CZS to CZM caused the cylinder damage and printing problems. Second, the insurer's control over the furnace was undisputed. *Id.* at *6. In this case, the control of the cylinders is very much in dispute, and far from clear. Therefore, *Auto-Owners* does not advance Defendants' argument. Similarly, *Great Northern Ins. Co. v. Altmans Products LLC,* on which Defendants also rely, is distinguishable. *See Great Northern Ins. Co.*, 2009 WL 10680841, at *2 ("Finally, unlike the case at bar, *Auto-Owners* specifically

stated that 'it is not disputed that plaintiff, through its subrogor, . . . was in control of the furnace and contaminated items, all of which were highly relevant to the case.' In the case at bar Plaintiff disputes that its subrogor/insured's documents and items are within its control.") (internal citations omitted).

Finally, the parties' purported agreement to share in the proceeds of this litigation cannot serve as a basis to prove that Flint had control over Sonoco's cylinders. Defendants admit that the Litigation Agreement was solely a draft, and therefore, never fully executed. Joint Mot., D.E. 373-1, at 41-42. Flint and Sonoco employees confirm this point. For example, Flint's Vice President of Sales, Nicki Kerrigan, testified that he had no knowledge of Flint reaching any such agreement with Sonoco. Ex. 12 to Nuñez Decl., Jan. 29, 2020 Dep. Tr. of Nicki Kerrigan (Vice President, Sales: Flexible Packaging, Flint), D.E. 385-13, at 135:1-15. Gregory Munoz, Sonoco's Vice President, also testified that Sonoco "do[es] not expect anything from Flint if it is successful in this litigation." Ex. 18 to Nuñez Decl., Oct. 3, 2019 Dep. Tr. of Gregory Dean Munoz (Vice President, Supply Management, Sonoco), D.E. 384-19, at 76:2-21. Accordingly, Defendants have not established that Flint controlled the cylinders.

### iii.  *Actual Suppression*

Even if Flint had a duty to preserve Sonoco's cylinders as of May 2013, and had control over them, Defendants have not established that Flint actually suppressed the cylinders. Actual suppression requires Defendants to prove that the cylinders were destroyed in bad faith, and not merely because of negligence or in the usual course of operations. *Van De Wiele*, 2015 WL 4508376, at *4; *McCann*, 2014 WL 282693, at *7. Defendants appear to argue that Flint actually suppressed the printing-press cylinders in an effort to collude with Sonoco to make exculpatory evidence disappear. Joint Mot., D.E. 373-1, at 29-30, 41. They reason that a reasonable party would not destroy evidence after spending "years" investigating the cause of issues that evidence

experienced, specifically cylinder wear.  *Id.* at 29.  To support their claim, Defendants again point to the Litigation Agreement between Sonoco and Flint.  *Id.* at 41.

Defendants have not carried their burden of proving that Sonoco or Flint actually suppressed the cylinders.  Sonoco remade and re-chromed the cylinders to serve its customers and keep its business running, even as it and Flint investigated the printing issues.  *See* Ex. 4 to Nuñez Decl., Oct. 11, 2017 Dep. Tr. of Hugo Giorgio (Technical Manager, Sonoco), D.E. 384-5, at 34:2-9, 35:8-24.  That practice falls squarely within Sonoco's normal course of operations, and does not provide a basis to conclude that Flint "actually suppressed" the cylinders.  *Van De Wiele*, 2015 WL 4508376, at *4 (finding that the destruction of evidence as part of a routine protocol does not amount to bad faith).

Deposition testimony from Flint, Sonoco, and Trident employees underscores this conclusion.  Flint's Senior Manager of Packaging, Jeff Johnson, testified that cylinders had to be resurfaced with new chrome when the protective chrome layer wore out.  Corrected Ex. 10 to Nuñez Decl., June 8, 2021 Dep. Tr. of Jeff Johnson (Senior Manager, App Specialist, Packaging & Narrow Web, Flint), D.E. 400-2, at 26:24-27:17.  Sonoco's Principal Engineer, Scott Huffer, also testified that cylinders might require re-chroming three to four times to "refresh the cylinder."  Ex. 8 to Nuñez Decl., Oct. 4, 2019 Dep. Tr. of Scott Huffer (Principal Engineer, Sonoco), D.E. 384-9, at 114:2-10.  As did Hugo Giorgio.  Ex. 4 to Nuñez Decl., Oct. 11, 2017 Dep. Tr. of Hugo Giorgio (Technical Manager, Sonoco), D.E. 384-5, at 34:2-9 (stating that the cylinders were remade two to three times to fulfill Sonoco's orders).  Trident's Operations Director, Edward Broadhurst, similarly testified that cylinders would be resurfaced as long as the cylinder was not so worn out that re-chroming was unproductive.  Ex. 1 to Nuñez Decl., Sept.

29, 2021 Dep. Tr. of Edward Broadhurst (Operations Director, Trident Graphics), D.E. 384-2, at 21:15-22:2.[10]

In sum, beyond alleging that Sonoco re-worked the cylinders, which is not disputed, Defendants have failed to prove actual suppression. *See Masterank Wax, Inc.*, 2022 WL 19927891, at *5 (requiring the movant to prove intent beyond the "alleged conduct as a matter of fact"). That is, Defendants have not established that either Flint or Sonoco engaged in conduct as to the cylinders for the purpose of committing fraud on the court or suppressing the truth. *See Hicks v. Wegmans Food Mkt.*, Civ. No. 09-624, 2011 WL 499368, at *1 (D.N.J. Feb. 10, 2011). For all of these reasons, Defendants' motion for spoliation sanctions as to the cylinders is denied.

### B. Whether Flint and/or Sonoco Spoliated the Cylinder Documents

The Court next considers whether Flint spoliated Cylinder Documents. Defendants contend that the Cylinder Documents could have helped them to determine the cause of the cylinder wear. Defendants argue that Flint's production of nineteen Cylinder Documents (excluding duplicates) is a miniscule subset of the "thousands" of Cylinder Documents it should have produced. On this issue, the parties dispute all four elements necessary to make out a claim for spoliation. The Court also must consider whether to apply the standards under Rule 37(e), because the Cylinder Documents were stored on Sonoco's computer system and therefore might constitute electronically stored information ("ESI").

The Court first analyzes whether Defendants have proven that the Cylinder Documents are relevant. If they are, the Court must consider whether Flint had a duty to preserve and

---

[10] Flint also submitted the deposition transcript of Andrew Sieber. Mr. Sieber testified that if the chrome plating is worn out, it must be replaced. Ex. 23 to Nuñez Decl., May 27, 2021 Dep. Tr. of Andrew Sieber, D.E. 384-24, at 33:6-24. However, Flint did not identify Mr. Sieber's role. *See* Joint List of Deponents, D.E. 406. Given the ample evidence on this point, and Flint's failure to identify Mr. Sieber's role, the Court need not rely on Mr. Sieber's testimony.

control over the Cylinder Documents before determining whether Flint actually suppressed the forms. The Court will then separately analyze whether Flint spoliated the allegedly electronically stored Cylinder Documents under Rule 37(e).

### i. *Spoliation of Physical Cylinder Documents*

#### a. *Relevance*

Defendants urge the Court to find that Cylinder Documents are relevant because they could have identified when the cylinder wear started and allowed Defendants to explore whether other factors contributed to their wear. Joint Mot., D.E. 373-1, at 37-38. Flint maintains that Sonoco did not maintain the Cylinder Documents in the ordinary course of business, and that the documents often contained inconsistent information regarding a cylinder's production. Pl.'s Opp'n, D.E. 384, ¶¶ 45-46. Additionally, Flint argues that neither its experts nor Defendants' experts articulated any useful data or purpose for the documents. *Id.* ¶¶ 54-55.

The Cylinder Documents have at least some relevance, particularly under the broad discovery standard of Rule 26. In fact, Flint's Senior Manager of Packaging testified during his deposition that Sonoco and Flint used and shared the Cylinder Documents throughout their joint investigation. Ex. 10 to Nuñez Decl., June 8, 2021 Dep. Tr. of Jeff Johnson, D.E. 384-11, at 183:22-184:2. That both companies utilized them in investigating the cylinder and printing-production issues suggests that the documents are relevant. And contrary to Flint's argument, Defendants' damages expert did not testify that the Cylinder Documents would not assist him in calculating damages. Pl.'s Opp'n, D.E. 384, ¶ 54. Dr. Klein testified in pertinent part as follows:

> Q: Okay. Am I understanding your testimony correctly, sir, that whatever information is in those reports, you don't view as helpful to you?
>
> A: The ones that I saw, no.

Q:  Okay.  Do you believe that there would be any out there that could be helpful to you?

A: I don't know, they don't exist, they have been destroyed.

Q:  Okay.  So, as you sit here today, you have no reason to believe that there ever were any cylinder location and history documents that would be helpful to any of the work that you're doing in this case, right?

. . .

A:  Again, without having the opportunity to review them, I can't answer that.

Ex. 13 to Nuñez Decl., Aug. 4, 2022 Dep. Tr. of Hubert Klein, PhD (Defendants' Joint Economic Expert), D.E. 385-14, at 251:4-23.  Mr. Klein does not state that the Cylinder Documents are or are not useful.  Instead, he could not make a determination based on the Cylinder Documents before him.  *See also id.* at 263:16-25.

Flint also argues that Cenotec's liability expert, Don Duncan, did not find the Cylinder Documents to be useful.  Pl.'s Opp'n, D.E. 384, ¶ 55 (citing Ex. 30 to Nuñez Decl., Aug. 8, 2022, Dep. Tr. of Don Porter Duncan, D.E. 384-31, at 359:19-23, 360:12-19).  But Mr. Duncan actually testified:

Q:  And you have no knowledge as far as how Sonoco used or didn't use these [Cylinder Documents], correct?

A:  From what's written on [the Cylinder Documents] in general, from the ones I have seen, they used it to monitor the cylinder situation as well as where the cylinders were kept and put because they'd have to take cylinders on and off, move them around.  They need to know where they are.  So it's a tracking cylinder location mechanism to let them find them again.  And then a summary of whether there were issues or not, which is the history report.

Q:  Okay.  How many feet did this cylinder have on it before this purported 131,000-foot job?

A:  I don't think you can tell from this sheet.

Ex. 30 to Nuñez Decl., Aug. 8, 2022 Dep. Tr. of Don Porter Duncan, D.E. 384-31, at 359:7-23.

Mr. Duncan testified that the particular document in front of him was not particularly useful, not

that the Cylinder Documents collectively lacked probative value. In fact, Mr. Duncan further

testified:

> Q: But without knowing how many feet this cylinder or these cylinders had on them or any of these cylinders, you would not be able to determine whether there was premature cylinder wear involving this job, correct?
>
> A: That is correct, which is why having a full set of them which would have allowed that is important.

*Id.* at 360:12-19.

Accordingly, the Court concludes that the Cylinder Documents meet the standard for

relevance under Rule 26.

### b. Duty to Preserve

The Court next considers whether Flint had a duty to preserve the Cylinder Documents.

Much like their argument concerning the cylinders, Defendants point to May 2013 as the

timeframe when Flint's duty to preserve the documents arose. However, Defendants also

contend that Flint spoliated Cylinder Documents after Flint and Sonoco concluded that the

change in shot caused the problems with Sonoco's printing processes. Ex. 25 to Kravitz Decl.,

Feb. 4, 2021 Dep. Tr. of Timothy Williams, D.E. 373-27, at 160:7-161:10 (stating that upon

leaving Flint's employ, Mr. Williams threw out "documents" in 2018); Ex. 27 to Kravitz Decl.,

June 8, 2021 Dep. Tr. of Jeff Johnson, D.E. 373-29, at 183:2-9, 235:13-19 (testifying that the

Cylinder Documents were "put in the trash" sometime in 2015). Defendants further maintain

that Flint never asked its employees, or employees of Sonoco, to preserve the Cylinder

Documents. Joint Mot., D.E. 373-1, at 15, 19. Unsurprisingly, Flint argues that any duty to

preserve began in July 2014, when it first became aware of the change in shot causing its inks to abrade Sonoco's cylinders.  Pl.'s Opp'n, D.E. 384, at 47.

For largely the same reasons as the Court held with respect to the cylinders, *supra* Section III.A, the Court finds that Flint's duty to preserve the Cylinder Documents arose in July 2014.  Litigation was reasonably foreseeable to Flint when it deduced that the problems were caused by the introduction of an abrasive component to its ink-manufacturing process, specifically the switch to CZM.  However, that conclusion does not end the spoliation inquiry concerning the Cylinder Documents, because Defendants contend that Flint destroyed Cylinder Documents after July 2014.

### c.   *Control*

Defendants urge the Court to find that Flint had control over the Cylinder Documents because Flint's employees accessed, reviewed, and printed the documents when investigating cylinder wear.  Joint Mot., D.E. 373-1, at 15, 28.  Defendants also reiterate their contention that Flint controlled the Cylinder Documents by virtue of its subrogation relationship with Sonoco. *Id.* at 28, 33-35.  Flint maintains that it did not have control over the Cylinder Documents because they were located on Sonoco's systems.  Pl.'s Opp'n, D.E. 384, at 44.  Additionally, Flint could not have control over the Cylinder Documents by virtue of the subrogation relationship because Sonoco and Flint did not enter that relationship until November 2014, well after the conclusion of the joint investigation.  Ex. 10 to Nuñez Decl., June 8, 2021 Dep. Tr. of Jeff Johnson, D.E. 384-11, at 183:2-184:2.

The Court finds that Flint had some measure of control over some of the Cylinder Documents.  Flint employees Jeff Johnson and Timothy Williams testified that they had access to the Cylinder Documents located on Sonoco's ink room computer. *See* Ex. 27 to Kravitz Decl., June 8, 2021 Dep. Tr. of Jeff Johnson, D.E. 373-29, at 182:1-183:1; Ex. 25 to Kravitz Decl., Feb.

4, 2021 Dep. Tr. of Timothy Williams, D.E. 373-27, at 154:20-155:12, 161:19-162:19.  In addition, Mr. Johnson testified that he printed anywhere from twenty to fifty Cylinder Documents and removed them from the ink room.  Ex. 27 to Kravitz Decl., June 8, 2021 Dep. Tr. of Jeff Johnson, D.E. 373-29, at 182:1-183:1.  Mr. Williams testified that he printed certain Cylinder Documents because he believed Hugo Giorgio was attempting to present false evidence of cylinder performance.  *See* Ex. 25 to Kravitz Decl., Feb. 4, 2021 Dep. Tr. of Timothy Williams, D.E. 373-27, at 155:11-14, 162:2-164:18.  The volume of Cylinder Documents that Mr. Williams printed is unclear.  As to those documents, the Court finds that Flint controlled them.  Mr. Johnson was a Senior Manager and Mr. Williams was Flint's Technical Service Manager.  In those managerial capacities, they exercised dominion and control over the documents that they printed and, at least in Mr. Johnson's case, later discarded.

However, the Court cannot impute to Flint control over the entire universe of Cylinder Documents based on Johnson's and Williams's control over a comparatively modest subset of the documents.  Defendants suggest that Flint had "thousands" of Cylinder Documents, but preserved only nineteen of them, excluding duplicates.  Joint Mot., D.E. 373-1, at 14.  For this assertion, Defendants rely entirely on Johnson's and Williams's testimony that they printed a subset of Cylinder Documents and then discarded them.  *See id.*  There is no evidentiary basis to conclude that Flint, whether through Johnson, Williams, or otherwise, controlled the remaining Cylinder Documents.  Moreover, Sonoco's counsel, Ross Shealy, informed Defense counsel that "it was not normal practice for the forms to be generated in paper form, and they were only retained *electronically* while the designs/jobs are active.  Once they were obsoleted, the information was deleted from Sonoco's system."  Ex. 28 to Kravitz Decl., Emails Between Counsel, D.E. 373-30, at 6 (emphasis added).  Mr. Shealy further stated, "The [Cylinder Documents] were deleted whenever the design (the graphics etched on the chrome) became

obsolete. Designs become obsolete when the packaging is no longer used/ordered by Sonoco's customer. That happens all the time." *Id.* at 3.

Therefore, the Court cannot find that Flint had control over any hard-copy Cylinder Documents other than the subset that Flint employees testified they printed, and those produced in this litigation.

### d.  Actual Suppression

Even if the Court found in Defendants' favor on the issue of Flint's control of the Cylinder Documents, it remains that Defendants have not demonstrated actual suppression. There is no evidentiary basis to conclude that Flint acted with an intent to deceive the Court or Defendants, or to suppress the truth. That applies both to the printed documents that Mr. Johnson discarded, and the other Cylinder Documents that Defendants theorize Flint should have produced in this litigation.

Defendants point to the deposition testimony of Mr. Williams and Mr. Johnson to urge the Court to conclude that Flint actually suppressed the Cylinder Documents. The Court analyzes each. Starting first with Mr. Williams's testimony, it is not clear whether Mr. Williams discarded those Cylinder Documents that he printed. He first testified that he threw away those Cylinder Documents that he had printed. Ex. 25 to Kravitz Decl., Feb. 4, 2021 Dep. Tr. of Timothy Williams, D.E. 373-27, at 155:9-156:1. He could not recall when. However, he later equivocated, and testified as follows:

> Q:  You can't approximate this, whether it was January 2015 or some time in 2018? You have absolutely no way of gauging the time you threw these documents away?
>
> . . .
>
> A:  No. I had thousands of pages of stuff laying around. Sometimes you throw them away. I have no idea.

. . .

> Q:  So you did throw away documents in 2018 when you left Flint, is that correct?
>
> A:  I believe I already stated that I did.
>
> Q:  Okay.  But you're not sure what documents you threw away at that time?
>
> A:  No.
>
> Q:  Okay.  And you're not sure whether those documents included the Cylinder Box Reports?
>
> A:  Nope.

*Id.* at 159:13-160:15.

Even assuming Mr. Williams discarded the Cylinder Documents he had printed, Defendants have not shown that Mr. Williams, or Flint for that matter, acted with the necessary intent to actually suppress evidence.  Instead, Mr. Williams testified that he threw away a lot of documents when he was "[c]learing an office[.]"  *Id.* at 155:13-156:7, 159:13-22; 160:4-15.  Even if the Court found that Mr. Williams did throw out Cylinder Documents, any destruction by Mr. Williams appears to be, at most, negligent.  Mr. Williams had no use for the documents once he left Flint's employ.  Thus, the Court cannot find that Flint actually suppressed the evidence by virtue of Mr. Williams's conduct.

Defendants' contention concerning the actions of Jeff Johnson likewise fails.  Mr. Johnson testified that he threw away Cylinder Documents.  Ex. 27 to Kravitz Decl., June 8, 2021 Dep. Tr. of Jeff Johnson, D.E. 373-29, at 183:2-9.  However, the deposition testimony does not reflect any intent to suppress evidence.  Instead, Mr. Johnson testified:

> Q:  And you didn't intentionally destroy whatever it is that you printed off of Sonoco's computer?
>
> [Objection to form.]

> A:  Intentionally, well, it was the fact I lost my office, I had no storage space and then I moved.  So a lot of that stuff got purged.
>
> Q:  All right.  I understand that to mean it wasn't intentional, right?
>
> [Objection to form.]
>
> A:  Yeah.  It was not like that it was throwing them away to hide something, no.  I was throwing them away because I had nowhere for them.

*Id.* at 183:2-17.  He further testified that the destruction of the Cylinder Documents had to do with losing his office:

> Q:  And did you keep those reports for some period of time that you would print it?
>
> A:  For some period of time.  And probably when I lost my office is probably when most of them got pitched.
>
> Q:  And when did you lose your office?
>
> A:  Oh gosh, maybe 2015.  I don't know.  I don't remember.
>
> . . .
>
> Q:  Okay.  And your recollection then is some time in 2015 you lose your office and at that point in time these Cylinder Location History Reports are destroyed?
>
> A:  Well, I guess I don't know if destroyed is the word.  They were put in the trash.
>
> . . .
>
> Q:  Okay.  But it was in connection with the loss of your office?
>
> A:  Primarily, yeah.
>
> Q:  Okay.  And is it – the reason why the reports were put in the trash that you had nowhere else to place them?
>
> A:  Yeah.

*Id.* at 234:18-236:4.

At most, the employees' actions speak to mere negligence: throwing away documents after leaving Flint's employ, after having lost office space, or that the employees no longer required the documents.  That clearly falls well short of the requisite intent to find spoliation. *Kuhar*, 2018 WL 6363747, at *6 (finding that spoliation does not occur where the purported destruction of the evidence "was a matter of routine with no fraudulent intent") (quoting *McCann*, 2014 WL 282693, at *6 n.5).  Therefore, Defendants' motion for spoliation sanctions as to the hard-copy Cylinder Documents is denied.

### ii.   *Spoliation of Electronically Stored Cylinder Documents*

Defendants also posit that the Cylinder Documents were computer-based, and thus, constitute ESI.  To determine whether a party spoliated ESI, the Court looks to Federal Rule of Civil Procedure 37(e).  That Rule, as amended, provides:

> (e)   Failure to Preserve Electronically Stored Information.   If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> >
> > (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> >
> > > (A)   presume that the lost information was unfavorable to the party;
> > >
> > > (B)   instruct the jury that it may or must presume the information was unfavorable to the party; or
> > >
> > > (C)   dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).  Rule 37(e) only applies "if the information was lost because the party

failed to take reasonable steps to preserve the information." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. The moving party "must necessarily show that the evidence at issue actually existed, since spoliation sanctions can be imposed only when the party seeking such sanction demonstrates that relevant evidence has been lost." *Europe v. Equinox Holdings, Inc.*, 592 F. Supp. 3d 167, 175-76 (S.D.N.Y. 2022) (quoting *La Belle v. Barclays Cap. Inc.*, 340 F.R.D. 74, 82 (S.D.N.Y. 2022) (internal quotation marks omitted)); *see also Manning v. Safelite Fulfillment, Inc.*, Civ. No. 17-2824, 2021 WL 3542808, at *3 (D.N.J. Aug. 11, 2021) (collecting cases).

The parties disagree over the threshold issue of whether ESI was actually lost. Defendants acknowledge that they cannot "identify the specific forms that were destroyed because the reports were destroyed." *See* Joint Mot., D.E. 373-1, at 36-37; Reply Br., D.E. 388, at 21-22. And beyond those printed forms that Mr. Johnson and Mr. Williams had, it is difficult to ascertain how many, if any, relevant Cylinder Documents were deleted in electronic form. However, Sonoco's counsel conceded that the Cylinder Documents would be automatically deleted whenever a design became obsolete. Ex. 28 to Kravitz Decl., Emails Between Counsel, D.E. 373-30, at 3, 6. Accordingly, the Court is satisfied that ESI was lost.

Next, the Court must determine whether ESI was spoliated under either Rule 37(e)(1) or (2). Under Rule 37(e)(1), the moving party must "come forward with plausible, concrete suggestions as to what the lost evidence might have been and a showing that its loss materially affected the substantial rights of the adverse party and is prejudicial to the presentation of the case." *United States v. Bayer Corp.*, Civ. No. 05-3895, 2020 WL 13189533, at *7 (D.N.J. Apr. 16, 2020) (quoting *Magnetar Techs. Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp. 2d 466, 481 (D. Del. 2012) (internal quotation marks and alterations omitted)). "An evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's

importance in the litigation." Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment.

Defendants have made a plausible suggestion as to what the lost evidence might have been—*i.e.*, the Cylinder Documents. But they have failed to show prejudice. For the reasons explained above, the Court has found that Flint's duty to preserve Cylinder Documents, or at least those it could control, arose in July 2014. The problems with the ink production underlying this litigation principally, if not entirely, occurred between May 2013 and Richardson's disclosure that CZS had been switched out for CZM. Therefore, Cylinder Documents produced after the July 2014 timeframe would have minimal relevance to Flint's claims. Defense counsel conceded as much at oral argument. When asked about the relevance of post-July 2014 Cylinder Documents, Defense counsel responded: "It's substantially limited – I mean, there's no – few cylinder reports that are going to be relevant at that point in time." Oral Argument Tr., D.E. 407, at 39:23-40:12.

Second, while Defendants argue that they will be prejudiced without the Cylinder Documents, they also admit that the trier of fact may "fill gaps" in this case even without them. Reply Br., D.E. 388, at 23-24 ("It will result in extensive additional fact and expert testimony to fill gaps that would otherwise not have existed. . . . Defendants are forced to look at questionable secondary evidence, such as the Rayment Report, which suggests cylinder wear before CZM was introduced to Flint's ink."). Defendants are not left without evidence to defend this action, as evidenced by the voluminous records produced on the instant motion. Therefore, the Court cannot conclude that Defendants have been prejudiced by Flint's failure to preserve any Cylinder Documents stored electronically.

Additionally, under Rule 37(e)(2), Defendants have failed to prove, and the evidence does not show, that Flint intended to deprive the Defendants of the ESI. Flint's counsel has maintained, with ample support from Sonoco's counsel, that the deletion of the Cylinder

Documents on Sonoco's computer system occurred when a design became obsolete. Emails Between Counsel, D.E. 373-30. Defendants have submitted nothing to the contrary, let alone evidence of bad faith. *Goldrich v. City of Jersey City*, Civ. No. 15-885, 2018 WL 4492931, at *8 (D.N.J. July 25, 2018). Thus, the Court cannot conclude that Flint "acted with the intent to deprive another party of the information's use in the litigation," a necessary predicate to finding spoliation of ESI. Defendants' motion for spoliation sanctions concerning the Cylinder Documents is therefore denied in its entirety.

### C. Whether Flint Spoliated Evidence when it Contaminated the Basket Mills

Finally, the Court considers whether Flint spoliated evidence when it mixed the contents of one basket mill of steel shot with eight basket mills of ceramic shot into a single vat. Joint Mot., D.E. 373-1, at 21-23. That Flint mixed the basket mills into one vat is not contested. Ex. 24 to Nuñez Decl., July 29, 2019 Dep. Tr. of Timothy Wagner (Product Manager, Flexible Film, NA, Flint), D.E. 384-25, at 16:14-20. Flint also does not dispute (i) that the basket mills were within its control, Pl.'s Opp'n, D.E. 384, ¶¶ 5, 27 (stating that the mills were located within its Lebanon plant), or (ii) that it had a reasonably foreseeable duty to preserve the evidence, *id.* at 28-32 (opposing Defendants' arguments on intent, relevance, and prejudice, but not the duty to preserve). Thus, the Court considers only whether Defendants have established (i) that the mills are relevant to the claims or defenses in this matter, and (ii) that Flint actually suppressed or withheld the evidence.

Flint's basket mills are clearly relevant, because whether and how much steel shot mixed with the ceramic shot might bear on causation. Specifically, the parties disagree over whether the migration of steel shot into baskets containing ceramic shot contributed to Flint's ink becoming abrasive. *Compare* Joint Mot., D.E. 373-1, at 21, *with* Pl.'s Opp'n, D.E. 384, at 29-30. The parties' experts offer contradictory opinions on this issue. *Id.* Relatedly, the parties dispute

how much steel shot mixed into the basket mills containing ceramic shot before the contamination.  Flint argues that only a dozen steel shot mixed into a ceramic mill, while Defendants opine that Flint mixed 50% steel shot with the ceramic shot.  *Compare* Pl.'s Opp'n, D.E. 384, ¶¶ 24, 26; Ex. 6 to Nuñez Decl., Nov. 18, 2020 Dep. Tr. of Ken Gregor (Production Manager, Flint), D.E. 384-7, at 279:14-24, *with* Ex. 14 to Kravitz Decl., Report of Don Duncan, D.E. 376-14, at 6, ¶ 42 *and* Joint Mot., D.E. 373-1, at 22.

However, the Court finds that Defendants have not proven that Flint actually suppressed or withheld evidence because of the contamination.  Beyond Defendants' bare assertion that "[n]one of these actions [was] accidental[,]" Joint Mot., D.E. 373-1, at 24, the record is devoid of evidence to support of the contention that Flint mixed the contents of the basket mills into the single vat to actually withhold or suppress the evidence.  *See Masterank Wax, Inc.*, 2022 WL 19927891, at *5.  Defendants posit that a prior instance of mixing steel shot into a ceramic mill establishes this instance was intentional.  Even if the Court were to draw such an inference, it would fall well short of the mark.[11]  First, it would require the Court to disregard the fact that

---

[11] Defendants also suggest that Flint had a nefarious purpose in mixing the nine mills into a single vat—specifically, to obfuscate the percentage of steel shot.  Joint Mot., D.E. 373-1, at 16-17.  That is significant, they argue, because Flint's root cause memo allowed that mixing steel and ceramic shot might have caused the abrasion problems Flint was experiencing with its ink.  *Id.*  The root cause memo was one part of the extensive and iterative investigation, discussed above, into the possible causes of Flint's ink problems and Sonoco's cylinder wear.  It sought to evaluate myriad potential causes of those problems.  However, the root cause memo does not state that mixing steel shot with ceramic shot caused the ink-abrasion problems that Flint and Sonoco began to experience in May 2013.  *See, e.g.,* Ex. 50 to Nuñez Decl., Root Cause Memo, D.E. 385-51, at 5.  Nor does it state that mixing the shot was the cause of Sonoco's cylinder wear.  *Id.*  Instead, the root cause memo explained that when shot types of different densities are mixed, "harder media fractures and wears down media of lower hardness and density."  *Id.*  The root cause memo, and an earlier version of it, also allowed that shot of different vintages might cause abrasion, but did not specify that ceramic and steel shot, when mixed, caused the problems first experienced in May 2013.  *Id.*; *see also* Ex. 29 to Kravitz Decl., Root Cause Memo, D.E. 376-29.  Therefore, Defendants' argument—that the prior instance of mixing shot, considered with the root cause memo, demonstrates actual suppression—is unpersuasive.

Flint actually attempted to preserve evidence by storing the shot in fifty-gallon drums.  Ex. 24 to Nuñez Decl., July 29, 2019 Dep. Tr. of Timothy Wagner (Product Manager, Flexible Film NA, Flint), D.E. 384-25, at 15:8-17:24.  But more importantly, that inference, unaccompanied by facts to establish the requisite intent, would be an insufficient basis to find actual suppression. *See Kuhar*, 2018 WL 6363747, at *9 ("Although the Court 'has discretion to draw inferences from the record on a party's intent, it strays beyond the bounds of its discretion when . . . there is no factual basis to do so.") (quoting *Bull*, 665 F.3d at 74).

Thus, the Court cannot conclude that Flint's contamination warrants a finding of spoliation.  *Van De Wiele*, 2015 WL 4508376, at *4; *Kuhar*, 2018 WL 6363747, at *6.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' motion is denied.  An appropriate Order shall accompany this Opinion.

*s/ Michael A. Hammer*
**United States Magistrate Judge**

**Dated:** June 29, 2023